## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN JIMERSON**, *et al.* | § | |
| **Plaintiffs**, | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:20-CV-02826-L** |
| | § | |
| **LT. MIKE LEWIS**, *et al.*, | § | |
| **Defendants.** | § | |

### APPENDIX TO
### PLAINTIFFS' RESPONSE TO OPPOSE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE MAGISTRATE JUDGE:

COME NOW ALL PLAINTIFFS. [hereinafter referred to as "Plaintiffs" or "Non-Movants"], to file this pleading as An Appendix to Plaintiffs' Response to Oppose Defendants' Motion for Summary Judgment; and Plaintiffs/Non-Movants, new submit as summary judgment evidence the following materials, which they believe raise fact issues sufficient to overcome the present defense request for summary judgment; and now Plaintiffs would respectfully show unto the Court as follows:

### I.
### <u>LIST OF EXHIBIT ITEMS</u>

The following listed/identified exhibits are attached to, and made for all purposes a part of, this Appendix pleading :

EXHIBIT 1:   Memorandum of April 7, 2019, from Chief Goolsby to Assistant Chief Wiser, to initiate an Internal Affairs investigation into the wrongful action at and against the Jimerson-Parks home and its occupants on 27 March 2019 [EXHIBIT 4-A to the deposition of Chief Goolsby]

EXHIBIT 2:   Declaration of Mrs. Rebecca DeSantis

EXHIBIT 3:   Declaration of Jasamea Jimerson

EXHIBIT 4:    Declaration of James Parks

EXHIBIT 5:    Declaration of Karen Jimerson

EXHIBIT 6:    Eleven (11) pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] show admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant on the occasion in question.

EXHIBIT 7:    Ambulance Records pertaining to Jasamea Jimerson and Karen Jimerson

EXHIBIT 8:    Robert Gill Vita

EXHIBIT 9:    Declaration of Robert Gill

EXHIBIT 10:  Chief Goolsby Deposition excerpts [the pages that are referenced in the depo index as it appears below at paragraph II.]

EXHIBIT 11:  Chief Goolsby signature page and Errata Sheet page, from Chief Goolsby Deposition

EXHIBIT 12:  Photo of Jimerson residence showing a wheelchair ramp with handrails in front of it [EXHIBIT 4-D to the deposition of Chief Goolsby]

EXHIBIT 13:  Photo of front door to Jimerson residence after it was rammed and busted open by SWAT Team [EXHIBIT 4-E to the deposition of Chief Goolsby]

EXHIBIT 14:  Photo of a window of the Jimerson residence after it was broken by the SWAT Team [EXHIBIT 4-F to the deposition of Chief Goolsby]

EXHIBIT 15:  Photo of other windows of Jimerson residence broken by the SWAT Team, and showing damage to the blinds and curtains inside the home due to the breaking of windows [EXHIBIT 4-G to the deposition of Chief Goolsby]

## II.

## INDEX TO EXCERPTS OF GOOLSBY DEPOSITION

**[which excerpts are presented as EXHIBIT 10 attached to this Appendix]**

**DEPOSITION INDEX**

**[DEPO OF GOOLSBY]**

PAGE          CONTENT

pp.5-6        Witness Wade Goolsby sworn [5]; He is Police Chief, City of Waxahachie, for the
              past 6 years [6].

pp. 8-9       He has given prior testimony and understands the formalities of being under oath.

pp.9-12       EXHIBIT 4 identified [9] and questions show it comes within business records
              exception, totals 93 pages, and is actually maintained by Chief Goolsby in his own
              office making him the principal custodian.

pp.16-18      Chief Goolsby knows all of the individuals, most of whom are police officers
              [including Brent Dunn, Dustin Koch, Andrew Gonzales, Derrick Young, Brian
              Fuller, James Lewis, OT Glidewell, James Taylor, and Derek Behringer; and
              Lieutenant Lewis, and Stephen Sanders who was a sergeant in the department]; on
              or about 27 March 2019 they were the SWAT team of the Waxahachie P.D.; and on
              that date the SWAT team went from Waxahachie to Lancaster to serve a warrant; and
              now, since they are identified, they will be referred to in the deposition [see page 18,
              lines 18-23] as either "defendants" or "the defendants" or "the SWAT team"]

p. 25         EXHIBIT 4 contains all of the written records of the Waxahachie P.D. which relate
              to the incident when the SWAT team entered the Jimerson home on 27 March 2019.

pp. 25-26     Goolsby authorized the use of the SWAT team (25). The warrant was not directed to

the home of the Jimerson family [it mentioned another address], and the warrant made no mention or reference to any of the plaintiffs in the Jimerson family (26).

pp. 27-28    SWAT teams are equipped with body armor, and lethal weapons (27), and the weapons include pistols and rifles, and glass breaking equipment [sometimes called "the break-in-rake"] (28).

p.28    Sergeant Sanders [one of the defendants] used the break-in-rake equipment on the Jimerson home.

pp. 31-32    The SWAT team is equipped with "flash-bang equipment" and "zip-tie equipment".

p.32    Flash bangs are used as a "distraction" to allow the SWAT team "to get in and take control....before the person(s) realized what was happening".

p. 32    Zip-ties are used for the purpose of "temporarily detaining somebody".

p. 33    Chief Goolsby would not expect the SWAT team to use zip-ties or flash-bangs against people not the subject of the warrant [lines 12-15]. He would not expect the SWAT team to use flash-bangs or zip-ties against a physical location or residence which was not the subject of their warrant [lines 16-20].

pp. 33-34    Goolsby does not know how long the SWAT team was at the Jimerson's residence on 27 March 2019 [page 33, lines 21-23]; He does not have personal knowledge about this [page 34, lines 1-2].

pp. 34-35    The documents at the Police Department [EXHIBIT 4] do not contain a time line showing when the SWAT team got to or left the Jimerson residence except for "one reference as to when they left" [see page 34, lines 19-20].

pp. 34-35    The one reference to when the SWAT team left indicates it left at approximately 12:45 a.m. on 28 March 2019.

p. 35        Goolsby has not seen the ambulance/EMS records pertaining to when the ambulance
             came to the Jimerson residence on the evening of 27 March 2019, and does not know
             if the ambulance came from Lancaster or Waxahachie [lines 6-16].

p. 35        Goolsby does not know whether the ambulance records show a time when the
             ambulance got the call, or was dispatched, or got on scene, or left, as he has not seen
             the records [lines 20-25].

p. 40        The after action report [which is within EXHIBIT 4, the Waxahachie Police
             department record] indicates that the SWAT team commander was Lieutenant Mike
             Lewis [lines 6-10].

pp.40-41     The warrant was a "no-knock warrant" (page 40); so this "means that you can make
             entry without waiting for someone to come to the door....you can force entry and
             make entry without knocking...." according to Goolsby; but the warrant still requires
             one to have to go with it to the address mentioned in the warrant [lines 3-12].

pp. 41-42    The SWAT team is equipped with devices to force entry through a door, including
             a large pry bar and also a ram device.

pp. 43-44    On April 2nd 2019, Chief Goolsby sent a memo to assistant Chief Joe Wiser [43] to
             order an Internal Affairs Investigation (44).

p. 44        Goolsby ordered the investigation into the actions of the SWAT team on 27 March
             2019 "because we were serving a warrant for 573 Eighth Street in Lancaster [but
             instead] went to the house at 593 Eighth Street."[lines 21-23]

pp. 44-45    Goolsby thought this was significant enough to order an Internal Affairs Investigation
             (44-45) "because property damage occurred, people were subjected to it....and **those
             kind of mistakes shouldn't happen**." (45). [lines 2-4]

p. 45        Lieutenant Mike Lewis was the SWAT commander on the scene; he has stated that

he directed the team to go to 593 Eighth Street, mistakenly. (see especially at lines 10-14).

p. 47      Chief Goolsby states "**they shouldn't have gone to the wrong house**." [lines 3-4]. That's what concerned Goolsby and made him decide there was a need for an Internal Affairs Investigation [lines 5-8].

p. 47      Asked if the SWAT team should do something like this again somewhere in the future by going to a house that's not the subject of a warrant, Chief Goolsby answered "**No**." [see at lines 9-15].

p. 47      The SWAT team should not have gone into the plaintiffs house on the occasion in question [lines 16-19]; and as a result Lieutenant Lewis ended up getting suspended without pay for a while because of this [lines 20-23].

p. 48      Sergeant Sanders [a defendant/member of SWAT team] before entering the residence of the plaintiffs broke out at least 3 of the windows with the break-in-rake device [see lines 2-6].

p. 48      Goolsby does not know whether Sanders could have done all of these things within 10 seconds [see at lines 7-17].

p. 50      Sergeant **Sanders** submitted a **statement** saying that he was also at fault, and it states in part "**I share responsibility with Lieutenant Lewis**" [see at lines 12- 22]. [Note as indicated in the deposition, this testimony refers to pages 18 and 19 of EXHIBIT 4].

p. 51      **Sanders** in his **statement** to the internal affairs group indicated in part: "By error and self-admittance of fault, the WPD SWAT team, including myself as team leader....executed the search warrant at the wrong address, 593 Eighth Street...." According to the testimony of Goolsby [see especially at lines 3-7] the Goolsby testimony also indicates that in the same confession document submitted by Sergeant

**Sanders**, Sanders **stated** in part "**Lieutenant Mike Lewis**, SWAT team **commander has shouldered** the entire **blame** for the operation's initial and **understandably unacceptable mistake**." [see at lines 13-16] and, according to the testimony of Goolsby, in the same confession document Sergeant **Sanders** also **stated** that: "Although Lieutenant Lewis had overall command and control of the operation...**I, as team leader, also share responsibility and blame**." [see at lines 20-23]...[and note, as indicated at page 51, line 24, thru page 52, line 2, that the confession document which appears as part of EXHIBIT 4 was also marked as EXHIBIT 4-B].

p. 53      Witness agrees that after he ordered the Internal Affairs Investigation various pieces of evidence were looked at and then assistant Chief Wiser did a report [lines 5-11] and that report is labeled as EXHIBIT 4-C [lines 15-17] and actually Page 53 shows that this report is Page 36 within EXHIBIT 4.

p. 55      The Wiser report says **"reasonable and normal protocol was completely overlooked"** [lines 4-6].

p. 55      The Wiser report details ways in which the houses have different numbers [target house and plaintiff house] [lines 7-10].

p. 56      Target home was similar to plaintiff home but had several defining characteristics according to the Wiser report, including one house having a wheelchair ramp complete with handrails; one house having a chain-linked fence in the front yard; both houses being clearly marked with address numbers affixed to both homes front facade and both being marked with house numbers on the outer curbing [lines 8-16].

p. 57      The Wiser report says that the residents located at 593 Eighth Street, Lancaster, TX, was wrongfully breached and entered in a dynamic manner by the Waxahachie SWAT team on March 27, 2019. [lines 3-10]

pp. 57-58  The probable cause affidavit [starting at Page 50 in EXHIBIT 4 as indicated at lines

11-14 of Page 57] makes no mention of any of the plaintiffs or of their residence [see especially Page 57, line 22 - Page 58, line 1].

p. 58        When asked if the Chief would agree that entering the wrong house by the SWAT team involved poor judgment he responds "I would agree that it was a mistake." [lines 13-17]

p. 59        The Wiser report states that: **"the mistakes made were significant. A home was entered illegally by members of our police department"**. [lines 14-19]

pp. 61-62    Chief Goolsby did not except in writing to the part of the Wiser report that stated **"a home was entered illegally** by members of our police department" [see especially Page 61, line 19 - Page 62, line 2].

p. 62        When asked if he would expect a **competent** police officer under his command to make the kinds of mistakes made by the SWAT team the Chief answers "<u>No, I wouldn't expect it....</u>" [lines 9-13].

p. 62        All of the officer members of the police department know what <u>probable cause</u> is.

p. 63        All of the officers under his command at the time of 27 March, 2019 <u>knew</u> about the requirement of having a <u>warrant</u> to do searches and seizures [lines 1-10].

p. 63        And on 27 March 2019 Chief Goolsby and his officers also knew about the 4th <u>Amendment</u> to the Federal Constitution that speaks to <u>searches and seizures</u> [lines 11-15].

p. 63        When he authorized this operation, Chief Goolsby did not give authority to the SWAT team to go beyond the bounds of what they were permitted to do under the warrant which had been issued on the occasion in question [lines 17-23].

p. 64        The correct way to do the job that the SWAT team was sent to do was to go to the

location mentioned in the warrant [lines 22-25].

p. 65    When he reviewed the Wiser reports and statements the Chief concluded **the SWAT team had acted incorrectly when they entered the wrong house [lines 1-7]; and because Lieutenant Lewis was in command he was the one that actually got suspended for a while** [lines 8-12].

pp. 67-68    There is nothing in the information [EXHIBIT 4] compiled by Chief Wiser that appears to indicate that any member of the Jimerson family was rude to the officers or was observed doing anything that appeared to be dangerous to the officers or themselves [Page 67, line 20 - Page 68, line 1].

p. 68    There is nothing in the information gathered in the investigation to indicate that any member of the Jimerson family was observed doing anything that looked like bad behavior [lines 2-12].

p. 72    The Wiser report says that on the occasion in question reasonable and normal protocol was overlooked [lines 17-22]. Lieutenant Lewis did not deny that he had made this mistake [lines 23-25].

p. 73    Chief agrees that if Ms. Jimerson recalls that she was compelled to lay face down on the floor in the bathroom where she was just finishing a bath and with no clothing on from the waist down for at least 10 minutes, that recollection on her part would not be consistent with a recollection that all of the officers were in and out of the house within 15-20 seconds [lines 1-14].

pp. 76-77    Both the Chief and Assistant Chief Wiser were concerned that the SWAT team went to the wrong house, and that is why the Chief issued an order for an Internal Affairs Investigation, and **Internal Affairs Investigations** are **not done lightly** but are done for things that are serious [Page 76, line 16 - Page 77, line 3].

p. 78    There was nothing in the warrant that authorized the SWAT team to go two houses down and search that house also [lines 1-5].

---

p. 78   The Waxahachie P.D. and City of Waxahachie paid for repairs to be made to the house that the Jimersons were living in- (NOTE it was a rent house) [lines 17-21].

pp. 79-80   Both Lieutenant Lewis and Chief Goolsby feel remorse and regret about the difficulty caused to the Jimerson family when the SWAT team came into their home [Page 79, line 22 - Page 80, line 4].

p. 80   Chief Goolsby was sufficiently concerned that he does not want it to happen again to anyone in the future [lines 5-9].

p. 89   The information compiled by the Waxahachie P.D. Internal Affairs Investigation does not say the time that the operation started, but indicates that it did not end until **1:30** in the morning [lines 10-16].

p. 90   The findings of Chief Wiser show that the target house and the plaintiff house differed and were marked with numbers, and one house had a ramp with handrails for a wheelchair and the target house had a chain-linked fence [lines 18-25]. The photo appearing at page 72 of EXHIBIT 4 is marked 573 and appears to be the target house and does not have a wheelchair ramp in front of it, but the photo of a house marked as Page 73 of EXHIBIT 4 does have a very visible wheelchair ramp with guardrails [lines 9-23].

p. 92   The photo on Page 73 of EXHIBIT 4 shows a house with a wheelchair ramp and guardrails [lines 6-19]. The photo at Page 72 of EXHIBIT 4 shows a house at 573 West Eighth Street which does not have a wheelchair ramp [lines 20-24].

p. 94   The photo at Page 77 of EXHIBIT 4 shows a broken window and appears to be marked indicating 593 Eighth Street [lines 4-14] depicting a photo of a broken window at the plaintiffs residence.

pp. 94-95   The photo at Page 79 of EXHIBIT 4 appears to be of 593 Eighth Street and shows disarray or damage to windows or blinds or both, which damage is consistent with use of a break-in-rake on windows [Page 94, line 15 - Page 95, line 4].

p. 95   With regard to the picture numbered Page 77 of EXHIBIT 4, the broken window damage is consistent with the use of a break-in-rake device on the window [line 5- line 9].

p. 96   The DEA did not complain to the Waxahachie Police Department about this "operation" having gone sideways when entry was made into the wrong location, and the Waxahachie P.D. did not ever complain to the DEA about that [line 6- line 13].

p. 98   Chief Wiser has consistent concern on his own to decide it was important to have an Internal Affairs Investigation without seeing anything from anyone outside the department [line 9-line 15].

pp. 98-99   Some pictures contained in EXHIBIT 4 are marked as separate sub-exhibits including the picture at Page 73, marked as EXHIBIT 4-D, which is the house that has the ramp in front of it [see Page 98, lines 20-24] and the picture at Page 74 of EXHIBIT 4 which looks like a door casing [Page 98, line 25 - Page 99, line 16] which is marked as SUB-EXHIBIT 4-E; and Page 79 of EXHIBIT 4, now marked as EXHIBIT 4-G; and also Page 77 of EXHIBIT 4, which is marked as EXHIBIT 4-F [see Page 99, lines 17-24].

p. 101   On the occasion in question the DEA was trying to provide real-time intelligence through communications [lines 8-14].

p. 102   **The Chief does not think he made the wrong decision, individually or through the department, when Lieutenant Lewis was sanctioned for a few days of unpaid leave** [lines 18-23].

p. 103   The term the department would probably use instead of "sanctioned" for what

happened to Lieutenant Lewis would be "**suspended** or **disciplined**". [lines 3-9]

pp. 103-104    Chief Goolsby agrees that while **police officers** have a hard job which is often dangerous, even so they have a **constant obligation to do everything they can to protect innocent citizens** [Page 103, line 22 - Page 104, line 2].

p. 104    **It is important for police officers to obey rules and regulations of their departments** [line 3- line 5].

p. 104    **It is important for police officers to obey rules and regulations that take the form of laws and constitutional provisions** [lines 6-9].

## III.

## RELIEF REQUESTED

Plaintiffs contend that they have now brought forward summary judgment evidence in this Appendix which is sufficient to show that there are fact issues that defeat the defense request for summary judgment. Accordingly, Plaintiffs ask the Court to deny the request for summary judgment as to each, and every, defendant; and to permit this case to move forward on the jury docket of the Court.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray that the Court to grant relief as requested in Plaintiffs' Response to Oppose Defendants' Motion for Summary Judgment pleading, by Denying the Defendants' Motion for Summary Judgment; and Plaintiffs also continue to seek all such other and further relief, both general and special, at law and in equity, to which they may be shown to be entitled under law, and their pleadings, and the record as it may develop in this case, and shall ever so pray.

Respectfully submitted,


*/s/ Ernest (Skip) Reynolds III*
Ernest (Skip) Reynolds III
State Bar Number 16806300
Law Office of Ernest (Skip) Reynolds III
201 Main Street, Suite 600
Fort Worth, Texas 76102-7423
Telephone: (817) 332-8850
Facsimile: (817) 332-8851
Email: ereynolds3@aol.com
**LEAD COUNSEL FOR PLAINTIFFS,
KAREN JIMERSON, JASAMEA JIMERSON,
JYDEN JIMERSON, XAVIEN PARKS, and
JAMES PARKS**


*/s/  Rose L. Romero*
Rose L. Romero
State Bar No. 17224700
Law Office of Romero Kozub
235 N.E. Loop 820, Suite 310
Hurst, Texas 76053
Telephone: (682) 267-1351
Fax: (817) 887-2133
E-mail: rose.romero@romerokozum.com
**CO-COUNSEL FOR PLAINTIFFS,
KAREN JIMERSON, JASAMEA JIMERSON,
JYDEN JIMERSON, XAVIEN PARKS, and
JAMES PARKS**


**ATTORNEYS FOR PLAINTIFFS,
KAREN JIMERSON, et al.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 26 August 2021, I electronically filed the foregoing document and all of its EXHIBITS with the clerk of the court for the United States District Court for the Northern District of Texas using the court's electronic case filing system.  It is believed that when this pleading is filed the ECF system will send a "Notice of Electronic Filing" to the following attorneys of record, as service of this document, by electronic means:

Mr.  Randy Montgomery
D. Randall Montgomery & Associates, P.L.L.C.
12400 Coit Road, Suite 560
Dallas, Texas 75251
Fax: 469-568-9323

Respectfully submitted,

*/s/ Ernest (Skip) Reynolds III*
Ernest (Skip) Reynolds III

# EXHIBIT 1

Memorandum of April 7, 2019, from Chief Goolsby to Assistant Chief
Wiser, to initiate an Internal Affairs investigation into the wrongful
action at and against the Jimerson-Parks home and its occupants
on 27 March 2019
[EXHIBIT 4-A to the deposition of Chief Goolsby]



# Memorandum

To:   Joe Wiser, Assistant Chief

From: Wade Goolsby, Chief of Police

Date: April 2, 2019

Re:   Administrative Investigation

On March 27, 2019, the Waxahachie SWAT team was requested to assist in the execution of a search warrant in the city of Lancaster at an address of 573 8th Street. The DEA HIDTA unit had requested the assistance based on the fact that they had made an arrest earlier in the day and had developed information that individuals at that residence were maintaining a large amount of drugs at that location.

On the evening of March 27, the DEA held a briefing on the situation and an execution plan was developed.  Photos of the residence were shown at the briefing and the address of the location was given.

However, upon execution of the warrant, the SWAT team made entry on the wrong residence. They forced entry at 593 8th Street which is two doors down from the correct location.

This error should not have occurred and I am submitting this complaint to initiate an investigation into the incident.  Specifically, Lt. Mike Lewis was the SWAT Commander on the scene and he has stated that he mistakenly directed the team to 593 8th Street.

EXHIBIT
4-A
PENGAD 800-631-6989

Waxahachie Police Department
*A Recognized "Best Practices" Agency*

1 | P a g e

# EXHIBIT 2

## Declaration of Mrs. Rebecca DeSantis

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN JIMERSON**, *et al.* | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-02826-L |
| | § | |
| **LT. MIKE LEWIS**, *et al.,* | § | |
| **Defendants.** | § | |

## DECLARATION OF Rebecca DeSantis

Pursuant to 28 U.S.A. section 1746, I, Mrs. Rebecca DeSantis, declare and state as follows:

1. ) My name is **Mrs. Rebecca DeSantis**. I am over twenty-one years of age and am capable and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. ) I am a resident of Lancaster, Texas, and my street address is 592 W. 8th Street. I live here with my husband, and we were living here in March, 2019. At that time I knew Karen Jimerson who was our neighbor across the street.

3. ) On the night of March 27 of 2019 I was at home with my husband. Suddenly we heard a loud "boom". We calmed our dogs because the noise got them upset, then I went to the window and I looked out and saw lights and police officers walking with "A-K's". I saw two police vans blocking the streets and I saw that the door of the Jimerson home was busted open. I was concerned for our neighbors, especially for the children, so I went across the street to check on them.

4. ) I went across the street about twenty minutes after my husband and I had heard the loud "boom". I had to ask one of the police officers before I could get into Karen Jimerson's house and he asked me why I wanted to go into the house. I told him I was concerned about the young boys. He let me go into the Jimerson home, and as I was going up to go inside I noticed that all the windows looked like they had been blown out, and when I entered the house I noticed that there was broken glass all over the house.

5. ) After I got into the house I found Karen Jimerson. She was sitting on a sofa and I noticed that

**DECLARATION OF REBECCA DESANTIS**                                                    1

she had glass on her shoulders and arms and she was bleeding from cuts that were on her body. Karen Jimerson was staring and had a blank stare, and I asked her if I could see the boys, and Karen Jimerson appeared to be in complete shock, and she was shivering and could barely speak to me at all, and she did not seem to know for sure where the boys were.

6. )   When I entered Karen Jimerson's house there were still police officers in the house. After I entered, I was in the house about five minutes. When I left to go home, I indicated that if Karen Jimerson or her family needed anything I would be across the street.  Police officers were still at the Jimerson home at that time.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Rebecca DeSantis*

Mrs.  Rebecca DeSantis

Executed the 23rd  day of August, 2021,  in Lancaster, Dallas County, Texas.

**DECLARATION OF REBECCA DESANTIS**                                    **2**

# EXHIBIT 3

## Declaration of Jasamea Jimerson

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| KAREN JIMERSON, *et al.*<br>**Plaintiffs,** | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 3:20-CV-02826-L |
| LT. MIKE LEWIS, *et al.*,<br>**Defendants.** | §<br>§ | FINAL on August 20, 2021 |

## DECLARATION OF JASAMEA JIMERSON

Pursuant to 28 U.S.A. section 1746, I, **Jasamea Jimerson**, declare and state as follows:

1. ) My name is Jasamea Jimerson. I am a natural born United States citizen, and I am capable and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. ) I am the biological daughter of Karen Jimerson, and the sister of the minors Jayden Jimerson [son of Karen Jimerson] and Xavien Parks [son of Karen Jimerson]. James Parks is the biological father of Xavien Parks and of Jayden Jimerson. We all lived together as a family unit on March 27, 2019, with Karen Jimerson being the mother in our family unit, and Mr. Parks being the father in our family unit.

3. ) I may sometimes in this declaration refer collectively to myself and Karen Jimerson and Jayden Jimerson and Xavien Parks and James Parks as "we" or as "us".

4. ) On March 27, 2019, I resided at a house located at 593 West 8th Street, in Lancaster, Dallas County, Texas. Karen Jimerson and Jayden Jimerson and Xavien Parks and James Parks also lived with me at that house, and we lived there as a family unit. Jayden and Xavien were little pre-school boys, and I [Jasamea] was a young pre- teen-aged girl. My date of birth is 08-27-2007.

5. ) On the evening of March 27, 2019, we were all at home and after it got dark and got to be bedtime we were all trying to settle down for the night. I was in my bedroom in bed and I know that my two little brothers were with Mr. Parks in another bedroom and he was getting them settled down for the night, and I know that my mother [Karen Jimerson] was trying to

**DECLARATION OF JASAMEA JIMERSON**                                      Page   1

take a bath at the end of the day as everyone was trying to settle down and go to sleep. We were not causing any trouble for anyone or misbehaving in any way, and we had no reason to expect that the police would come and attack our home.

6. )   Suddenly and unexpectedly there was a terrible noise and commotion around our house. I now know we were being attacked by police officers, but I had no reason to think the police officers would do this to us. All of this noise and commotion was not only unexpected, it was scary. I got up out of my bed, because of all of this commotion. I did not know exactly what to do and I was frightened.

7. )   The police officers attacking our house were breaking windows and making lots of noise. They broke down the door and came into the house. They never asked for permission or knocked on the door. They never warned us. We never gave them permission to come into our home.

8. )   Suddenly several police officers burst into my room. They had weapons and were making noise. At least two police officers grabbed me and threw me down on the floor face down on some glass, and my knee got hurt. They tied up my hands behind me using some kind of zip ties as handcuffs. They detained me and I was not permitted to move about freely. They searched through things in my room, and tossed things around in my room.  I do not know why.  They did not ask me for permission to do this, and I never gave them permission to do it.

9. )   These officers had guns and I was afraid. Also, I was a child at the time and they were big people. They were not polite to me. I was very scared.

10. )   The police officers never asked me for permission to come into my room or to come into my house. They were very rough and abrupt and loud in their treatment of me. They also never asked for permission to search around in my room, but they did search.

11. )   They tossed things around in my room and I do not know what they were looking for or why they were doing it. They made a mess. While they were in the house they broke some of our property.

12. )   I was detained and on the floor for a long time with my hands zip-tied behind me. I do not know exactly how long, but I am sure it was more than twenty minutes. During all of this time the armed  police officers were in the house, and in my room, and making all kinds of noise, and roaming about in the house as they pleased, and doing as they pleased, and it was frightening to me.  I was afraid they were going to hurt or kill my mother, or my brothers, or

**DECLARATION OF JASAMEA JIMERSON**                                      Page   2

Mr. Parks, or me. The police officers did not kill us. They did hurt me. I also know they hurt my mother, Karen Jimerson, and they hurt my little brothers, Jayden Jimerson and Xavien Parks.

13. ) The Police officers hurt me, and because of this injury I had to go directly from my house to a hospital emergency room in an ambulance on the night of March 27, 2019. The parts of my body that were injured by the police officers were my knee and my head which was aching from being thrown around. I did not have these injuries until I was roughed up by these police officers.

14. ) I know that my mother, Karen Jimerson, was not able to help me because the police officers had her under their command and custody in the doorway of the bathroom.

15. ) I know that Mr. Parks was not able to help me because he was trying to keep my little brothers safe so that they would not get hurt or killed by the police officers.

16. ) So I was all alone and I do not blame my mother or Mr. Parks for this. It was very scary. I blame the police officers. They are the ones who did it. There were a bunch of them and they were not acting nice at all.

17. ) I was removed from my house on the late night of March 27, 2019, on a gurney to go directly into the ambulance to go directly to the Emergency Room. I do not know exactly how long this transfer by gurney into the ambulance was after the police attacked our house, broke the glass, and busted down the front door, but I believe it was at least thirty or more minutes. At the time when I was taken out of the house on the gurney, there were still police officers in our house. I never told them they could stay in the house, and so far as I am aware nobody ever told them they could stay in our house, but these police officers just stayed and did as they pleased without permission.

18. ) What the police officers did to me and my family in our home on the night of March 27, 2019, scared me very badly and every time I think about it it still scares me. I am a natural born American Citizen and I never imagined that something like this could happen to me or anyone else in America, but it did. It is very frightening to me still to think about it.

19. ) I got to the Emergency Room and got treatment for my injuries to my knee and I am thankful to God that these injuries healed up, but sometimes I wonder if something bad like this could happen again and if I might get hurt worse or even killed by the police. I never imagined that the police would act this way until they busted into our house on the evening of March 27, 2019.

**DECLARATION OF JASAMEA JIMERSON**                                        Page   3

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Jasamea Jimerson

Executed the 20th day of August 2021 in Forth Worth Texas.

**DECLARATION OF JASAMEA JIMERSON**                                     Page   4

# EXHIBIT 4

## Declaration of James Parks

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN JIMERSON**, *et al.* | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:20-CV-02826-L** |
| | § | |
| **LT. MIKE LEWIS**, *et al.*, | § | **FINAL on August 20, 2021** |
| **Defendants.** | § | |

---

### DECLARATION OF JAMES PARKS

---

Pursuant to 28 U.S.A. section 1746, I, **James Parks**, declare and state as follows:

1. ) My name is James Parks. I am a natural born United States citizen, and I am capable and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. ) I am the biological father of the minors Jayden Jimerson [son of Karen Jimerson] and Xavien Parks [son of Karen Jimerson]. On March 27, 2019, these boys were both pre-school age. Along with Karen Jimerson and Jasamea Jimerson, we all lived together as a family unit on March 27, 2019, with me being the father in our family unit, and Karen Jimerson being the mother in our family unit.

3. ) I may sometimes in this declaration refer collectively to myself and Karen Jimerson and Jayden Jimerson and Xavien Parks and Jasamea Jimerson as "we" or as "us".

4. ) On March 27, 2019, I resided at a house located at 593 West 8th Street, in Lancaster, Dallas County, Texas. Karen Jimerson and Jayden Jimerson and Xavien Parks and Jasamea Jimerson also lived with me at that house, and we lived there as a family unit. Jayden and Xavien were little pre-school boys, and Jasamea was a young pre-teen-aged girl. Her date of birth is August 27, 2007. We rented the house, and it was our family residence.

5. ) On the evening of March 27, 2019, we were all at home and after it got dark and got to be bedtime we were all trying to settle down for the night. I was in my bedroom with the boys, Jayden and Xavien, trying to help them to settle down and go to sleep for the night. Jasamea had gone into her bedroom to sleep for the night. Karen Jimerson had gone into the

**DECLARATION OF JAMES PARKS**                                    Page   1

bathroom to take a bath at the end of the day as everyone was trying to settle down and go to sleep for the night. We were not causing any trouble for anyone or misbehaving in any way, and we had no reason to expect that the police would come and attack our home.

6.) Suddenly, without any warning, and unexpectedly, there was a terrible noise and commotion around our house. I now know we were being attacked by police officers, but I had no reason to think the police officers would do this to us. All of this noise and commotion was not only unexpected, it was scary. I tried to help to keep the boys, Jayden and Xavien calm and to keep them from getting frightened. I did not know exactly what was going on. The window glass of our home started to break, and some of the breaking glass came into the house. I now know the police were breaking the window glass. Pieces of broken glass came into the bedroom where my boys [Jayden and Xavien] were, and pieces of that glass got into the eyes of the boys, Jayden and Xavien, and hurt the boys. This was an attack and it was scary.

7.) With no warning, the police officers were attacking our house, and were breaking windows and making lots of noise. They broke down the door and came into the house. They never asked for permission or knocked on the door. I never gave them permission to come into our home, or to stay in our home. None of us ever gave them permission to come into our home, or to stay in our home, or to move things around in our home, or to search any portions of our home. None of the invading police officers ever made any indication that they had any sort of warrant.

8.) Suddenly police officers burst into the bedroom where I was with the boys, Jayden and Xavien. They had weapons drawn, including pistols and rifles, and those police were making a lot of noise. The police officers made me and the boys leave the room, and then the police officers went back into the bedroom and searched it.

9.) These police officers had weapons drawn and I was afraid they would use the weapons. We did not have any weapons. The police officers had pistols and rifles. The police officers were not polite to me, or to any of us, and they ordered us around. I did not know why they had come or what they might do. They were abrupt and rude and loud. I could hear noise that let me know they were all over the house, on the inside of it. I had gotten the boys onto the floor and was trying to be protective of them, and trying to keep them as calm as possible. I feared the police might kill the boys. I feared for my own life. I feared for the lives of Jasamea and Karen Jimerson. All of us are black, but I did not see anything to indicate that any of the police officers were black, and that was frightening to me in view of the rough way we were

being treated by these police officers. It was like the nightmare of being attacked by a gang of Klansmen.

10. ) The police officers never asked me, or any of us, for permission to come into our home, or for permission to stay in our home after they had broken down the door and invaded our home, or for permission to come into the room I was in, or for permission to come into any room. We were not asked for permission when the police officers came into the house, and once they were in the house they stayed a long time, and roamed around and did as they pleased, and moved some things around, and abused us. There were a lot of them all over the place. They were very rough and abrupt and loud. They also never asked for permission to search around in my room, but they did search. They pushed and tossed things around, and they made a mess. While they were in the house they broke some of our property.

11. ) The police officers hurt Jasamea Jimerson and Karen Jimerson so badly that both of them had to be taken from our home in an ambulance to a hospital emergency room for treatment.

12. ) While the police officers were in our house we did not try to confront or antagonize them or threaten them. We were all scared and frightened. We did not give them permission to be in our home, or to stay in our home; but we did not "act out" in any improper manner while the police were at our home. None of us was charged with any crime.

13. ) Police officers were in the house a long time, and they never asked for permission to be there, and we never gave them permission to be there. I do not know exactly how long police officers were in our home, but I am sure it was more than two hours. During all of this time police officers were in the house and in the room where I was with the boys, and making all kinds of noise and it was frightening and I was trying to protect and comfort the boys, and I feared the police were going to hurt or kill my boys, or Karen Jimerson, or Jasamea Jimerson, or me.

14. ) I was not able to help Karen Jimerson because I was detained by the police officers in a room with the boys, and she was in the doorway to the bathroom where the officers found and detained her. I could hear some of what was going on between her and the police officers. I heard her begging them not to kill her. I heard her begging them to let her put her clothes on.

15. ) I could hear some of what was going on in the room where police officers had detained Jasamea, but I was not able to go to help her as the police officers had me detained in another room. I heard unusual noises coming from the room where the police officers had detained

**DECLARATION OF JAMES PARKS**                          Page   3

Jasamea.

16.)   The police officers had their weapons drawn and were ordering all of us around, like we were prisoners in our own home.  They encountered Karen Jimerson in the doorway to the bathroom as she was getting out of her bath, and they made her lie on the floor there for a long time, and would not even let her put her clothes on. The conduct of the police officers was very scary. I blame the police officers. They are the ones who did it. There were a bunch of them and they were not acting nice at all. We did nothing to provoke them.

17.)   We were renting our home on March 27, 2019, and I know it got torn up a lot by the police officers who attacked it and rammed open the door, and broke windows and damaged blinds and curtains and flooring.  I also know that the damage to the home was repaired and paid for by the Waxahachie Police Department, and I believe this demonstrates that they knew they were wrong to attack our home, and to attack us, on March 27, 2019.

18.)   Because of injuries to Karen Jimerson and to Jasamea Jimerson which were inflicted upon them by the police officers who attacked and invaded our home on March 27, 2019, Karen Jimerson and Jasamea Jimerson had to be removed from our home that night on ambulance gurneys and had to go into an ambulance and had to go to the Emergency Room. I do not know exactly how long this departure from the house and into the ambulance was after the time when the police initially attacked and invaded our house, broke the glass, and busted down the front door, but I believe it was at least thirty minutes. Furthermore, there were still police officers in and around our house at the time when Karen Jimerson and Jasamea Jimerson were taken out to the ambulance.

19.)   What the police officers did to us when they attacked and invaded our home, and asserted control and dominion over us at gunpoint, and basically took us prisoner in our own home, and were abusive to us, and injured Karen Jimerson and Jasamea Jimerson and the young boys in our home on the night of March 27, 2019, scared me very badly when it happened; and still today every time I think about it it still scares me. It still is very frightening to me to think about or recall it.

**DECLARATION OF JAMES PARKS**                                        Page   4

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*James Parks*

James Parks


Executed the 20th day of August 2021 in Fort Worth Texas.

**DECLARATION OF JAMES PARKS**                    Page    5

# EXHIBIT 5

## Declaration of Karen Jimerson

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN JIMERSON,** *et al.* | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Civil Action No. 3:20-CV-02826-L** |
| | § | |
| **LT. MIKE LEWIS,** *et al.*, | § | **FINAL on August 20, 2021** |
| Defendants. | § | |

## DECLARATION OF KAREN JIMERSON

Pursuant to 28 U.S.A. section 1746, I, **Karen Jimerson**, declare and state as follows:

1. ) My name is Karen Jimerson. I am over twenty-one years of age and am capable and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2, ) I am the biological mother of the minors Jasamea Jimerson [my daughter] and Jayden Jimerson [my son] and Xavien Parks [my son]. James Parks is the biological father of Xavien Parks and of Jayden Jimerson. We all lived together as a family unit in March of 2019, with me being the mother in our family unit, and Mr. Parks being the father in our family unit.

3. ) On March 27, 2019, I resided at a house located at 593 West 8th Street, in Lancaster, Dallas County, Texas. We rented the house, and it was our family residence. My children, Jasamea Jimerson and Jayden Jimerson and Xavien Parks also lived with me at that house, and so did James Parks. We lived there as a family unit. Jayden and Xavien were little pre-school boys, and Jasamea was a young pre-teen-aged girl. Her date of birth is August 27, 2007. Mr. Parks and I were the parents in this family unit and we were adult persons.

4. ) I may sometimes in this declaration refer collectively to myself and Karen Jimerson and Jayden Jimerson and Xavien Parks and Jasamea Jimerson as "we" or as "us".

5. ) On the evening of March 27, 2019, we were all at home and after it got dark and got to be bedtime we were all trying to settle down for the night. Everyone but me had gone to sleep. I [Karen Jimerson] had gone into the bathroom to take a bath at the end of the day as

**DECLARATION OF KAREN JIMERSON**                                    Page    1

everyone was trying to settle down and go to sleep for the night.    Mr. Parks was in a bedroom with the boys, Jayden and Xavien, and they were asleep for the night. Jasamea had gone into her bedroom and had gone to sleep for the night. We were not causing any trouble for anyone or misbehaving in any way, and we had no reason to expect that the police would come and attack our home.

6. )  Suddenly, without any warning, and unexpectedly, there was a terrible noise and commotion around our house. I now know we were being attacked by police ófficers, but I had no reason to think the police officers would do this to us. All of this noise and commotion was not only unexpected, it was scary. I did not know exactly what was going on. The window glass of our home started to break, and some of the breaking glass came into the house. Then without any warning the police officers busted down the front door and came rushing into our home yelling and making a lot of noise. This was an attack and it was scary.

7. )  With no warning, the police officers were attacking our home. They were breaking windows and making lots of noise. They broke down the door and came into the house. They never asked for permission or knocked on the door. I never gave them permission to come into our home, or to stay in our home. None of us ever gave them permission to come into our home, or to stay in our home, or to move things around in our home, or to search any portions of our home. None of the invading police officers ever made any indication that they had any sort of warrant.

8. )  Suddenly police officers burst into the hallway by the bathroom door area where I was.  I had on no clothing from the waist down. They had weapons drawn and were making noise. They made me lay down on the floor, and they would not let me put my clothes on. I was very afraid and thought they might kill me, or my children, or Mr. Parks.  I begged them not to shoot me or kill me. I also begged them to let me put my clothes on.  They made me stay on the floor half naked for at least fifteen minutes. They basically kept me as a prisoner in my own home during this time.

9. )  These police officers had weapons drawn and I was afraid they would use the weapons.  We did not have any weapons. The police officers had pistols and rifles. The police officers were not polite to me, or to any of us, and they ordered us around. I did not know why they had come or what they might do. They were abrupt and rude and loud. I could hear noise that let me know they were all over the house, on the inside of it. I heard them in the room of my daughter, Jasamea, and heard noises coming from that direction. I could hear noises from the

**DECLARATION OF KAREN JIMERSON**                                   Page   2

direction of the room where I knew Mr. Parks and the boys were located. I feared the police might kill the boys. I feared for my own life. I feared for the lives of Jasamea, and Mr. Parks. All of us are black, but I did not see anything to indicate that any of the police officers were black, and that was very concerning to me in view of the rough way we were being treated by these police officers. It was like the nightmare of being attacked by a gang of Klansmen.

10. )   None of the police officers ever asked me, or any of us, for permission to come into our home, or for permission to stay in our home after they had broken down the door and invaded our home, or for permission to come into the area I was in, or for permission to come into any room or any part of the house. We were not asked for permission when the police officers came into the house, and once they were in the house they stayed a long time, and roamed around and did as they pleased, and moved some things around, and abused us. There were a lot of them all over the place. They were very rough and abrupt and loud. They also never asked for permission to search around in my daughter Jasamea's room, but they did search. They pushed and tossed things around, and they made a mess. They also brutalized and injured Jasamea. While they were in the house they broke some of our property.

11. )   The police officers hurt Jasamea Jimerson and me [Karen Jimerson] so badly that both of us had to be taken on the late evening of 27 March 2019 directly from our home in an ambulance which then took us directly to a hospital emergency room for treatment. They also hurt my sons, Jayden Jimerson and Xavien Parks when the police officers broke out the windows of our home and glass got into the house near the boys and got into their eyes.

12. )   While the police officers were in our house we did not try to confront or antagonize them or threaten them. We were all scared and frightened. We did not want to make the police officers mad at us for fear they might hurt us or even kill us. We did not give the police officers permission to be in our home, or to stay in our home; but we did not "act out" in any improper manner while the police were at our home. None of us was charged with any crime.

13. )   Police officers were in the house a long time, and they never asked for permission to be there, and we never gave them permission to be there. I do not know exactly how long police officers were in our home, but I am sure it was more than twenty-five or thirty minutes. During all of this time police officers were in the house and were moving about and doing whatever they wanted to do, and there was nothing we could do about it.

14. )   I was not able to help my children or Mr. Parks because I was detained by the police officers

**DECLARATION OF KAREN JIMERSON**                    Page   3

in the doorway to the bathroom with out even having any clothes on from the waist down, where the officers found and detained me, and made me lie on the floor on my stomach, but after a while they let me sit but I still did not have on any clothes from the waist down. I begged the police officers not to kill me, and I begged them to let me put my clothes on. I could hear some of what was going on between the police officers and other members of my family. That also scared me.

15. ) I could hear some of what was going on in the room where police officers had detained Jasamea, but I was not able to go to help her as the police officers had me detained in another room. I heard unusual noises coming from the room where the police officers had detained Jasamea.

16. ) The police officers had their weapons drawn and were ordering all of us around, like we were prisoners in our own home. They encountered me [Karen Jimerson] in the bathroom as I was getting out of my bath, and they made me lie on the floor there for a long time, and would not even let me put my clothes on. The conduct of the police officers was very scary. I blame the police officers. They are the ones who did it. There were a bunch of them and they were not acting nice at all. We did nothing to provoke them.

17. ) After I had been made to stay on the floor for fifteen minutes or more I heard the police officers tell Jasamea she could come to me and bring my clothes to me, and then I was permitted to put on clothing from the waist down. At about that time I know that someone called the ambulance, but it did not arrive immediately. At this time there were still police officers moving about as they wished to do in our home. We had no control over the police officers. They had control of us.

18. ) Around this time Lt. Lewis introduced himself to me and told me that he was in charge and that the police officers were a SWAT Team and that they should never have come into our house or bothered us. He admitted they had done us wrong. At this time there were still police officers moving about as they wished to do in our home.

19. ) The ambulance did not arrive immediately when it was called. It took a while between the time it was called, and when it arrived, and then it took more time while the ambulance people checked me out and checked Jasamea out, and decided we needed to go to the hospital, and then put us into the ambulance. I do not know the exact amount of time all of this took, but I believe it was more than fifteen minutes. During this time there were still police officers moving about as they wished to do in our home. When the ambulance did

**DECLARATION OF KAREN JIMERSON**                                Page   4

arrive the people from the ambulance checked me and checked Jasamea and decided we needed to go to the hospital. So they put us on gurneys and took us straight out of the house and loaded us up into the ambulance and drove us straight to the emergency room at the hospital. There were still police officers in and around our house at the time when I was put into the ambulance.

20. ) We were renting our home on March 27, 2019, and I know it got torn up a lot by the police officers who attacked it and rammed open the door, and broke windows and damaged blinds and curtains and flooring. I also know that the damage to the home was repaired and paid for by the Waxahachie Police Department, and I believe this demonstrates that they knew they were wrong to attack our home, and to attack us, on March 27, 2019, just like Lt. Lewis admitted to me that they were wrong to do it. Also, after March 27, 2019. Lt. Lewis visited with me and again admitted that the SWAT Team should never have come into our house or bothered us, and admitted they had done us wrong, and he asked if we wanted to be paid some money, though he did not state how much, because of what they had done to us. I believe this demonstrates that Lt. Lewis knew he and the police officers in the SWAT Team were wrong to attack our home, and to attack us, and to hurt us, on March 27, 2019

21. ) Because of injuries to me [Karen Jimerson] and to Jasamea Jimerson which were inflicted upon us by the police officers who attacked and invaded our home on March 27, 2019, I [Karen Jimerson] and Jasamea Jimerson had to be removed from our home that night on ambulance gurneys and had to go into an ambulance and had to go to the Emergency Room. I do not know exactly how long this departure from the house and into the ambulance was after the time when the police initially attacked and invaded our house, broke the glass, and busted down the front door, but I believe it was at least twenty-five or thirty minutes. There were still police officers in and around our house at the time when I [Karen Jimerson] and Jasamea Jimerson were taken out of the house and put into the ambulance.

22. ) What the police officers did to us when they attacked and invaded our home, and asserted control and dominion over us at gunpoint, and basically took us prisoner in our own home, and were abusive to us, and injured me [Karen Jimerson] and Jasamea Jimerson and the young boys [my sons Jayden and Xavien] in our home on the night of March 27, 2019, scared me very badly when it happened; and still today every time I think about it it still scares me. It still is very frightening to me to think about or recall it.

**DECLARATION OF KAREN JIMERSON**                                    Page   5

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Karen Jimerson

Executed the 20th day of August 2021 in Fort Worth Texas.

EXHIBIT 6

Eleven (11) pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] show admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant on the occasion in question.

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Lt. Lewis was a member of the Waxahachie Police Department as well as the Waxahachie Police Department's SWAT Team.[4] Lt. Lewis and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Lt. Lewis:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Lt. Lewis, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... a fully trained, experienced, law enforcement officer who knew, or should have known the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant Lt. Lewis was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 5, ¶ 4-A.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 22, ¶ 17.

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 40 of 215   PageID 1985
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 20 of 66   PageID 1573
Case 3:20-cv-02826-L   Document 74   Filed 01/12/21   Page 2 of 6   PageID 546

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Behringer was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Behringer, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Behringer:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Behringer, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Behringer] was acting 'under color of law'..."[10]

---

[3] Id. at pp. 39-40, ¶ 37.
[4] Id. at p. 9, ¶ 4-K.
[5] Id. at p. 11, fn. 5.
[6] Id. at p. 19, ¶ 12(c).
[7] Id.
[8] Id. at p. 20, ¶ 12(d).
[9] Id. at p. 28, ¶ 29.
[10] Id. at p. 23, ¶ 18.

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 41 of 215   PageID 1986
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 21 of 66   PageID 1574
Case 3:20-cv-02826-L   Document 75   Filed 01/12/21   Page 2 of 6   PageID 553

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross

negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Dunn was a member of the Waxahachie Police Department as

well as a member of the Waxahachie Police Department's SWAT Team.[4] Dunn, and the other

Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered

Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the

Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions

that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that

Defendants, including Dunn:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Dunn, as well as the other Defendants, was "[a]t all times

relevant to the acts described in this Complaint, … [a] fully trained, experienced, law

enforcement officer[] who knew, or should have known, the well[-]established and well known

law pertaining to the legal rights of citizens…..and Defendant [Dunn] was acting 'under color of

law'…"[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 6, ¶ 4-B.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Fuller was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team. Fuller, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Fuller:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Fuller, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Fuller] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 7, ¶ 4-F.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 43 of 215   PageID 1988
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 23 of 66   PageID 1576
Case 3:20-cv-02826-L   Document 77   Filed 01/12/21   Page 2 of 6   PageID 567

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Glidewell was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Glidewell, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Glidewell:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Glidewell, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Glidewell] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 8, ¶ 4-J.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT O.T. GLIDEWELL'S MOTION TO DISMISS PLAINTIFFS'
STATE TORT CLAIMS – Page 2

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 44 of 215   PageID 1989
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 24 of 66   PageID 1577
Case 3:20-cv-02826-L   Document 78   Filed 01/12/21   Page 2 of 6   PageID 574

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Gonzales was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Gonzales, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Gonzales:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Gonzales, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Gonzales] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 6, ¶ 4-D.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT ANDREW GONAZLES' MOTION TO DISMISS PLAINTIFFS'
STATE TORT CLAIMS – Page 2

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Koch was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Koch, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Koch:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Koch, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, … [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens…..and Defendant [Koch] was acting 'under color of law'…"[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 6, ¶ 4-C.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT DUSTIN KOCH'S MOTION TO DISMISS PLAINTIFFS' STATE TORT CLAIMS – Page 2

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Lewis was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Lewis, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Lewis:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Lewis, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Lewis] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 8, ¶ 4-H.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT JAMES LEWIS' MOTION TO DISMISS PLAINTIFFS' STATE TORT CLAIMS – Page 2

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 47 of 215   PageID 1992
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 27 of 66   PageID 1580
Case 3:20-cv-02826-L   Document 81   Filed 01/12/21   Page 2 of 6   PageID 595

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Sanders was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Sanders, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Sanders:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Sanders, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Sanders] was acting 'under color of law'..."[10]

---

[1] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at pp. 7-8, ¶ 4-G.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT STEPHEN SANDERS' MOTION TO DISMISS PLAINTIFFS'
STATE TORT CLAIMS – Page 2

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Taylor was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Taylor, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Taylor:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Taylor, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Taylor] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 9, ¶ 4-J.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT JAMES TAYLOR'S MOTION TO DISMISS PLAINTIFFS'
STATE TORT CLAIMS – Page 2

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 49 of 215   PageID 1994
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 29 of 66   PageID 1582
Case 3:20-cv-02826-L   Document 83   Filed 01/12/21   Page 2 of 6   PageID 609

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Young was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Young, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Young:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Young, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Young] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 7, ¶ 4-E.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

# EXHIBIT 7

Ambulance Records pertaining to
Jasamea Jimerson and Karen Jimerson

## Lancaster Fire Department
Patient Care Record

Incident #: 19-1650

Date: 03/27/2019     Patient 1 of 2

Name: JIMERSON, KAREN

| Patient Information | | | | Clinical Impression | |
|---|---|---|---|---|---|
| Last | JIMERSON | Address | 593 EIGHTH ST | Primary Impression | Injury |
| First | KAREN | Address 2 | | Secondary Impression | |
| Middle | | City | Lancaster | Protocol Used | Pain Control |
| Gender | Female | State | TX | Anatomic Position | |
| DOB | | Zip | 75146 | Onset Time | |
| Age | 31 Yrs, 6 Months, 0 Days | Country | US | Chief Complaint | "my whole body is hurting" |
| Weight | | Tel | 2144975804 | Duration | Units |
| Pedi Color | | Physician | | Secondary Complaint | |
| SSN | | Ethnicity | Not Hispanic or Latino | Duration | Units |
| Race | Black or African American | | | Patient's Level of Distress | |
| Advance Directives | None | | | Signs & Symptoms | Pain - Multiple injuries |
| Resident Status | Resident | | | Injury | Assault - Assault with bodily force - Home - 03/28/2019 |
| | | | | Mechanism of Injury | |
| | | | | Medical/Trauma | Trauma |
| | | | | Barriers of Care | None Noted |
| | | | | Alcohol/Drugs | None Reported |
| | | | | Pregnancy | No |
| | | | | Initial Patient Acuity | |
| | | | | Final Patient Acuity | |
| | | | | Patient Activity | |

| Medication/Allergies/History | |
|---|---|
| Medications | None Reported |
| Allergies | No known allergies |
| History | Other - partially paralyzed on right side |
| Last Oral Intake | |

| Vital Signs | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | AVPU | Side | POS | BP | Pulse | RR | SPO2 | ETCO2 | CO | BG | Temp | Pain | GCS(E+V+M)/Qualifiers | RTS | PTS |
| 23:49 | Alert | L | Sit | 134/94 A | 80 R | 18 R | 98 Rm | | | | | 9 | 15=4+5+6 | 12 | |

| Initial Assessment | | | | |
|---|---|---|---|---|
| Category | Comments | Abnormalities | | |
| Mental Status | | Mental Status | | No Abnormalities |
| Skin | | Skin | | No Abnormalities |
| HEENT | | Head/Face | + | Pain |
| | | Eyes | | No Abnormalities |
| | | Neck/Airway | | No Abnormalities |
| | | Chest | + | Pain |
| Chest | | Heart Sounds | | No Abnormalities |
| | | Lung Sounds | | No Abnormalities |
| | | General | | No Abnormalities |
| Abdomen | | Left Upper | + | Pain |
| | | Right Upper | + | Pain |
| | | Left Lower | + | Pain |
| | | Right Lower | + | Pain |
| | | Cervical | | No Abnormalities |
| Back | | Thoracic | | No Abnormalities |
| | | Lumbar/Sacral | | No Abnormalities |
| Pelvis/GU/GI | | Pelvis/GU/GI | + | Pain (2) |
| Extremities | | Left Arm | + | Pain (2) |
| | | Right Arm | + | Pain (2) |
| | | Left Leg | + | Pain (3) |
| | | Right Leg | + | Pain (3) |
| | | Pulse | | Not Assessed |
| | | Capillary Refill | | Not Assessed |
| Neurological | | Neurological | | No Abnormalities |

Assessment Time:

03/28/2019 00:38:32
Template Version: PCR-WEB-1.3.1
Data Version: 0014-0000000021 (6C49

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 52 of 215   PageID 1997
02/11/2021   03:26 PM   TO:18173328851   FROM:2143820931   Page: 3
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 59 of 66   PageID 1612

## Lancaster Fire Department
### Patient Care Record

**Name:** JIMERSON, KAREN | **Incident #:** 19-1650 | **Date:** 03/27/2019 | Patient 1 of 2

### Narrative

aostf pt sitting on a chair. pt stated that the police raided her house and forced her to the ground while she was in the bathroom. the pt stated that she was on the floor for "what felt like 20 minutes". the pt stated that she was "hurting all over but more on my left side". pt was moved into the ambulance and v/s were taken. pt was monitored en-route with no changes. pt report was given to the ER staff and care was transferred.

### Specialty Patient - CDC 2011 Trauma Criteria

| | | | |
|---|---|---|---|
| Vital Signs | None | Trauma Activation | No |
| Anatomy of Injury | None | Time | |
| Mechanism of Injury | None | Date | |
| Special Considerations | None | Trauma level | |
| | | Reason Not Activated | |

### Incident Details / Destination Details / Incident Times

| Incident Details | | Destination Details | | Incident Times | |
|---|---|---|---|---|---|
| Location Type | Home/Residence | Disposition | Transported No Lights/Siren | PSAP Call | 23:28:28 |
| Location | | Transport Due To | Patient's Choice | Dispatch Notified | |
| Address | 593 EIGHTH ST | Transported To | Methodist Charleton Medical Center | Call Received | 23:28:28 |
| Address 2 | | Requested By | Law Enforcement | Dispatched | 23:29:39 |
| Mile Marker | | Destination | Hospital | En Route | 23:30:24 |
| City | LANCASTER | Department | Emergency Room | Staged | |
| County | Dallas | Address | 3500 W. Wheatland Road | Resp on Scene | |
| State | TX | Address 2 | | On Scene | 23:36:25 |
| Zip | 75146 | City | Dallas | At Patient | 23:37:00 |
| Country | US | County | Dallas | Care Transferred | |
| Medic Unit | M353 | State | TX | Depart Scene | 23:50:58 |
| Medic Vehicle | M353 | Zip | 75237 | At Destination | 00:08:21 |
| Run Type | 911 Response | Country | US | Pt. Transferred | 00:20:00 |
| Response Mode | Emergent | Zone | | Call Closed | 00:40:00 |
| Shift | A shift | Condition at Destination | Unchanged | In District | |
| Zone | City | Destination Record # | | At Landing Area | |
| Level of Service | Basic Life Support | Trauma Registry ID | | | |
| EMD Complaint | Assault | STEMI Registry ID | | | |
| EMD Card Number | | Stroke Registry ID | | | |
| Dispatch Priority | | | | | |

### Crew Members

| Personnel | Role | Certification Level | |
|---|---|---|---|
| BURTON, DANNY | Lead | NREMT-Paramedic (NREMT-P) - P8054608; EMT-Paramedic - 706559 | |
| INGRAM, TYLER | Driver | EMT-Paramedic - 731306 | |
| EMT Rider, Student | Other | | |

### Insurance Details

| | | | | | |
|---|---|---|---|---|---|
| Insured's Name | KAREN JIMERSON | Primary Payer | Medicaid | Dispatch Nature | |
| Relationship | Self | Medicare | | Response Urgency | |
| Insured SSN | | Medicaid | | Job Related Injury | |
| Insured DOB | | Primary Insurance | | Employer | |
| Address 1 | 593 EIGHTH ST | Policy # | | Contact | |
| Address 2 | | Primary Insurance Group Name | | Phone | |
| Address 3 | | Group # | | Mileage to Closest Hospital | |
| City | Lancaster | Secondary Ins | | | |
| State | TX | Policy # | | | |
| Zip | 75146 | Secondary Insurance Group Name | | | |
| Country | US | Group # | | | |

### Mileage / Delays / Additional Agencies

| Mileage | | Delays | | Additional Agencies |
|---|---|---|---|---|
| Scene | 1.0 | Category | Delays | |
| Destination | 10.7 | Dispatch Delays | None/No Delay | |
| Loaded Miles | 9.7 | Response Delays | None/No Delay | |
| Start | | Scene Delays | None/No Delay | |
| End | | Transport Delays | None/No Delay | |
| Total Miles | | Turn Around Delays | None/No Delay | |

03/28/2019 00:38:32
Template Version: PCR-WEB-1.3.1
Data Version: 00174-0000000002176C49

02/11/2021 Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 60 of 66   PageID 1613

## Lancaster Fire Department
Patient Care Record

Name: JIMERSON, KAREN

Incident #: 19-1650

Date: 03/27/2019

Patient 1 of 2

| Patient Transport Details | | | |
|---|---|---|---|
| How was Patient Moved to Ambulance | Stretcher | How was Patient Moved From Ambulance | Stretcher |
| Patient Position During Transport | | Condition of Patient at Destination | Unchanged |

03/28/2019 00:38:32
Template Version: PCR-WED-1.3.1
Data Version: 00174-0000000002176C49

02/11/2021 16:58 TO:18323328851 FROM:2143820931   Page: 5

## Lancaster Fire Department
### Patient Care Record

Incident #: 19-1650     Date: 03/27/2019     Patient 2 of 2

Name: JIMERSON, JASAMEA

### Patient Information

| Field | Value |
|---|---|
| Last | JIMERSON |
| First | |
| Middle | |
| Gender | Female |
| DOB | |
| Age | |
| Weight | |
| Pedi Color | |
| SSN | |
| Race | Black or African American |
| Advance Directives | None |
| Resident Status | Resident |

| Field | Value |
|---|---|
| Address | |
| Address 2 | |
| City | Lancaster |
| State | TX |
| Zip | 75146 |
| Country | US |
| Tel | 2144975804 |
| Physician | |
| Ethnicity | Not Hispanic or Latino |

### Clinical Impression

| Field | Value |
|---|---|
| Primary Impression | Injury |
| Secondary Impression | |
| Protocol Used | Multiple Trauma |
| Anatomic Position | |
| Onset Time | |
| Chief Complaint | "my knee hurts" |
| Duration | | Units |
| Secondary Complaint | |
| Duration | | Units |
| Patient's Level of Distress | |
| Signs & Symptoms | Pain - Knee pain |
| Injury | Struck by Object - Contact with blunt object - Home - 03/28/2019 |
| Mechanism of Injury | |
| Medical/Trauma | Trauma |
| Barriers of Care | None Noted |
| Alcohol/Drugs | None Reported |
| Pregnancy | No |
| Initial Patient Acuity | |
| Final Patient Acuity | |
| Patient Activity | |

### Medication/Allergies/History

| Field | Value |
|---|---|
| Medications | None Reported |
| Allergies | No known allergies |
| History | None Reported |
| Last Oral Intake | |

### Vital Signs

| Time | AVPU | Side | POS | BP | Pulse | RR | SPO2 | ETCO2 | CO | BG | Temp | Pain | GCS(E+V+M)/Qualifiers | RTS | PTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23:53 | Alert | R | Sit | 137/86 A | 66 R | 19 R | 97 Rm | | | | | 4 | 15=4+5+6 | 12 | |

### Initial Assessment

| Category | Comments | Abnormalities | |
|---|---|---|---|
| Mental Status | | Mental Status | No Abnormalities |
| Skin | | Skin | No Abnormalities |
| HEENT | | Head/Face | No Abnormalities |
| | | Eyes | No Abnormalities |
| | | Neck/Airway | No Abnormalities |
| Chest | | Chest | No Abnormalities |
| | | Heart Sounds | No Abnormalities |
| | | Lung Sounds | No Abnormalities |
| Abdomen | | General | No Abnormalities |
| | | Left Upper | No Abnormalities |
| | | Right Upper | No Abnormalities |
| | | Left Lower | No Abnormalities |
| | | Right Lower | No Abnormalities |
| Back | | Cervical | No Abnormalities |
| | | Thoracic | No Abnormalities |
| | | Lumbar/Sacral | No Abnormalities |
| Pelvis/GU/GI | | Pelvis/GU/GI | No Abnormalities |
| Extremities | | Left Arm | No Abnormalities |
| | | Right Arm | No Abnormalities |
| | | Left Leg | No Abnormalities |
| | | Right Leg | Pain |
| | | Pulse | Not Assessed |
| | | Capillary Refill | Not Assessed |
| Neurological | | Neurological | No Abnormalities |

Assessment Time:

## Lancaster Fire Department
Patient Care Record

**Name:** JIMERSON, JASAMEA     **Incident #:** 19-1650     **Date:** 03/27/2019     Patient 2 of 2

**Narrative:**
...notif pt standing next to her mother. pt stated that she was laying in her bed when a piece of glass from a window hit her in the knee. the pt had no signs of trauma. the pt requested to go to the ER. the pt was moved into the ambulance and monitored en-route with no changes. pt report was given to the ER staff and care was transferred.

### Specialty Patient - CDC 2011 Trauma Criteria

| | | | |
|---|---|---|---|
| Vital Signs | None | Trauma Activation | |
| Anatomy of Injury | None | Time | |
| Mechanism of Injury | None | Date | |
| Special Considerations | None | Trauma level | |
| | | Reason Not Activated | |

### Incident Details / Destination Details / Incident Times

| Incident Details | | Destination Details | | Incident Times | |
|---|---|---|---|---|---|
| Location Type | Home/Residence | Disposition | Transported No Lights/Siren | PSAP Call | 23:28:28 |
| Location | | Transport Due To | Family Choice | Dispatch Notified | |
| Address | | Transported To | Methodist Charleton Medical Center | Call Received | 23:26:28 |
| Address 2 | | Requested By | Law Enforcement | Dispatched | 23:29:39 |
| Mile Marker | | Destination | Hospital | En Route | 23:30:24 |
| City | LANCASTER | Department | Emergency Room | Staged | |
| County | Dallas | Address | 3500 W. Wheatland Road | Reap on Scene | |
| State | TX | Address 2 | | On Scene | 23:36:25 |
| Zip | 75146 | City | Dallas | At Patient | 23:37:00 |
| Country | US | County | Dallas | Care Transferred | |
| Medic Unit | M353 | State | TX | Depart Scene | 23:50:58 |
| Medic Vehicle | M353 | Zip | 75237 | At Destination | 00:08:21 |
| Run Type | 911 Response | Country | US | Pt. Transferred | 00:15:00 |
| Response Mode | Emergent | Zone | | Call Closed | 00:29:50 |
| Shift | A shift | Condition at Destination | Unchanged | In District | |
| Zone | City | Destination Record # | | At Landing Area | |
| Level of Service | Basic Life Support | Trauma Registry ID | | | |
| EMD Complaint | Traumatic Injury | STEMI Registry ID | | | |
| EMD Card Number | | Stroke Registry ID | | | |
| Dispatch Priority | | | | | |

### Crew Members

| Personnel | Role | Certification Level |
|---|---|---|
| BURTON, DANNY | Lead | NREMT-Paramedic (NREMT-P) - P8054608; EMT-Paramedic - 706559 |
| INGRAM, TYLER | Driver | EMT-Paramedic - 731306 |
| EMT Rider, Student | Other | |

### Mileage / Delays / Additional Agencies

| Mileage | | | Delays | | |
|---|---|---|---|---|---|
| Scene | 1.0 | | Category | Delays | |
| Destination | 10.7 | | Dispatch Delays | None/No Delay | |
| Loaded Miles | 9.7 | geo-verified | Response Delays | None/No Delay | |
| Start | | | Scene Delays | None/No Delay | |
| End | | | Transport Delays | None/No Delay | |
| Total Miles | | | Turn Around Delays | None/No Delay | |

### Patient Transport Details

| How was Patient Moved to Ambulance | Assisted/Walk | How was Patient Moved From Ambulance | Assisted/Walk |
|---|---|---|---|
| Patient Position During Transport | | Condition of Patient at Destination | Unchanged |

# EXHIBIT 8

## Robert Gill Vita

# ROBERT K. "BOB" GILL

Attorney at Law
Retired State District Judge
2502 Gravel Drive
Fort Worth, TX 76118
Bob@GillBrissette.com
817-803-6918

## PROFESSIONAL ACTIVITIES

Assistant Criminal District Attorney-- Tarrant County 1981-92 and 2008-2014
Private Criminal Defense Practice Since January 2015
Presiding Judge, 213th Criminal District Court-- Jan. 1993-May 2007
Presiding Judge over Tarrant County Criminal Courts --1997
Local Administrative Judge-- Tarrant County 1997-98 and 2003-4
Board Certified in Criminal Law since 1988
Approved for Death Penalty Cases in 8th Admin. Judicial Region
Co-owner Third Chair Digital Forensics LLC and Third Chair Technologies LLC – Fort Worth,
Co-owner Third Chair Investigations LLC, Texas License Number C20849
Board Member, Texas Criminal Defense Lawyers Association (2020-2023)

## PROFESSIONAL MEMBERSHIPS

State Bar of Texas, Member, 1981 - Present
Tarrant County Bar Association, Member
Texas Bar Foundation, Life Fellow, 2013 – Present
Texas Criminal Defense Lawyers Association, Member
Tarrant County Criminal Defense Lawyers Association, Member
Texas District and County Attorneys Association, Former Member

## SPEAKING ENGAGEMENTS

Tarrant County Bar Association, *Pre-Trial Motions* (2018)
Southwestern Association of Forensic Scientists *Digital Forensics* (2017)
Tarrant County Medical Examiner's Office, *Current Trends in Forensic Science* (2015)
Tarrant County Criminal Defense Lawyers Association, *Capital Seminar* (2015-2017)
Tarrant County Medical Examiner's Office Grand Rounds, *Digital Forensics* (April 2015)
Tarrant County Criminal Defense Lawyers Association, *Digital Forensics* (March 2015)
Tarrant County Young Lawyers *When Lawyers Run For Office: Ethical Considerations of Political Campaigns* (2013)

The Center For American And International Law *Capital and Non-Capital Training For The Prosecution* (2013)
The Center For American And International Law *Emerging Trends in Capital Trial Prosecution* (2012)
Louisiana District Attorneys Association, *Electronic Discovery* (2012)
State Bar of Texas *Advanced Criminal Law Course* (2011)
Law Enforcement and Emergency Services Video Association *Video Evidence Symposium and Training Conference* (2011)
The Center For American And International Law *Actual Innocence: Establishing Innocence or Guilt* (2010)
Course Director—State Bar of Texas *Advanced Criminal Law Course, Death Penalty Workshop* (2010)
Texas Criminal Defense Lawyers Association, *Sexual Assault Conference* (2010)
Texas District and County Attorneys Association, *Annual Criminal and Civil Law Update* (2010)
State Bar of Texas, *Advanced Criminal Law Course* (2010)
Tarrant County Bar Association, *Ethical Practice of Criminal Law in Tarrant County* (2010)
Course Director—State Bar of Texas, *Advanced Criminal Law Course, Death Penalty Workshop* (2009)
Tarrant County Bar Association, *Trial by Movie* (2009)
Texas Center for the Judiciary, *Capital Murder Seminar* (2008)
Texas Center for the Judiciary, *College For New Judges* (2006)
National Judicial College, *Managing the Capital Case in Texas* (2006)
Texas Center for the Judiciary, *Criminal Justice Conference* (2006)
Texas Wesleyan University School of Law, *Death Penalty Law* (2005)
Texas Criminal Defense Lawyers Association, *Rusty Duncan Criminal Law Seminar* (2000)
Texas Criminal Defense Lawyers Association, *Attacking Forensic Evidence and Child Abuse Seminar* (2001)
Tarrant County Medical Examiner's Office, *Current Trends in Forensic Science* (2001)
Criminal Justice Advocacy Institute, *Jury Selection* (1995)
Leadership Colleyville, *The Tarrant County Justice System* (1995)
Texas Municipal Courts Training Center, *Felony Court Jurisdiction* (1993)
State Bar of Texas, *Sex Drugs and DNA: Use and Abuse of Scientific Evidence* (1991)
Juvenile Justice Seminar, *Gangs Update* (1991)
State Bar of Texas, *Advanced Criminal Law Course* (1990)
State of Oklahoma District Attorneys Council, *DNA Fingerprinting* (1990)
State Bar of Texas, *Practice Skills Course* (1989)
Texas District and County Attorneys Association, *Prosecutor Trial Skills Course* (1988-92)

## LAW-RELATED PUBLICATIONS

*Texas Criminal Lawyers Handbook* – James Publishing (Updated annually)
*Texas Criminal Forms* – James Publishing (Updated annually)
*Interview Rooms: Design for Safety and Utility*—The Police Chief, The Professional Voice of Law Enforcement, November 2013, International Association of Chiefs of Police
*DNA Testing Handbook For Prosecutors* – Texas District and County Attorneys Association – 1990

*Preparing A Case For Trial*—Texas Prosecutor's DWI Trial Manual (1989)

# EXHIBIT 9

## Declaration of Robert Gill

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN JIMERSON**, *et al.* | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:20-CV-02826-L** |
| | § | |
| **LT. MIKE LEWIS**, *et al.*, | § | |
| **Defendants.** | § | |

---

## DECLARATION OF ROBERT GILL

---

Pursuant to 28 U.S.A. section 1746, I, **Robert Gill**, declare and state as follows:

1. ) My name is Robert Gill. I am over twenty-one years of age and am capable and competent to make this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. ) I am presently an attorney in private practice, and have been now for a few years. Earlier in my career I was an assistant district attorney in Tarrant County, Texas, and after doing that for several years I became a Texas State District Court judge presiding over a court in Tarrant County; and I did that for a number of years but became eligible to retire and did so, returning at that time to the Tarrant County District Attorney office.

3. ) I have been designated in the Jimerson case as an expert, and in connection with that I did prepare a report letter of 8 March 2021. I will attach a full copy of that letter [and all of its exhibits] hereto as **EXHIBIT** I to this Declaration. [Note that the report letter has several exhibits attached to it]. I will now incorporate that letter, and all of its exhibits, into this present Declaration. The EXHIBITS attached to that report are :

> **EXHIBIT A [to my report of 8 March 2021]** : Aerial Map of Jimerson Home v. Warrant Location [they are not "next door"]
>
> **EXHIBIT B [to my report of 8 March 2021]** : 11 pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] showing admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant

**DECLARATION OF ROBERT GILL**                         **PAGE 1 of 13**

**EXHIBIT C [to my report of 8 March 2021]** : Probable Cause Affidavit [filed in a Texas State Court, not in a federal court; does not mention or refer to any plaintiff and does not mention or refer to plaintiffs' home]

**EXHIBIT D [to my report of 8 March 2021]** : the two (2) Search Warrants [issued out of a Texas State Court, by a Texas State Judge, in Dallas; they do not mention or refer to any plaintiff or mention or refer to any person, and do not mention or refer to plaintiffs' home or its address in any manner; but they do mention two (2) other locations specifically and by their specific addresses]

**EXHIBIT E [to my report of 8 March 2021]** : Filed returns on two (2) Search Warrants [filed in a Texas State Court, in Dallas, not in a federal court; they do not mention or refer to any plaintiff or mention or refer to any person, and do not mention or refer to plaintiffs' home or its address in any manner; but they do mention two (2) other locations specifically and by their specific addresses]

**EXHIBIT F   [to my report of 8 March 2021]**    : Home Repair Records/Invoices/some photos [all pertaining to plaintiffs' home]

**EXHIBIT G [to my report of 8 March 2021]** : Ambulance Records

**EXHIBIT H [to my report of 8 March 2021]** : (VITA OF ROBERT K. "BOB" GILL ~ (totaling 3 pages)

4.) The report letter of 8 March 2021 contains copies [as exhibits] of items I had reviewed when I wrote it, except for the complaint pleading [which I noted that I had reviewed, but did not attach as an exhibit]. Since I signed and submitted that report letter I have been able to review more items, which were not available to me or to the attorney [Mr. Reynolds] for the Jimerson plaintiffs when I signed the report letter. **The items I have reviewed since 8 March 2021 include**:

    a.) Declaration of Jasamea Jimerson

    b.) Declaration of James Parks

    c.) Declaration of Karen Jimerson

    d.) Declaration of Rebecca DeSantis

    e.) Documents produced by Waxahachie Police Department to counsel [Reynolds] for Plaintiffs after he sent a Texas State Public Information Act request [total of 92 pages, including some photos] [it is my understanding that this was made an exhibit (as EXHIBIT 4) to the Deposition of Chief Goolsby; and some pages of EXHIBIT 4 were also re-designated as separate

**DECLARATION OF ROBERT GILL**                                    **PAGE 2 of 13**

exhibit items, such as EXHIBIT 4-A (Goolsby memorandum of April 2, 2019, ordering the Internal Affairs investigation); and EXHIBIT 4-B (memo from Sgt. Sanders to Chief Goolsby on March 28, 2021, in which Sanders confesses fault); and EXHIBIT 4-D (photo of Jimerson residence showing a wheelchair ramp with handrails in front of it); and EXHIBIT 4E (photo of front door to Jimerson residence after it was rammed and busted open by SWAT Team); and EXHIBIT 4-F (photo of a window of the Jimerson residence after it was broken by the SWAT Team); and EXHIBIT 4-G (photo of other windows of Jimerson residence broken by the SWAT Team, and showing damage to the blinds and curtains inside the home due to the breaking of windows).

f. )   Deposition of Chief Goolsby [of the Waxahachie Police Department [transcript of his deposition testimony] and a copy of the documentation showing that witness Goolsby reviewed the transcript of his deposition testimony and on the Errata Sheet requested no changes to that transcript and then signed the deposition, so that the Court Reporter could be formally apprised that he had gone through this review and signature process.

I will not attach these items as exhibits to this declaration as I understand that they probably will be filed by counsel [attorney Reynolds] for the Jimerson-Parks plaintiffs when he files an Appendix as a companion to the Plaintiffs' pleading that will be filed to respond to and oppose a currently pending summary judgment motion. I have not seen that motion pleading.

5. )   My qualifications are summarized on my VITA (3 pages) which is attached to as **EXHIBIT H** to my Expert Report Letter of 8 March 2021 (which is attached hereto and made a part hereof as EXHIBIT I to this Declaration). I will not now re-state everything in the VITA. I am presently in private law practice, and have been since January, 2015. I practice law with another attorney, and we maintain our office in Fort Worth, Texas. I am a Board Certified specialist in criminal law. I am an attorney licensed for many years (since 1981) continuously (and presently) to practice law in Texas. I am admitted to practice in some federal courts, including the federal courts in the Northern District of Texas. My VITA lists many of my speaking engagements, and lists several publications I have authored. I was for many years (1981-1992 and 2008-2014) an assistant district attorney in Tarrant County, Texas. I left that position (later returning to it after retiring from the bench, and some years later retiring from that position to enter private law practice). I served over fourteen years as an elected Texas state district court judge in a court dedicated to handling criminal cases in Fort Worth,

**DECLARATION OF ROBERT GILL**                                    **PAGE 3 of 13**

Tarrant County, Texas. During my time as a judge of the 213th Criminal District Court (from January, 1993 to May, 2007), I also served as Local Administrative Judge of Tarrant County between 1997-1998 and 2003-4. I also served as Presiding Judge over Tarrant County Criminal Courts in 1997. I have direct experience with all aspects of criminal law and procedure in Texas from the perspective of attorney (in district attorney office, and more recently in private practice) and judge (during my time on the bench). In this connection, I also have knowledge and expertise regarding rights and liberties protected and guaranteed to citizens under provisions of the United States Constitution (including the Fourth and Fourteenth Amendments to that constitution) and corresponding limitations on the powers and authority of law enforcement officials (including police officers and detectives and investigators and attorneys and judges and police departments and prosecutor's offices such as district attorney's offices, and various law enforcement offices and agencies and units of state and local government). During my time in the Tarrant County District Attorney's Office, in addition to directly handling and trying many cases, I also had training and supervisory responsibilities and supervised the work activities of other attorneys and their staff assistants, including investigators. I know that criminal investigations should be conducted with appropriate care to assure that criminal charges are not brought improperly against citizens, and to insure that search and seizure warrants are not either sought or executed improperly. I am familiar with all aspects of the grand jury process. I know the processes for obtaining warrants to search, warrants to seize, and warrants to arrest. I know that warrants must be sufficiently detailed and focused, and that a warrant for one thing is not a blanket permit to do other things. I am familiar with arrest and detention procedures, and with procedures for determining whether probable cause exists in connection with a particular situation, and with procedures for pressing and bringing criminal charges against persons. I am familiar with the procedures for investigating to determine whether crimes have occurred and whether to press charges against any particular person. I am familiar with the Texas Penal Code, and know (among other things) that it defines, as separate crimes and offenses, criminal trespass, and assault, and aggravated assault, and official oppression. I am also familiar with the Texas Code of Criminal Procedure and know the rules for obtaining search warrants and arrest warrants. I know the law and rules relating serving and/or executing such warrants. I have some familiarity with what S.W.A.T. TEAMS do, and how federal-state law enforcement personnel sometimes work together on task forces, and I know

**DECLARATION OF ROBERT GILL**                    **PAGE 4 of 13**

that in such situations the rights of people which are protected by the Constitution and other laws are still protected, and those protections may not be ignored, and are not somehow suspended, and the protected rights of the people must be fully and properly protected and respected by all officers and personnel who are serving as members of any S.W.A.T. Team or of any such task force. I am familiar with what constitutes competence or incompetence of police officers, including those who are working as part of a S.W.A.T. Team.  I am familiar with what constitutes reasonable or unreasonable conduct of police officers, including those who are working as part of a SWAT Team. I know that police officers, like other citizens, must at all times comply with the requirements of all provisions of the Constitution of the United States [including all provisions of the Fourth Amendment], and must obey the law including all federal and state laws, and local ordinances], and must obey the rules and directives and protocols of their police departments. I know that police officers, like other citizens, are legally prohibited from making illegal entry into a home, or attacking a home, or tearing up a home which they have no right to assault or enter.  I know that the Fourth Amendment prohibits police officers, including those who may be serving on a S.W.A.T. Team, from making warrantless entry into homes, or making warrantless detentions or arrests of citizens who are not misbehaving or breaking the law; and I know that the Fourth Amendment prohibits police officers, including those who may be serving on a S.W.A.T. Team, from using improperly excessive force against persons, and prohibits any use of force against persons who are not committing any crime or doing anything to put themselves or others at risk of harm.

6. ) The opinions I will express below are all based upon the sorts of information that an expert such as I would routinely review in order to assess and act upon problems such as those presented in this case.

7. ) Eleven (11) pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] show admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant on the occasion in question. In their own filed  pleadings the defendants, each and every, have each admitted that on the occasion in question they were members of the S.W.A.T.

**DECLARATION OF ROBERT GILL**                                         **PAGE 5 of 13**

Team and have admitted that they, each and every one, improperly entered into the home of the plaintiffs without a warrant.

8. )   It is clear that the defendants [the S.W.A.T. Team, as they as identified by Chief Goolsby in his deposition] were not simply in the Jimerson home for a short period of time. While there appear to be no completely definitive records, the record that Chief Goolsby did know about indicated that the operation did not end until about 1:30 a.m. on the day after it started It must have started prior to the time when the ambulance was called, which was at 11:28 p.m. according to ambulance records. Other available information appears to indicate that the ambulance was not called until well after the operation started, at least fifteen or more minutes after the time when the defendants [S.W.A.T. Team] invaded and attacked the home of the Jimerson-Parks plaintiffs. From the start of that attack, until much later than when the ambulance left [at 11:50 p.m. according to ambulance records] carrying in it Jasamea Jimerson and Karen Jimerson, defendants were inside of the home of plaintiffs doing whatever they wanted to do, and always without any warrant or permission to enter or to stay. Based upon information now available, it appears that the ambulance was not called until at least 15 or more minutes after the defendants first entered into the plaintiffs' home. Declarations of Karen Jimerson and James Parks [who remained in the Jimerson-Parks home after Karen and Jasamea Jimerson were taken by ambulance from the home] show that the defendants [the police/S.W.A.T. Team] were in the Jimerson-Parks home a long time, totaling at least over two (2) hours. The declaration of Mrs. Rebecca DeSantis establishes that the police/S.W.A.T. Team officers were in the Jimerson-Parks home at least 20 minutes from the time they initially attacked and invaded that home until the time when Mrs. DeSantis [the across the street neighbor of Karen Jimerson] had gotten permission from the police/S.W.A.T. Team to enter the invaded home of plaintiffs in order to try to check on the condition of the two young boys [Jayden Jimerson and Xavien Parks] and had seen the devastation in the home and had seen Karen Jimerson who was in shock and covered with broken glass and bleeding from her wounds. The declaration of Mrs. DeSantis shows that even when she left the home of plaintiffs police officers were still at that home.

9. )   The ambulance records show injury to Ms. Jimerson as "Pain - Multiple Injuries ... Assault - Assault with bodily force ..."] . The injuries to minor plaintiff Jasamea Jimerson, as reported

**DECLARATION OF ROBERT GILL**                    **PAGE 6 of 13**

in the ambulance records, included "Pain - Knee Pain ... Struck by Object - Contact with blunt object ..." Jasamea was grabbed by at least two officers [defendants] who forced her to the floor and tied her hands behind her with zip-tie type devices. Karen Jimerson was forced to stay on the floor with no clothing on from the waist down for a long time, first on her stomach and eventually she was permitted to sit up, still on the floor and with no clothes on from waist down. The invading defendants/S.W.A.T. Team were armed and had their weapons drawn. They ordered the plaintiffs about and exercised control and dominion over them and restricted their movement and detained the plaintiffs in their own home from the time the defendants attacked and entered the home of the plaintiffs until after the ambulance took Jasamea Jimerson and Karen Jimerson away from their home. After the ambulance left James Parks and the two minor plaintiffs [Jayden Jimerson and Xavien Parks] remained at the home. The two young boys, Jayden and Xavien got glass in their eyes when the assault on their home commenced as a result of the S.W.A.T. Team breaking the window glass of the home. Defendant Sanders has admitted that he used the break-n-rake device to break the glass.

10.)   Lt. Lewis was in command of the S.W.A.T. Team and defendant Sgt. Sanders was second in command. In connection with the Internal Affairs investigation into the improper forced entry by the defendants/S.W.A.T. Team into the residence of the plaintiffs, both Lt. Lewis and Sgt. Sanders admitted fault, and acknowledged that it was improper for the S.W.A.T. Team to have attacked and entered the home of the plaintiffs, and that what had happened at the home of the plaintiffs never should have happened. Both Lt. Lewis and defendant Sanders bear special responsibility for what happened at the home of the plaintiffs on 27 March 2019, and both have so admitted.

11.)   While inside the home of the plaintiffs, and with no warrant to do so, the defendants searched at least two (2) rooms inside the house. One was the room of minor plaintiff Jasamea Jimerson, and the other was the bedroom where James Parks and his two young sons [minor plaintiffs Jayden Jimerson and Xavien Parks] were sleeping when the defendants invaded their home. These warrantless searches were unauthorized and totally illegal. There is no indication that these warrantless and illegal searches turned up anything indicating any misconduct by any plaintiff. The S.W.A.T. Team had no warrant to search the home of the

**DECLARATION OF ROBERT GILL**                                   **PAGE 7 of 13**

plaintiffs, or to search or seize any of the plaintiffs, and no application was ever made for any such warrant. There is no indication of any sort of probable cause to believe that either the plaintiffs or their home might be involved in any kind of criminal misconduct that could form any basis to conduct a search inside the home of the plaintiffs.

12. ) The plaintiffs had done nothing wrong. There was no reason to search them, or their home, or to detain them, or to enter their home. The plaintiffs were the only persons in their home when the S.W.A.T. Team invaded it. The plaintiffs endured a very frightening ordeal, and sustained some injury, and some of their property was damaged or destroyed, and the house was damaged. There was no probable cause to invade the home of the plaintiffs, or to suspect that they had committed any crime. No arrests were made. No charges were ever made against the plaintiffs.

13. Chief Goolsby authorized the defendants/S.W.A.T. Team to serve a warrant, but not to do what they did. He did not authorize them to make any warrantless entry and they should not have done so. When they did so they stepped outside of the scope of the task authorized by Chief Goolsby. The warrant he authorized the defendants to serve made no mention of the plaintiffs or of their home. It was directed to another address.

14. ) Chief Goolsby stated at deposition that he would not expect a S.W.A.T. Team to use zip ties or flash bangs against people, or against a physical location, not mentioned in the warrant. I agree with him. The defendants/S.W.A.T. Team were acting improperly and incompetently and unreasonably when they used flash bangs against the plaintiffs, and when they used zip ties against at least one [Jasamea Jimerson] of the plaintiffs. The leaders of the S.W.A.T. Team, defendants Lt. Lewis and Sgt. Sanders are particularly at fault for not preventing this misconduct. In failing to do so, they were acting improperly and incompetently and unreasonably.

15. ) Chief Goolsby was concerned because the defendants should not have gone to the wrong house, and he ordered an internal affairs investigation. Such an investigation is not done lightly, but is only done for serious problems. He has stated that the defendants should not have gone to the wrong house. He ordered the investigation because property damage

**DECLARATION OF ROBERT GILL**                     **PAGE 8 of 13**

occurred and people were subjected to the improper conduct, and because those kind of mistakes should not happen. He does not ever want anything like this to happen again in the future. I agree with Chief Goolsby on these points. His memorandum of April 2, 2019, which ordered and initiated the Internal Affairs investigation, states, in part, that: "upon execution of the warrant, the SWAT Team made entry on the wrong residence. They forced entry at 593 8th Street which is two doors down from the correct location. This error should not have occurred ...." In the same memo Chief Goolsby recounted that on the evening of the invasion of the Jimerson-Parks home the DEA had conducted briefing regarding the plan for the execution of service of the warrant, and at that briefing "Photos of the residence were shown at the briefing and the address of the location was given".

16.) The Internal Affairs investigation found that **reasonable and normal protocol was completely overlooked** by the defendants/S.W.A.T. Team when they attacked and invaded the Jimerson home. The investigation also found that a **home was entered illegally by the members of the Waxahachie Police Department who comprised the S.W.A.T. Team** [and are the defendants in this case]. I agree with these findings in the report of the Internal Affairs investigation, and it appears that Chief Goolsby is in general agreement, also.

17.) When asked at deposition if he would expect a **competent police officer** under his command to make the kinds of mistakes the defendants/S.W.A.T. Team made, Chief Goolsby answered; "**No**, I wouldn't expect it...." I agree with Chief Goolsby on this point, and commend him for making the admission that the errors of the defendants/S.W.A.T. Team show lack of competence.

18.) Chief Goolsby testified that all of the officers in his department on 27 March 2019 knew about the warrant requirement for searches and seizures, and knew about the Fourth Amendment that speaks to the warrant requirement for searches and seizures. He testified that he did not authorize the defendants/S.W.A.T. Team to go beyond the boundaries of the warrant [which was for a location different from the home of the plaintiffs], and that the **correct way** to do the job he authorized the S.W.A.T. Team to do on the occasion in question was for them to **go to the location mentioned in the warrant**.

**DECLARATION OF ROBERT GILL**                                    **PAGE 9 of 13**

19. ) Chief Goolsby testified that the defendants/S.W.A.T. Team acted incorrectly when they entered the wrong house [the home of plaintiffs] and that because Lt. Lewis was in command of the S.W.A.T. Team he was the one that actually got suspended without pay. Chief Goolsby later testified that he does not think that he, or the police department, made a wrong decision when Lt. Lewis was sanctioned by having a few days of unpaid leave. The Chief also referred to the sanction as being "suspended" or "disciplined".

20. ) The Internal Affairs investigation found that when the defendants/S.W.A.T. Team invaded the home of the plaintiffs **reasonable and normal protocol was overlooked**; and defendant Lt. Lewis did not deny this.

21. ) Chief Goolsby stated at his deposition that police officers have a constant obligation to so everything they can to protect innocent citizens. I agree with the Chief, and note that the defendants/S.W.A.T. Team failed to meet this duty when they invaded the home of the plaintiffs.

22. ) Chief Goolsby stated that it is important for police officers to obey rules and regulations of their departments, and to obey rules and regulations that take the form of laws and constitutional provisions. I agree with Chief Goolsby about this, and would state that the failure of the defendants/S.W.A.T. Team to do so on the occasion in question, when they attacked and invaded the home of the plaintiffs without warrant or probable cause, and then hurt the plaintiffs, and then searched parts of the home of the plaintiffs without warrant or probable cause, was so badly wrong as to constitute incompetence on the part of each and every defendant, and as to constitute on the part of each and every defendant misbehavior that no reasonable office would commit. Further, in view of the knowledge of the officers/S.W.A.T. Team of warrant requirements, and the total disregard they showed for this fundamental legal requirement, it appears that the defendants/S.W.A.T. Team did knowingly disregard and violate the law regarding the Fourth Amendment prohibition on warrantless searches and seizures, on the occasion in question, especially with regard to the warrantless and violent forced invasion entry into the home of the plaintiffs, and the warrantless search they conducted inside the home of the plaintiffs, and the rough treatment they meted out to the plaintiffs. This demonstrates incompetence on the part of each and

**DECLARATION OF ROBERT GILL**                    **PAGE 10 of 13**

every defendant member of the S.W.A.T. Team.   Also, this constitutes unreasonable misbehavior on the part of each and every defendant member of the S.W.A.T. Team. Further, the leader of this illegal episode, Lt. Lewis, bears special responsibility and fault and, in this connection, it is clear that his conduct as an officer was incompetent, and was unreasonable. Similarly, the second in command of this illegal episode, Sgt. Sanders, bears special responsibility and fault and, in this connection, it is clear that his conduct as an officer was incompetent, and was unreasonable.

23.)    At deposition Chief Goolsby stated that as of 27 March 2019 all of his officers [which would include all the defendants who were members of the S.W.A.T Team of his department] knew about warrant requirements, and about the Fourth Amendment; so presumably they knew that it is legally incumbent on an officer executing a search warrant to ensure that the search is lawfully authorized and lawfully conducted, and that under the Fourth Amendment there is a presumptive rule against warrantless searches, and that under the law of the Fourth Amendment it is wrong to improperly arrest a person or even to detain a person for a long time in the absence of a proper warrant, and that the Fourth Amendment prohibits use of unnecessary force and prohibits police brutality; yet Lt. Lewis, and his second in command Sgt. Sanders, and the members of the S.W.A.T. Team of the Waxahachie police department who are defendants in this case, simply cast all of this to the wind, and disregarded it, when they attacked and invaded [according to pleadings they have each and all filed in this case indicating they each and all went into the home of the plaintiffs] the Jimerson-Parks home on 27 March 2019, and did so with great noise and violence and broke windows and rammed down the front door and made entry without warning or permission or any legal right to do so, and then inside the home illegally roughed up the occupants and illegally searched portions of the home, and broke up some of the personal property of the plaintiffs, and damaged the home itself, and basically took custody of the plaintiffs at gunpoint, and [according to several declarations I have seen, as appears to be corroborated by some written records] stayed in the home for an extended period of time, and caused various injuries to most of the plaintiffs who at all times were in their own home, peacefully trying to shelter for the night. This demonstrates incompetence on the part of each and every defendant member of the S.W.A.T. Team. Also, this constitutes unreasonable misbehavior on the part of each and every defendant member of the S.W.A.T. Team. Further, the leader of this

**DECLARATION OF ROBERT GILL**        **PAGE 11 of 13**

illegal episode, Lt. Lewis, bears special responsibility and fault and, in this connection, it is clear that his conduct as an officer was incompetent, and was unreasonable. Similarly, the second in command of this illegal episode, Sgt. Sanders, bears special responsibility and fault and, in this connection, it is clear that his conduct as an officer was incompetent, and was unreasonable.

24.) Attached hereto and made for all purposes a part hereof, as indicated above in paragraph 4, please find and see [attached hereto as EXHIBIT 1] my entire expert report letter of 8 March 2021, with all of its exhibits attached [just as it was e-filed with the court clerk and e-served upon opposing counsel in this case; it is designated by the clerk of the court as Document 150-1].


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Robert Gill


Executed the 24th day of August 2021 in Tarrant County, Texas.

# EXHIBIT I

# REPORT OF ROBERT GILL

**[with all exhibits, as previously e-filed and served
on or about 8 March 2021,
and designated by the Court Clerk as DOC. 150-1]**

LAW OFFICES OF

# GILL & BRISSETTE
(NOT A PARTNERSHIP)

**BOB GILL**
RETIRED STATE DISTRICT JUDGE
BOARD CERTIFIED - CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION

**D. MILES BRISSETTE**
BOARD CERTIFIED - CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
BOARD CERTIFIED - CRIMINAL LAW SPECIALIST
NATIONAL BOARD OF TRIAL ADVOCACY

**HEATHER NERING**
PARALEGAL

**YEZENIA HERNANDEZ**
LEGAL SECRETARY

2502 GRAVEL DRIVE
FORT WORTH, TEXAS 76118
(817) 803-6918
FACSIMILE (817) 554-1534

RE:    Civil Action No. 3:20-CV-02826-L; Jimerson, et al v. Lt. Lewis, et al

8  March  2021

Mr. Ernest ("Skip") Reynold III
314 Main Street, Ste 202
Fort Worth, Texas 76102

RE:    Jimerson-Parks case : CIVIL ACTION NO. 3:20-CV-02826-L

Mr. Reynolds:

I am sending this letter to you pertaining to the above captioned case in which I know you represent the Jimerson-Parks plaintiffs. This is a letter which I know will be used for legal purposes. This letter contains factual background about my training and qualifications, about materials I have reviewed, and what I have done to analyze this matter up to this time. This letter also contains certain opinions that I have formulated which are legal opinions based upon my factual knowledge, and my legal knowledge and expertise.

All of my opinions are based upon "reasonable legal probability." The opinions are based upon information currently available to me, and are based upon my professional experience and expertise, and are based upon my knowledge of law which is relevant or pertinent to the opinions.

I have been retained to serve in this case as an expert. I am being paid by the hour at a rate of **$250.00** per hour, and do not own any part of any claim asserted in this case, and have no contingent interest in the outcome of this case.

During the past four years I have testified zero times at trial.

During the past four years I have testified zero times as a deposition witness.

Report Letter/Jimerson-Parks case
8 March 2021
page - 2 of 22
----------------------------

My qualifications are summarized on my VITA (3 pages) which is attached hereto as **EXHIBIT H** (and made a part hereof). I will not now re-state everything in the VITA. I am presently in private law practice, and have been since January, 2015. I practice law with another attorney, and we maintain our office in Fort Worth, Texas. I am a Board Certified specialist in criminal law. I am an attorney licensed for many years (since 1981) continuously (and presently) to practice law in Texas. I am admitted to practice in some federal courts, including the federal courts in the Northern District of Texas. My VITA lists many of my speaking engagements, and lists several publications I have authored. I was for many years (1981-1992 and 2008-2014) an assistant district attorney in Tarrant County, Texas. I left that position (later returning to it after retiring from the bench, and some years later retiring from that position to enter private law practice). I served over fourteen years as an elected Texas state district court judge in a court dedicated to handling criminal cases in Fort Worth, Tarrant County, Texas. During my time as a judge of the 213th Criminal District Court (from January, 1993 to May, 2007), I also served as Local Administrative Judge of Tarrant County between 1997-1998 and 2003-4. I also served as Presiding Judge over Tarrant County Criminal Courts in 1997. I have direct experience with all aspects of criminal law and procedure in Texas from the perspective of attorney (in district attorney office, and more recently in private practice) and judge (during my time on the bench). In this connection, I also have knowledge and expertise regarding rights and liberties protected and guaranteed to citizens under provisions of the United States Constitution (including the Fourth and Fourteenth Amendments to that constitution) and corresponding limitations on the powers and authority of law enforcement officials (including police officers and detectives and investigators and attorneys and judges and police departments and prosecutor's offices such as district attorney's offices, and various law enforcement offices and agencies and units of state and local government). During my time in the Tarrant County District Attorney's Office, in addition to directly handling and trying many cases, I also had training and supervisory responsibilities and supervised the work activities of other attorneys and their staff assistants, including investigators. I know that criminal investigations should be conducted with appropriate care to assure that criminal charges are not brought improperly against citizens, and to insure that search and seizure warrants are not either sought or executed improperly. I am familiar with all aspects of the grand jury process. I know the processes for obtaining warrants to search, warrants to seize, and warrants to arrest. I know that warrants must be sufficiently detailed and focused, and that a warrant for one thing is not a blanket permit to do other things. I am familiar with arrest and detention procedures, and with procedures for determining whether probable cause exists in connection with a particular situation, and with procedures for pressing and bringing criminal charges against persons. I am familiar with the procedures for investigating to determine whether crimes

Report Letter/Jimerson-Parks case
8 March 2021
page - 3 of 22
----------------------------

have occurred and whether to press charges against any particular person. I am familiar with the Texas Penal Code, and know (among other things) that it defines, as separate crimes and offenses, criminal trespass, and assault, and aggravated assault, and official oppression. I am also familiar with the Texas Code of Criminal Procedure and know the rules for obtaining search warrants and arrest warrants. I know the law and rules relating serving and/or executing such warrants. I have some familiarity with what S.W.A.T. TEAMS do, and how federal-state law enforcement personnel sometimes work together on task forces, and I know that in such situations the rights of people which are protected by the Constitution and other laws are still protected, and those protections may not be ignored, and are not somehow suspended, and the protected rights of the people must be fully and properly protected and respected by all officers and personnel who are serving as members of any S.W.A.T. TEAM or of any such task force.

I have reviewed, and will attach to this letter as exhibit items, all of the following :

**EXHIBIT A** : Aerial Map of Jimerson Home  v. Warrant Location [they are not "next door"]

**EXHIBIT B** : 11 pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] showing admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant

**EXHIBIT C** : Probable Cause Affidavit [filed in a Texas State Court, not in a federal court; does not mention or refer to any plaintiff and does not mention or refer to plaintiffs' home]

**EXHIBIT D** : the two (2) Search Warrants [issued out of a Texas State Court, by a Texas State Judge, in Dallas; they do not mention or refer to any plaintiff or mention or refer to any person, and do not mention or refer to plaintiffs' home or its address in any manner; but they do mention two (2) other locations specifically and by their specific addresses]

**EXHIBIT E** : Filed returns on two (2) Search Warrants [filed in a Texas State Court, in Dallas, not in a federal court; they do not mention or refer to any plaintiff or mention or refer to any person, and do not mention or refer to

Report Letter/Jimerson-Parks case
8 March 2021
page - 4 of 22
----------------------------

plaintiffs' home or its address in any manner; but they do mention two (2) other locations specifically and by their specific addresses]

**EXHIBIT F** : Home Repair Records/Invoices/some photos [all pertaining to plaintiffs' home]

**EXHIBIT G** : Ambulance Records

**I have also reviewed** the current complaint pleading [DOC. 16 ~ the Amended Complaint]; and I have obtained some general background information from lead counsel for the plaintiffs. I am aware that plaintiffs have served written discovery upon all defendants, and I know that the defendants have been resisting discovery, and that thus far they have not filed and served answers to the written discovery, and it has not been possible to take deposition testimony. I am aware that plaintiffs are pressing for discovery, and I understand that when, if, and as they may obtain discovery from the defendants [and their attorney, Mr. Montgomery] they will be able to provide further information to me so that I may review it. My understanding of the facts of this case are based upon the information currently available to me.

-----------------------------------

**I may use any of the above-referenced exhibit items as exhibits** in connection with any testimony I may give in this case. I may also use the Texas Penal Code, the Texas Code of Criminal Procedure (and any pertinent parts thereof) and the United States Constitution (especially; but not limited to, its Fourth and Fifth and Fourteenth Amendments) as exhibit items.

---------------------------------

Based upon my review of information, I believe that I know and understand many facts about this case.

The defendants have admitted that on the occasion in question they were all experienced law enforcement officers; so they should have known about the laws that protect the rights of citizens like the plaintiffs, including the Fourth Amendment prohibition regarding warrantless searches and seizures, and the various Texas laws that prohibit assault, and aggravated assault, and criminal trespass, and official oppression; and the defendants

Report Letter/Jimerson-Parks case
8 March 2021
page - 5 of 22
----------------------------

must have known that these were all well established laws by the time of the occasion in question, and that these laws limited what any law enforcement officer could do in order to safeguard the rights and liberties of members of the public, including the right to be safe and secure in the sanctity of their homes.

I know that in this case there was no warrant that gave any defendant any right or authority or power to disturb the peace of the plaintiff's home, or to invade it, or to ram down its front door, or to damage it; and there was no warrant that made any reference to that home, or to the address of that home, or to the address of any home "next door" to it. I also know that any warrant the defendants may have had was a Texas State warrant, and was not a federal court warrant, and was requested by a Texas police officer [a member of the Dallas P.D.].

I know that in this case there was no warrant that gave any defendant any right or authority or power to disturb the peace of the plaintiffs' home, or to invade it, or to ram down its front door, or to damage it, or to search it [or search any part of it] on the occasion in question, or at any time ever; and there was no warrant that made any reference to that home, or to the address of that home, or to the address of any home "next door" to it.

I also know that any warrant the defendants may have had was a Texas State warrant, issued by a Texas State judge in Dallas, and was not a federal court warrant, and was requested by a Texas police officer [a member of the Dallas P.D.] who made the request to a Texas State judge, and was issued in Dallas County, Texas, by a Texas State Judge. I know that the probable cause affidavit used by that officer to obtain the warrants [there were two of them, and neither of them mentioned the plaintiff's home or its address in any way] that the defendants were supposed to be serving/executing on the occasion in question made no mention at all of the address of the plaintiff's home or of the names of the plaintiffs or of the plaintiffs or of the names of any persons.

I know that in this case there was no warrant that gave any defendant any right or authority or power to disturb the peace of the plaintiffs, or to search any plaintiff, or to seize any plaintiff, or to restrain any plaintiff in any way, or to detain any plaintiff in any way, on the occasion in question, or at any time ever; and there was no warrant that made any reference to any of the plaintiffs, or mentioned the name of any plaintiff, or mentioned the name of any person.

Report Letter/Jimerson-Parks case
8  March 2021
page - 6 of 22
----------------------------

     I also know that on the occasion in question there was no probable cause to disturb the plaintiffs, or to attack their home, or to detain any plaintiff, or to search any plaintiff, or to restrain any plaintiff, or to enter the home of the plaintiffs, or to search the home [or any part of the home] of the plaintiffs.


     The case arises from a S.W.A.T. TEAM activity which, without any warrant, and without any probable cause, invaded the home of the plaintiffs. The occurrence date was 27 March 2019. The location invaded was 593 West 8th Street, Lancaster, Texas (75146). A nearby house where there apparently had  been problems of a criminal nature is located at 573 West 8th Street, Lancaster, Texas. That nearby house is not "next door" to the location of the plaintiffs' home, but both homes are on the same street.  Both are single family dwellings, and each is on its own lot, and has its own address. **PLEASE SEE EXHIBIT A [attached hereto ~ aerial map]**. The plaintiffs had no connection with the other home, and the warrant that the defendants had referred specifically to the other home, by its address, and the warrant made no reference to the plaintiffs' home.


     The plaintiffs were at [and inside of] their home, which they rented, in Lancaster, Texas, on the evening of 27 March 2019, when their home [as described more fully in the filed complaint pleading] was attacked and invaded by a S.W.A.T. TEAM, which made a "no knock" entry in the dark of night.  The invaders destroyed and/or damaged some personal property of Plaintiffs. The activities of the S.W.A.T. TEAM were very loud and scary, and once they entered the defendants did not quickly leave. The defendants were armed with dangerous weapons and the plaintiffs were frightened. **The defendants have each filed a pleading in which they each admit that they entered the home of the plaintiffs. PLEASE SEE EXHIBIT B [attached hereto~a copy of the set of the pertinent pages from those pleadings].** While inside the plaintiffs' home the defendants took control in a manner hostile to plaintiffs, and which in effect made plaintiffs unable to move freely just as though they were prisoners.  At least one plaintiff's hands were tied up using "flex cuffs" (zip ties) instead of handcuffs, and at least one bedroom was searched by the defendants, and Ms. Jimerson was forced to lie on the floor in the doorway between the bathroom and the hallway without any clothing on from her waist down for an extended period of time, and several of the plaintiffs sustained some sorts of injuries and the defendants treated and handled the plaintiffs roughly and at least two of the plaintiffs had to be taken out of the home by ambulance and delivered to a hospital emergency room because of all of this activity carried on by the defendants.

Report Letter/Jimerson-Parks case
8 March 2021
page - 7 of 22
----------------------------

The warrant documentation clearly showed the addresses made the subject of the warrants to be addresses other than Plaintiffs'. Also, neither warrant mentioned any person. **PLEASE SEE EXHIBIT C [attached hereto~ a copy of the probable cause affidavit], and EXHIBIT D [attached hereto~ copies of the two (2) search warrants obtained by use of the probable cause affidavit], and EXHIBIT E [attached hereto~copies of the two (2) returns filed in connection with service/execution of those warrants].** These records were located in Dallas County, among the state court records maintained by and for the state courts. Both warrants are search warrants. Both warrants issued out of a Texas State Court in Dallas County, Texas, and were signed by a Texas State judge. There does not appear to be reason to believe there are any such warrant or return document filed with, or issued from, any federal court in connection with any matter relating to the problems experienced by the Jimerson-Parks plaintiffs, which are the problems addressed in their present civil rights lawsuit.

The plaintiffs had done nothing wrong.

The plaintiffs were the only persons in their home when the S.W.A.T. TEAM invaded it. They endured a very frightening ordeal, and sustained some injury, and some of their property was damaged or destroyed, and the house was damaged.

There was no probable cause to invade the home of the plaintiffs, or to suspect that they had committed any crime. No arrests were made.

The S.W.A.T. TEAM had no warrant to search the home of the plaintiffs, or to search or seize any of the plaintiffs, and no application was ever made for any such warrant.

The invading officers [the defendants] were not federal employees. They were members of the Waxahachie Police Department, which is in Waxahachie, Ellis County, Texas.

The warrant(s) that the defendants were supposed to be serving/executing were for other totally separate locations/addresses. Those warrants were not federal, and did not issue from any federal court, but instead were issued in Dallas County, Texas, by a Texas State judge, based upon a probable cause affidavit signed and sworn to by an officer [Hight] who apparently was a member of the Dallas P.D. The probable cause affidavit made no mention directly or indirectly of any of the plaintiffs, or of their home [or its address....]. In fact, the warrants [PLEASE see **EXHIBIT D**~attached hereto] issued made no mention of the

Report Letter/Jimerson-Parks case
8 March 2021
page - 8 of 22
----------------------------

plaintiffs, or of their home [or its address]. No warrant made mention of any particular person [or of any person at all], but the two warrants that were signed by the Texas State judge did each specifically identify an address [neither of which was the address of the home of the plaintiffs], and one was a "no knock" warrant. **PLEASE SEE EXHIBIT C [attached hereto~ a copy of the probable cause affidavit], and EXHIBIT D [attached hereto~ copies of the two (2) search warrants obtained by use of the probable cause affidavit], and EXHIBIT E [attached hereto~copies of the two (2) returns filed in connection with service/execution of those warrants].**

The Jimerson-Parks plaintiffs are a family unit, comprised of two (2) adults [both of whom are disabled persons] and three young children [two of whom, the little boys, were pre-schoolers on 27 March 2019].

When the S.W.A.T. TEAM entered the Jimerson-Parks home they made a "no knock" entry, and they had no permission to enter, and never asked for permission to either enter or to stay in the home. They rammed in the door, and damaged it, and did other things that caused damage to the home. Afterwards the home was repaired, and it appears that the repairs were paid for by someone on behalf of the invading S.W.A.T. TEAM. Though the home was located in Lancaster, in Dallas County, Texas, the officers who entered the home were from the Waxahachie P.D. Waxahachie is in Ellis County, and basically is to the South of Dallas County. **PLEASE SEE EXHIBIT F [attached hereto~copies of some photos and documents pertaining to damage to the home of the plaintiffs, and to repairs done, and costs of repairs, and payment.**

Information indicates that the defendants were in the home, and were searching parts of it, and were ordering the plaintiffs about and otherwise exercising domination over them in a hostile and threatening manner while armed with deadly weapons and making much noise and yelling, for at least fifteen or more minutes before anybody called an ambulance. Ambulance records **PLEASE SEE EXHIBIT G [attached hereto~a copy of Ambulance Records]** show that from the time a call was made for an ambulance, until the time it had arrived and collected up two of the plaintiffs, and departed from their home to take them to the Emergency Room at a hospital, the time elapsing was about a half hour. Even when Plaintiff Ms. Jimerson was on a gurney and was taken from her home to the ambulance defendants were still inside if it, and others were outside boarding up the broken windows.

At the plaintiffs' home, before she was taken away to the hospital, at least one defendant [Lt. Lewis] told Ms. Jimerson that the defendants should not have come into her

Report Letter/Jimerson-Parks case
8 March 2021
page - 9 of 22
----------------------------

home and admitted that doing so was wrong.

When the defendants entered the home of plaintiffs, the defendants were a fearsome group, and were armed with scary looking weapons that could inflict great harm or cause death. The defendants were like a loud group of hostile folks, and ordered the plaintiffs about, and hurt the plaintiffs. It is my understanding that the two little boys got broken glass in their eyes. Ms. Jimerson was just getting out of her bath, and had no clothes on from the waist down; but she was ordered and forced to lay on the floor in or near the doorway from the bathroom to the hall, with no clothing on from the waist down for a long time [probably at least 15 or more minutes]. Because of the way she was mistreated by the defendants Ms. Jimerson sustained bodily injury and had to be taken from her house by gurney to an ambulance, and then taken by ambulance to a hospital emergency Room. This is reported in the ambulance record. **PLEASE SEE EXHIBIT G [attached hereto~copies of the ambulance records, which show injury to Ms. Jimerson as "Pain - Multiple Injuries ... Assault - Assault with bodily force ..."]**. Based upon information now available, it appears that the ambulance was not called until at least 15 or more minutes after the defendants first entered into the plaintiffs' home.

Ms. Jimerson recalls that while she was being forced to lay on the floor half naked the time that passed was at least 15 minutes. She also reports that during this time her young daughter, plaintiff Jasamea Jimerson, was in her own room where Ms. Jimerson learned that Jasamea had been forced to the floor and her hands had been bound, apparently with "flex cuffs" (zip ties), and her room was searched by defendants. As Ms. Jimerson recalls, only when defendants found nothing and stopped searching Jasamea's room, did they let Jasamea get up and come to where Ms. Jimerson was, and only then did the defendants permit Ms. Jimerson to get clothing and get completely dressed. It was after this that the ambulance arrived.

**The ambulance records [EXHIBIT G] show ambulance was called for at 11:28 p.m., dispatched at 11:29 p.m. , on scene at 11:36 p.m., some vitals were taken at 11:49 p.m., and the ambulance departed at 11:50 p.m ... ].**

The **injuries to minor plaintiff Jasamea** Jimerson, as reported in the ambulance records **[EXHIBIT G]** included **"Pain - Knee Pain ... Struck by Object - Contact with blunt object ..."**   .

After the defendants broke into the Jimerson-Parks family home, they ordered the

Report Letter/Jimerson-Parks case
8 March 2021
page - 10 of 22
----------------------------

plaintiffs around and intimidated and frightened them, and the plaintiffs were basically their prisoners; and plaintiffs did not resist or do anything to antagonize the defendants. Plaintiffs were not armed. Plaintiffs were not behaving improperly or illegally. While in the home the defendants searched the room of minor plaintiff Jasamea. Defendants damaged and broke some of plaintiffs' personal property. Ms. Jimerson still recall that this was frightening and that she and members of her family could have been killed.

----------------------------------

**I am of the opinion** that under there are various limitations upon the conduct of police officers, and detectives, and investigators, and prosecutors, and district attorney offices, and police departments, and cities and municipalities, and units of government at the state and local level, and at the federal level, and upon various law enforcement offices and agencies which are imposed by virtue of the various provisions of the Constitution of the United States of America, and its amendments (including Fourth and Fifth and Fourteenth Amendments) in order to protect the rights and liberties of citizens, and that these various limitations include:

> regarding police work and all law enforcement, police officers and detectives, and all law enforcement officials and investigators, must obey the law, cannot violate the law, must respect the legal and constitutionally guaranteed rights of all citizens, and cannot violate the legal rights of any citizen. It is wrong to violate Fourth Amendment Constitutional rights regarding search and regarding seizure, it is wrong to abuse citizens, it is wrong to harass citizens, it is wrong to invade and/or search the home of citizens without any warrant and without any probable cause, and also wrong to detain or search any person without a warrant and without probable cause.

In this case it is my opinion, on the basis of reasonable legal probability, that the defendants violated the rights of the plaintiffs when, without warrant or probable cause, they invaded the home of the plaintiffs. This was unreasonable, and no reasonable law

Report Letter/Jimerson-Parks case
8 March 2021
page - 11 of 22
----------------------------

enforcement office would have entered the plaintiffs home in the way that the defendants did. This caused real harm to the plaintiffs, as described hereinabove.

Further, in this case it is my opinion, on the basis of reasonable legal probability, that after making improper entry into the home of plaintiffs, the defendants violated the rights of the plaintiffs when, without warrant of probable cause, they harassed and intimidated and dominated, and in essence held under what amounted to arrest, the plaintiffs, and searched parts of their home which included the bedroom of minor plaintiff Jasamea Jimerson, and damaged and broke some of the plaintiffs' personal property, and handled at least some of the plaintiffs roughly causing two of them to need to be transported by ambulance to a nearby hospital emergency Room, and force Ms. Karen Jimerson to lay on the floor without any clothing on from the waist down for an extended period of time, and all the while the defendants exercised domination over the plaintiffs entire home roaming around uninvited as they pleased and armed with dangerous and lethal weapons. This was unreasonable, and no reasonable law enforcement officer would have entered the plaintiffs home in the way that the defendants did. This caused real harm to the plaintiffs, as described hereinabove.

Separately, in this case, and on the basis of reasonable legal probability, it is my opinion that the defendants violated Texas criminal law by committing against the plaintiffs the crimes of official oppression, and of criminal trespass, and of assault, and of aggravated assault; and that this misconduct constitutes under Texas state law negligence per se, and was a proximate cause of harms and damages to plaintiffs in ways as described hereinabove.

Also, in this case, I am of the opinion, on the basis of reasonable legal probability, that:

    a)   on the occasion in question Plaintiffs, each and all, had a legally recognized and well-known right to be free from unreasonable search and seizure which was guaranteed by the Fourth Amendment.

    b)   on the occasion in question, when the Defendants entered into the premises of the home of Plaintiffs without a warrant [and without consent, and without warning] the Defendants violated the Plaintiffs' legally recognized and well-known right to be free

Report Letter/Jimerson-Parks case
8 March 2021
page - 12 of 22
----------------------------

from unreasonable search and seizure which was guaranteed by the Fourth Amendment.

c)   on the occasion in question, when the Defendants, after having entered into the premises of the home of Plaintiffs without a warrant [and without consent, and without warning], then in effect took custody of the Plaintiffs [and of each of them] at gun point and thereby deprived the Plaintiffs [and each of them] of their liberty, with no warrant and with no probable cause, the Defendants violated the Plaintiffs' legally recognized and well-known right to be free from unreasonable search and seizure which was guaranteed by the Fourth Amendment.

d)   at the time, and on the occasion in question, when the Defendants attacked and  assaulted the home of the Plaintiffs [with no warrant] and entered into the home attired as a heavily armed "S.W.A.T. team", and took control of the premises of the home, and of the Plaintiffs, the Defendants had no "probable cause" upon which to believe [or even suspect] that any of the Plaintiffs had committed any crime [and in fact the Defendants were erroneously invading the home of the Plaintiffs by a total mistake, having come to the wrong address to try to execute [as a "S.W.A.T. team] a search warrant that had  nothing to do with any Plaintiff, or with any activity related to any Plaintiff.

I may continue to work on this case by reviewing further information when, if, and as it may become available [if the defense ever provides discovery responses and information, and stops resisting discovery....]; and in so doing I may, if appropriate, formulate more opinions.

Report Letter/Jimerson-Parks case
8 March 2021
page - 13 of 22
----------------------------

Best regards,

Robert K. "Bob" Gill

Attachments/Exhibits:  As indicated above ~

**EXHIBIT A** : Aerial Map of Jimerson Home  v. Warrant Location [they are not "next door"]

**EXHIBIT B** : 11 pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] showing admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant

**EXHIBIT C** : Probable Cause Affidavit [filed in a Texas State Court, not in a federal court; does not mention or refer to any plaintiff  and does not mention or refer to plaintiffs' home]

**EXHIBIT D** : the two (2) Search Warrants  [issued out of a Texas State Court, by a Texas State Judge, in Dallas; they do not mention or refer to any plaintiff or mention or refer to any person, and do not mention or refer to plaintiffs' home or its address in any manner; but they do mention two (2) other locations specifically and by their specific addresses]

Report Letter/Jimerson-Parks case
8 March 2021
page - 14 of 22
----------------------------

**EXHIBIT E** : Filed returns on two (2) Search Warrants [filed in a Texas State Court, in Dallas, not in a federal court; they do not mention or refer to any plaintiff or mention or refer to any person, and do not mention or refer to plaintiffs' home or its address in any manner; but they do mention two (2) other locations specifically and by their specific addresses]

**EXHIBIT F** : Home Repair Records/Invoices/some photos [all pertaining to plaintiffs' home]

**EXHIBIT G** : Ambulance Records

**EXHIBIT H** : (VITA OF ROBERT K. "BOB" GILL ~ (totaling 3 pages)

Report Letter/Jimerson-Parks case
8 March 2021
page - 15 of 22
----------------------------

# EXHIBIT "A"

**EXHIBIT A** : Aerial Map of Jimerson Home  v. Warrant Location [they are not "next door"]



Report Letter/Jimerson-Parks case
8 March 2021
page - 16 of 22
----------------------------

# EXHIBIT "B"

**EXHIBIT B** : 11 pages from 11 separate defense pleadings filed in this case [by attorney Montgomery] showing admissions of Lt. Lewis and the ten other Waxahachie P.D. members who are defendants [Behringer, Dunn, Fuller, Glidewell, Gonzales. Koch, James Lewis, Sanders, Taylor, and Young] that they improperly entered plaintiffs' home without a warrant

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Lt. Lewis was a member of the Waxahachie Police Department as well as the Waxahachie Police Department's SWAT Team.[4] Lt. Lewis, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Lt. Lewis:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Lt. Lewis, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, … a fully trained, experienced, law enforcement officer who knew, or should have known the well[-]established and well known law pertaining to the legal rights of citizens…..and Defendant Lt. Lewis was acting 'under color of law'…"[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 5, ¶ 4-A.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 22, ¶ 17.

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 92 of 215   PageID 2037
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 20 of 66   PageID 1573
Case 3:20-cv-02826-L   Document 74   Filed 01/12/21   Page 2 of 6   PageID 546

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Behringer was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Behringer, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Behringer:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Behringer, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Behringer] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 9, ¶ 4-K.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT DEREK BEHRINGER'S MOTION TO DISMISS PLAINTIFFS'
<u>STATE TORT CLAIMS</u> – Page 2

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Dunn was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Dunn, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Dunn:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Dunn, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Dunn] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 6, ¶ 4-B.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Fuller was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Fuller, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Fuller:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Fuller, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Fuller] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 7, ¶ 4-F.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Glidewell was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Glidewell, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Glidewell:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Glidewell, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, … [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens…..and Defendant [Glidewell] was acting 'under color of law'…"[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 8, ¶ 4-I.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

**DEFENDANT O.T. GLIDEWELL'S MOTION TO DISMISS PLAINTIFFS' STATE TORT CLAIMS – Page 2**

gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Gonzales was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Gonzales, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Gonzales:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Gonzales, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Gonzales] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 6, ¶ 4-D.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT ANDREW GONZALES' MOTION TO DISMISS PLAINTIFFS' STATE TORT CLAIMS – Page 2

Case 3:20-cv-02826-L-BH Document 183 Filed 08/26/21 Page 97 of 215 PageID 2042
Case 3:20-cv-02826-L Document 150-1 Filed 03/08/21 Page 25 of 66 PageID 1578
Case 3:20-cv-02826-L Document 79 Filed 01/12/21 Page 2 of 6 PageID 581

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Koch was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Koch, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Koch:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Koch, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, … [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens…..and Defendant [Koch] was acting 'under color of law'…"[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 6, ¶ 4-C.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT DUSTIN KOCH'S MOTION TO DISMISS PLAINTIFFS' STATE TORT CLAIMS – Page 2

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Lewis was a member of the Waxahachie Police Department as well a member of the Waxahachie Police Department's SWAT Team.[4] Lewis, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Lewis:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Lewis, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Lewis] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 8, ¶ 4-H.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

**DEFENDANT JAMES LEWIS' MOTION TO DISMISS PLAINTIFFS'STATE TORT CLAIMS – Page 2**

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 99 of 215   PageID 2044
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 27 of 66   PageID 1580
Case 3:20-cv-02826-L   Document 81   Filed 01/12/21   Page 2 of 6   PageID 595

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Sanders was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4]  Sanders, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Sanders:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Sanders, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, … [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens…..and Defendant [Sanders] was acting 'under color of law'…"[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at pp. 7-8, ¶ 4-G.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

DEFENDANT STEPHEN SANDERS' MOTION TO DISMISS PLAINTIFFS' STATE TORT CLAIMS – Page 2

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 100 of 215   PageID 2045
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 28 of 66   PageID 1581
Case 3:20-cv-02826-L   Document 82   Filed 01/12/21   Page 2 of 6   PageID 602

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Taylor was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Taylor, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Taylor:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]
- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]
- Used a battering ram to break open the front door;[8] and
- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Taylor, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Taylor] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 9, ¶ 4-J.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

**DEFENDANT JAMES TAYLOR'S MOTION TO DISMISS PLAINTIFFS'**
**STATE TORT CLAIMS – Page 2**

other Defendants as well as asserted pendent state tort claims for assault, negligence per se, gross negligence per se, criminal trespass, criminal assault, aggravated assault and official oppression.[3]

At the time of the incident, Young was a member of the Waxahachie Police Department as well as a member of the Waxahachie Police Department's SWAT Team.[4] Young, and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the home next door.[5] All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant. Specifically, Plaintiffs allege that Defendants, including Young:

- Made an unannounced, violent, surprise and warrantless no-knock entry;[6]

- Attacked Plaintiffs' home as a heavily armed "paramilitary force" (a SWAT team);[7]

- Used a battering ram to break open the front door;[8] and

- Used flash bang devices to make great noise and emit smells and smoke.[9]

Further, Plaintiffs' allege that Young, as well as the other Defendants, was "[a]t all times relevant to the acts described in this Complaint, ... [a] fully trained, experienced, law enforcement officer[] who knew, or should have known, the well[-]established and well known law pertaining to the legal rights of citizens.....and Defendant [Young] was acting 'under color of law'..."[10]

---

[3] *Id.* at pp. 39-40, ¶ 37.
[4] *Id.* at p. 7, ¶ 4-E.
[5] *Id.* at p. 11, fn. 5.
[6] *Id.* at p. 19, ¶ 12(c).
[7] *Id.*
[8] *Id.* at p. 20, ¶ 12(d).
[9] *Id.* at p. 28, ¶ 29.
[10] *Id.* at p. 23, ¶ 18.

**DEFENDANT DERRICK YOUNG'S MOTION TO DISMISS PLAINTIFFS'**
**STATE TORT CLAIMS – Page 2**

Report Letter/Jimerson-Parks case
8 March 2021
page - 17 of 22
----------------------------

# EXHIBIT "C"

**EXHIBIT C** : Probable Cause Affidavit [filed in a Texas State Court, not
in a federal court; does not mention or refer to any plaintiff and does not
mention or refer to plaintiffs' home]

| | |
|---|---|
| **THE STATE OF TEXAS** | **AFFIDAVIT TO SUPPORT THE ISSUANCE OF SEARCH WARRANTS AT 573 8TH STREET, LANCASTER, TEXAS AND 1211 GLENCOE DRIVE, GLENN** |
| **COUNTY OF DALLAS** | **HEIGHTS, TEXAS** |

## AFFIDAVIT IN SUPPORT OF THE ISSUANCE OF A SEARCH WARRANT

I, Christopher A. Hight, the undersigned Affiant, am a Peace Officer under the laws of Texas and being duly sworn, on oath makes the following statements and accusations:

1.     I am currently employed by the City of Dallas Police Department (DPD) as a police officer. I have been so employed for approximately 29 years and have been assigned to the Narcotics Division of said department for approximately the last 22 years. I am currently certified as a Master Peace Officer by the Texas Commission on Law Enforcement. Since April 2005, I have been assigned to the Drug Enforcement Administration (DEA), Department of Justice, as a deputized Task Force Officer. I am currently assigned to DEA's Strike Force 1. During my employment as a police officer, I have used a variety of methods during drug related investigations, including, but not limited to, visual surveillance, general questioning of witnesses, the use of: search warrants, confidential informants, undercover agents, pen registers/trap and trace devices, electronic mobile tracking/monitoring devices, and Title III wire interceptions. Based on my training and experience relating to the investigation of drug traffickers, and based upon interviews I have conducted with defendants, informants, witnesses, and participants in drug trafficking activity, I am familiar with the ways that drug traffickers conduct their business. My familiarity includes: the various means and methods by which drug traffickers import and distribute drugs; their use of cellular telephones and calling cards to facilitate drug activity; and their use of numerical codes and code words to conduct drug transactions.

2.     Furthermore, based on my training, experience, and my participation in this investigation and other investigations involving drug trafficking organizations, I know:

    a.     drug traffickers often place assets, including accounts at financial institutions, in

JIMERSON-00001

names other than their own to avoid detection of those assets by government or other law enforcement agencies;

b.    even though these assets are in other persons names, the drug dealers continue to use the assets and exercise dominion and control over them;

c.    large-scale narcotics traffickers must keep access to large amounts of cash in order to maintain and finance their narcotics business;

d.    illicit drug traffickers maintain books, records, receipts, notes, ledgers, computers with hard drive and media storage devices, money orders, photographs, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; that illicit drug traffickers commonly "front" (provide on consignment) controlled substances to their customers; and that the aforementioned books, records, computers with hard drive and media storage devices, receipts, notes, ledgers etc. are maintained where the illicit drug traffickers have ready access to them;

e.    persons who traffic in controlled substances, like any other person, in that they maintain documents and records. These documents and records will normally be retained for long periods regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained, and subsequently forgotten. Hence, documents that one would normally think a prudent person would destroy because of the incriminating nature of the documents are kept. In fact, affiant has participated in the execution of search warrants where documentary evidence dating back years was found. It is also affiant's experience that the larger, more complex a continuing criminal enterprise is, the more documentary evidence is generated during the course of commission;

f.    it is common for large-scale dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, businesses, safe deposit boxes, and obscure locations known only to them (e.g. mail drops, mini storage warehouses) for easy access and to conceal them from law enforcement authorities;

g.    persons involved in large-scale drug trafficking conceal in their residences, businesses, safe deposits boxes, and vehicles, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, personal effects, coin collections, and other items of value representing the proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal narcotic trafficking activities;

JIMERSON-00002

h.   although drug dealers often store their valuables in their residence, including proceeds from their drug sales, they often store their drugs and other evidence of their criminality in places other than their residences to protect themselves if law enforcement were to search their residence;

i.   drug dealers often purchase expensive vehicles and residences with the proceeds from their drug transactions;

j.   when drug dealers amass proceeds from the sale of drugs, they often attempt to legitimize these profits. In order to accomplish this goal, drug traffickers utilize foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, brokerage houses, trusts, partnerships, shell corporations and business fronts;

k.   drug traffickers commonly maintain addresses or telephone numbers in books, papers or media storage devices, which reflect the names, addresses and/or telephone numbers for their associates in the drug trafficking organization;

l.   drug traffickers take, or cause to be taken, photographs of themselves, their associates, their properties, and their products;

m.   drug traffickers utilize cellular telephones to communicate with their drug sources, customers, and other co-conspirators in furtherance of their criminal activity.

n.   in addition to controlled substances, drug traffickers usually keep paraphernalia for manufacturing cutting, packaging, weighing and distributing their drugs, and for the collection, packaging, counting, and shipment of drug proceeds. This paraphernalia includes but is not limited to, scales, plastic bags, rubber gloves, heat sealers, rubber bands and vacuum sealers;

o.   the courts have recognized unexplained wealth is probative evidence of crimes motivated by greed, in particular, illegal trafficking in controlled substances.

3.   This affidavit is submitted in support of the issuance of search warrants, pursuant to Texas Code of Criminal Procedure Article 18.02, authorizing the search of:

a.   573 8th Street, Lancaster, Dallas County, Texas (hereinafter, "the 8th Street residence"), a single-family residence, which is located on the north side of the 500 block of 8th Street and is the thirteenth residence west from Elm Street. The residence is a white-frame, single

JIMERSON-00003

story residence, with a gray composition shingle roof, and the numbers "573" painted on the curb directly in front of the residence and affixed to a wooden post that supports the front porch. Also, the property contains two outbuildings located behind the residence. Said premise, in addition to the foregoing description, also includes all other buildings, structures, places and vehicles on said premises and within the curtilage, which are found to be under the control of the suspected parties named below and in, on, or around which said suspected parties may reasonably reposit or secrete property which is the object of the search requested herein. Said residence is in the charge of and controlled by Jonathan Fierro, a Hispanic male born on June 28, 1990 (hereinafter, "Fierro"); and

        b.    1211 Glencoe Drive, Glenn Heights, Dallas County, Texas (hereinafter, "Glencoe residence"), a single-family residence, which is located on the south side of the 1200 block of Glencoe Drive and is the sixth residence east from Gateway Boulevard. The residence is a brown-brick, two-story residence, with a gray composition shingle roof, the numbers "1211" are painted on the curb directly in front of the residence, and a decorative placard with the numbers "1211" affixed to the residence near the garage doors. Said premise, in addition to the foregoing description, also includes all other buildings, structures, places and vehicles on said premises and within the curtilage, which are found to be under the control of the suspected parties named below and in, on, or around which said suspected parties may reasonably reposit or secrete property which is the object of the search requested herein. Said residence is also in the charge of and controlled by Fierro.

        4.    I believe and hereby charge and accuse there is at said premise personal property concealed and kept in violation of the laws of Texas and described as follows: instruments of an organized criminal enterprise associated with the ongoing distribution of methamphetamine and the laundering of the attendant proceeds, as enumerated in Attachment A (attached to this affidavit and now being made a part hereof for all purposes and incorporated herein as if written verbatim within the confines of this affidavit). Furthermore, I contend the possession of the said described personal property is occurring at the 8th Street and Glencoe residences on an ongoing basis, including today's date of March 27, 2019.

**Background of the Investigation**

5.     In October, 2018, members of Strike Force 1 began an investigation into the drug trafficking and money laundering activities of Fierro. As a result of several surveillances, agents identified Fierro's residence, the Glencoe residence, his drug stash location, the 8th Street residence, and his vehicle, a silver, 2011 Lincoln MKX.

6.     On October 23, 2018, in furtherance of the investigation, agents utilized a confidential source to make a controlled purchase of approximately one kilogram of methamphetamine from Fierro for $5,500 cash. After the purchase, Fierro traveled to his residence, the Glencoe residence, with the cash he was paid for the drugs.

7.     On March 27, 2019, at about 2:50 p.m., members of Strike Force 1 established surveillance on the 8th Street residence. At 5:30 p.m., agents observed Fierro arrive driving his Lincoln MKX, park in the driveway, and walk out of sight toward the residence. About 15 minutes later, Fierro returned to his vehicle and departed. Agents followed Fierro until he arrived at Home Depot, 500 North IH-35E, in Lancaster. Upon arrival, agents observed Fierro park his Lincoln next to a black, 2008 Ford F-150, which was parked on the far west side of the Home Depot lot away from any other vehicles. Fierro parked in such a way so his Lincoln's passenger side was beside the Ford's driver's side. A soon as Fierro stopped, the driver of the Ford F-150, Vazquez, exited the Ford and immediately entered the front passenger seat of Fierro's Lincoln. About one minute later, Vasquez exited Fierro's Lincoln, opened the Ford's driver's side rear passenger door an appeared to place an object on the truck's floorboard behind the driver's seat. Vasquez then entered the Ford's driver's seat and departed. Fierro also departed.

8.     Agents followed both Vasquez and Fierro. Agents suspected they observed a drug transaction between Fierro and Vasquez and requested Lancaster police officers conduct a pretextual traffic stop of Vasquez's Ford upon observing a traffic violation. Lancaster police officers observed Vasquez failed to signal a turn and failed to make a proper turn on IH-35E north of Beltline Road, Lancaster, Texas. Lancaster officers stopped Vasquez for the observed traffic violations. Upon contacting Vasquez, he opened his driver's door and Lancaster officers observed, in plain view as they stood outside the truck, suspected cocaine in the driver door's pouch. Lancaster officers placed Vasquez under arrest for the suspected cocaine. A search

incident to arrest of Vasquez's truck revealed a white, plastic bag that contained a gallon-sized, Ziplock-type bag with approximately one kilogram of suspected methamphetamine. Vasquez was taken into custody and transported to the Lancaster Police Department for processing and interviewing.

9.     While Vasquez was stopped by Lancaster officers, agents continued following Fierro as he traveled south on IH-35E. Once agents learned Lancaster officers located the kilogram of methamphetamine in Vasquez's truck, they stopped Fierro and took him into custody. A search incident to arrest of Fierro's person revealed a large amount of cash. The cash was sealed on scene in an evidence envelope pending an official count. Fierro was transported to the Lancaster Police Department for processing and interviewing. Fierro invoked his right to counsel and agents did not attempt to interview him.

10.     Vasquez was advised of his rights pursuant to Miranda and he knowingly and voluntarily waived those rights and provided a verbal statement. During his verbal statement, he admitted to purchasing the kilogram of methamphetamine officers seized from Fierro for $3,900. Vasquez also admitted to purchasing another kilogram of methamphetamine in the recent past from Fierro for the same price. On both occasions Fierro sold methamphetamine to Vasquez, he drove his Lincoln MKX.

11.     Based upon the totality of the above-related facts, I believe probable cause exists to believe items enumerated in Attachment A will be found in the 8th Street and Glencoe residences. I believe a search of those residences will reveal evidence showing Fierro engaged in the unlawful delivery and/or possession with intent to deliver controlled substances; to wit: methamphetamine, a felony under Chapter 481 of the Texas Health and Safety Code, and/or to store the evidence of and proceeds from such crimes.

12.     This affidavit is based on my own personal knowledge as well as information provided to me by other law enforcement officers who participated in this investigation with me and are known to me as credible. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have only set forth the facts I believe are essential to establish probable cause.

JIMERSON-00006

## "NO KNOCK" AUTHORIZATION

13.    I request authorization to enter the 8th Street residence without first knocking and announcing the presence and purpose of officers executing the warrant sought herein.  As reasonable suspicion to believe such knocking and announcing would be dangerous, futile, or would inhibit the effective investigation of the offense described in this affidavit, I submit the following facts and circumstances:

a.    During surveillance of the 8th Street residence, agents observed at least four males entering and exiting the residence and two outbuildings.  Agents observed the males frequently entering the residence's front yard and watching vehicular traffic as it passed.  I believe these males act as "lookouts" for law enforcement officers' presence.  I believe officers attempting to execute the warrant will be observed prior to their entry, which will give the occupants time to destroy evidence or flee the scene.

**WHEREFORE,** I ask for issuance of a warrant that will authorize officers to search the 8th Street and Glencoe residences, as well as their outbuildings, for the personal property enumerated in Attachment A, attached hereto, and seize the same.

**FURTHERMORE,** I request authorization to dispense with the usual requirement to knock and announce our purpose before entering the suspected premise to execute this warrant

CHRISTOPHER A. HIGHT
DALLAS POLICE DEPARTMENT

Subscribed and sworn to before me by said Affiant on this the27th day of March 2019.

JUDGE HECTOR GARZA
195TH JUDICIAL DISTRICT COURT
DALLAS, DALLAS COUNTY, TEXAS

JIMERSON-00007

Report Letter/Jimerson-Parks case
8 March 2021
page - 18 of 22
-----------------------------

# EXHIBIT "D"

**EXHIBIT D** : the two (2) Search Warrants  [issued out of a Texas State
Court, by a Texas State Judge, in Dallas; they do not mention or refer to any
plaintiff or mention or refer to any person, and do not mention or refer to
plaintiffs' home or its address in any manner; but they do mention two (2)
other locations specifically and by their specific addresses]

## SEARCH WARRANT

**THE STATE OF TEXAS**

**COUNTY OF DALLAS**

**WARRANT AUTHORIZING THE SEARCH OF 1211 GLENCOE DRIVE, GLENN HEIGHTS, TEXAS**

THE STATE OF TEXAS to the Sheriff or any Peace Officer of Dallas County, Texas, or any Peace Officer of the State of Texas,

GREETINGS:

WHEREAS, the affiant whose name appears on the affidavit attached hereto is a peace officer under the laws of Texas and did heretofore this day subscribe and swear to said affidavit before me (which said affidavit, including Attachment A, is here now made a part hereof for all purposes and incorporated herein as if written verbatim within the confines of this Warrant), and whereas I find that the verified facts stated by affiant in said affidavit show that affiant has probable cause for the belief he expresses herein and establishes existence of proper grounds for issuance of this Warrant;

NOW, THEREFORE, you are commanded to enter the suspected place, vehicles, and premises described in said affidavit, to wit: **1211 GLENCOE DRIVE, GLENN HEIGHTS, DALLAS COUNTY, TEXAS.** At said places you shall search for and, if same be found, seize and bring before me the property **enumerated in Attachment A.**

FURTHERMORE, I find that affiant has established reasonable suspicion to believe that to knock and announce their purpose by the officers executing this warrant would be futile, dangerous, and otherwise inhibit the effective investigation of the offense or offenses related to the purpose of this warrant. Therefore, unless circumstances to the contrary are discovered prior to entry, you are hereby authorized to dispense with the usual requirement that you knock and announce your purpose before entering the suspected premise to execute this warrant

It is further ordered that all U.S. currency and assets seized that may be forfeitable under Texas law or Title 21 of the United States Code be released to the appropriate agency, whether the agency be state or federal, by either depositing the currency into an appropriate bank account or converting it into a cashier's check or other acceptable negotiable instrument to be deposited into an appropriate account for forfeiture proceedings.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its execution, with your return thereon, showing how you have executed same.

ISSUED AT __9:41__ o'clock __P__ M., on this the 27th day of March, 2019, to certify which witness my hand this day.

**JUDGE HECTOR GARZA**
**195TH JUDICIAL DISTRICT COURT**
**DALLAS, DALLAS COUNTY, TEXAS**

JIMERSON-00008

## SEARCH WARRANT

**THE STATE OF TEXAS**

**COUNTY OF DALLAS**

**WARRANT AUTHORIZING THE SEARCH OF 573 8TH STREET, LANCASTER, TEXAS**

THE STATE OF TEXAS to the Sheriff or any Peace Officer of Dallas County, Texas, or any Peace Officer of the State of Texas,

GREETINGS:

WHEREAS, the affiant whose name appears on the affidavit attached hereto is a peace officer under the laws of Texas and did heretofore this day subscribe and swear to said affidavit before me (which said affidavit, including Attachment A, is here now made a part hereof for all purposes and incorporated herein as if written verbatim within the confines of this Warrant), and whereas I find that the verified facts stated by affiant in said affidavit show that affiant has probable cause for the belief he expresses herein and establishes existence of proper grounds for issuance of this Warrant;

NOW, THEREFORE, you are commanded to enter the suspected place, vehicles, and premises described in said affidavit, to wit: **573 8TH STREET, LANCASTER, DALLAS COUNTY, TEXAS**. At said places you shall search for and, if same be found, seize and bring before me the property **enumerated in Attachment A.**

FURTHERMORE, I find that affiant has established reasonable suspicion to believe that to knock and announce their purpose by the officers executing this warrant would be futile, dangerous, and otherwise inhibit the effective investigation of the offense or offenses related to the purpose of this warrant. Therefore, unless circumstances to the contrary are discovered prior to entry, you are hereby authorized to dispense with the usual requirement that you knock and announce your purpose before entering the suspected premise to execute this warrant

It is further ordered that all U.S. currency and assets seized that may be forfeitable under Texas law or Title 21 of the United States Code be released to the appropriate agency, whether the agency be state or federal, by either depositing the currency into an appropriate bank account or converting it into a cashier's check or other acceptable negotiable instrument to be deposited into an appropriate account for forfeiture proceedings.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its execution, with your return thereon, showing how you have executed same.

ISSUED AT __9:40__ o'clock __P__ M., on this the 27th day of March, 2019, to certify which witness my hand this day.

**JUDGE HECTOR GARZA**
**195TH JUDICIAL DISTRICT COURT**
**DALLAS, DALLAS COUNTY, TEXAS**

JIMERSON-00009

## ATTACHMENT A

1. Books, records, receipts, notes, correspondence, ledgers, bank records, money orders, credit card records, deposit items, bank drafts, wire transfer records, receipts for cashier's checks, airline tickets and other items relating to domestic or international travel, records relating to pre-paid debit or stored value cards, passbooks, certificates of deposit, time saving certificates, financial statements, loan records, real estate purchase and/or rental records (including contracts, deeds, promissory notes, applications, and rental agreements), records reflecting the purchase, ownership, sale, or lease of automobiles (including titles, registration, purchase or lease agreements, and payment records) automobile insurance policy records, records reflecting the purchase of items such as jewelry, furs, furniture and electronics, or other expenditures of money, mail and contract mail carrier records, and/or other papers relating to the transportation, ordering, sale and distribution of illegal controlled substances or relating to the receipts and/or disposition of the proceeds from the distribution of illegal controlled substances or the illegal laundering of funds derived from sale of controlled substances;

2. Currency, financial instruments, including stocks, bonds, and other securities, precious metals, jewelry, and/or other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, laundering, secreting or spending large sums of money made from engaging in illegal controlled substance activities, keys to automobiles, false identifications used to acquire assets or make expenditures in alias or nominee names, keys to safe deposit boxes;

3. Telephone and address books, electronic pagers and pager records, mobile and cellular telephones including records of telephone calls whether recorded in writing or electronically, and lists of telephone and pager numbers or papers which reflect names, addresses and/or telephone numbers of individuals associated in dealing in illegal controlled substances;

4. Photographs and videotapes of individuals and property, with controlled substances or money and/or associates in the drug trafficking business;

5. Illegal controlled substances, scales, and other materials used in the packaging, cutting, weighing, cooking and/or manufacturing and distributing of illegal controlled substances;

6. Electronic paging devices (pagers) and cellular telephones, contracts, purchase and/or rental agreements, and billing records relative to the acquisition and use of pagers and/or cellular telephones;

7. Documents reflecting the shipment or mailing of parcels through the U.S Postal Service or commercial carriers such as United Parcel Service (UPS) or FedEx;

8. Firearms and ammunition for firearms;

JIMERSON-00010

9. Electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer-related electronic devices;

10. Instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission; and

11. Written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device.

JIMERSON-00011

Report Letter/Jimerson-Parks case
8 March 2021
page - 19 of 22
-----------------------------

# EXHIBIT "E"

**EXHIBIT E** : Filed returns on two (2) Search Warrants [filed in a Texas
State Court, in Dallas, not in a federal court; they do not mention or refer to
any plaintiff or mention or refer to any person, and do not mention or refer
to plaintiffs' home or its address in any manner; but they do mention two
(2) other locations specifically and by their specific addresses]

## RETURN AND INVENTORY

**THE STATE OF TEXAS**

**573 8TH STREET,**

**COUNTY OF DALLAS**

**LANCASTER, TEXAS**

    The undersigned Affiant, being a Peace Officer under the laws of Texas and being duly sworn, on oath certifies that the foregoing Warrant came to hand on the day it was issued and that it was executed on the 27th day of March, 2019, by making the search directed therein and seizing during such search the following described personal property:

Approximately 1,210.5 grams heroin;
Approximately 2,027.0 grams crystal methamphetamine;
Approximately 1,206.6 grams liquid methamphetamine;
Approximately 625.0 grams marijuana;
1 – Glock model 20, 10mm semi-automatic handgun, serial #BBLU401;
1 – LG cellular telephone;
Drug packaging materials;
1 – one gallon acetone can;
1 – Master lock; and
Approximately 656.7 grams of an unknown type drug.

CHRISTOPHER A. HIGHT
DALLAS POLICE DEPARTMENT

SUBSCRIBED AND SWORN to before me, the undersigned authority, on this the 1st day of April, 2019.

JEAN LYNN REED
My Notary ID # 4449546
Expires September 24, 2022

NOTARY PUBLIC, IN AND FOR
DALLAS COUNTY, TEXAS

JIMERSON-00012

## RETURN AND INVENTORY

**THE STATE OF TEXAS**

**COUNTY OF DALLAS**

**1211 GLENCOE DRIVE,**

**GLENN HEIGHTS, TEXAS**

The undersigned Affiant, being a Peace Officer under the laws of Texas and being duly sworn, on oath certifies that the foregoing Warrant came to hand on the day it was issued and that it was executed on the 27th day of March, 2019, by making the search directed therein and seizing during such search the following described personal property:

No arrests or seizures were made.

CHRISTOPHER A. HIGHT
DALLAS POLICE DEPARTMENT

SUBSCRIBED AND SWORN to before me, the undersigned authority, on this the 1st day of April, 2019.

JEAN LYNN REED
My Notary ID # 4449548
Expires September 24, 2022

NOTARY PUBLIC, IN AND FOR
DALLAS COUNTY, TEXAS

JIMERSON-00013

Report Letter/Jimerson-Parks case
8 March 2021
page - 20 of 22
-----------------------------

# EXHIBIT "F"

**EXHIBIT F** : Home Repair Records/Invoices/some photos [all pertaining to plaintiffs' home]

# Invoice



**Hawkeye Home Improvement, Inc.**
121 Lynnie Pennie
Midlothian, TX 76065
972-754-0515
johnniekay@sbcglobal.net
HawkeyeHomeImprovement.com



| Bill To |
|---|
| Waxahachie Police Department |

| Date | Invoice No. | Project | P.O. Number |
|---|---|---|---|
| 04/15/19 | 2161 | | |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Entry door, hardware, trim | | 404.39 | 404.39 |
| Labor On Entry Door | | 275.00 | 275.00 |
| Labor & Materials on 6 Replacement windows | | 2,550.00 | 2,550.00 |
| Sales Tax | | 8.25% | 0.00 |

| | | |
|---|---|---|
| Subtotal | | $3,229.39 |
| Total | | $3,229.39 |
| Balance Due | | $0.00 |

JIMERSON-00014

5/24/19 9:10 Am

## Crossroads
### CRIME & TRAUMA SCENE CLEANING
P.O. Box 381975 • Duncanville, TX 75138
Ph # 972-709-1188 • 214-577-4551
www.crossroadstrauma.com
*"Compassion in Crisis"*

**Job Address Information**

Date: May 2, 2019
Name: Jimerson
Address: 593 8th st
City, State, Zip: Lancaster 75146
Ph #: 903-917-7636 Early
214-497-5804 Karen

In Reference to: ___ VC# ___ HM DC SI AC MD GF O ✓
In Reference to: ___ VC# ___ HM DC SI AC MD GF O
Make - ___ Model - ___ Year - ___ VIN# ___ Plate -

Type Structure: (Home) Mobile Home  Vehicle  Business  Other:

**Representative Information**

Name: Waxahachie Police Dept.
Address: Lt. Lewis
City, State, Zip: mlewis@waxahachie pd.org
Ph #: ___
Relationship: 972-922-8723

**Authorization**

(Please Print)

I _____ authorize Crossroads Crime and Trauma Scene Cleaning to enter job address for the purpose of removing and/or cleaning any contaminated items and decontamination of crime or trauma scene.

Signature _____

**Insurance (If Applicable)**

Ins. Co. Name ___
Policy # ___ Ph # ___
Claim # ___ Deductible Amount ___
Adjuster Name ___
Agent Name ___ Ph # ___

**Details**

Approx 560 sf of carpet/pad to be replaced by 'Ideal Floors' 972-421-1019 *

Replace/Install new blinds rods and curtains for 6 windows by 'Crossroads'

* Carpet install to be scheduled for week of 5/13 - 5/17

**Payment Type**

Cash ___
Check MC - 3748 *ATeR ___
Terms ___
Due Date ___
Late Fee (recurring after due date) ___

**Amount**

Total: $1500.00
(− Deductible) ___
Sub Total ___
Tax ___
Total Amt. $1500.00

PO # if Applicable ___ Invoice # 190502

White Copy: Office    Yellow Copy: Representative

JIMERSON-00015



Page   1

DV036351

**INVOICE**

| Sold To | Ship To |
|---|---|
| CROSSROADS CRIME AND TRAUMA | JIMERSON, KAREN |
| P.O. BOX 381975 | 593 8TH ST |
| DUNCANVILLE, TX 75138 | LANCASTER, TX 75146 |

| Order Date | Tele #1 | PO Number | Order Number |
|---|---|---|---|
| 05/03/19 | 972-709-1188 | | DV036351 |

| Inventory | Style/Item | Color/Description | Quantity Units | Price | Extension |
|---|---|---|---|---|---|
| QH2XXAM | DAZZLING (S) 15 | 22TRUMPET 1ST | 65.33 SY | 13.07 | 854.04 |
| 3/8R6 | 3/8 6LB PAD | 30 YDS/ROLL | 64.28 SY | 0.00 | 0.00 |
| | Amt or Inv: 30 YDS./ROLL | | | | |
| C 30-999 250 | CARPET INSTALL PI | | 65.33 SY | 5.56 | 363.00 |
| | FURNITURE MOVING BY THE YARD | | 65.33 SY | 0.00 | 0.00 |
| | 1 YEAR INSTALLATION WARRANTY | | 1.00 SY | 0.00 | 0.00 |
| | COMPUTER GENERATED CARPET | | 65.33 SY | 0.00 | 0.00 |
| DISCOUNT | DISCOUNT TO CUSTOMER | DISCOUNT | -1.00 EA | 67.04 | -67.04 |
| | Amt or Inv: DISCOUNT LINE | | | | |
| REMOVE, CARPET | CARPET REMOVAL/UNSANITARY | | 1.00 SY | 0.00 | 0.00 |
| CSA | CSA | CSA | 7.41 EA | 0.00 | 0.00 |

— 05/28/19 —                                                                 11:08AM —

Sales Representative(s):

OLEN PHILLIPS

Thank you for choosing our company.
*100% Satisfaction Guaranteed*

| | |
|---|---|
| Subtotal: | 1,150.00 |
| Sales Tax: | 0.00 |
| Misc. Tax: | 0.00 |
| **INVOICE TOTAL:** | **$1,150.00** |
| Discount: | 0.00 |
| Less Payment(s): | 1,150.00 |
| **BALANCE DUE:** | **$0.00** |

JIMERSON-00016

JIMERSON-00017





JIMERSON-00018





JIMERSON-00019

JIMERSON-00020





JIMERSON-00021



JIMERSON-00022



JIMERSON-00023

Report Letter/Jimerson-Parks case
8 March 2021
page - 21 of 22
----------------------------

# EXHIBIT "G"

**EXHIBIT G** : Ambulance Records

## Lancaster Fire Department
### Patient Care Record

Incident #: 19-1650

Date: 03/27/2019   Patient 1 of 2

Name: JIMERSON, KAREN

| Patient Information | | | | Clinical Impression | |
|---|---|---|---|---|---|
| Last | JIMERSON | Address | 593 EIGHTH ST | Primary Impression | Injury |
| First | KAREN | Address 2 | | Secondary Impression | |
| Middle | | City | Lancaster | Protocol Used | Pain Control |
| Gender | Female | State | TX | Anatomic Position | |
| DOB | | Zip | 75146 | Onset Time | |
| Age | 31 Yrs, 6 Months, 0 Days | Country | US | Chief Complaint | "my whole body is hurting" |
| Weight | | Tel | 2144975804 | Duration | Units |
| Pedi Color | | Physician | | Secondary Complaint | |
| SSN | | Ethnicity | Not Hispanic or Latino | Duration | Units |
| Race | Black or African American | | | Patient's Level of Distress | |
| Advance Directives | None | | | Signs & Symptoms | Pain - Multiple injuries |
| Resident Status | Resident | | | Injury | Assault - Assault with bodily force - Home - 03/28/2019 |
| | | | | Mechanism of Injury | |
| | | | | Medical/Trauma | Trauma |
| | | | | Barriers of Care | None Noted |
| | | | | Alcohol/Drugs | None Reported |
| | | | | Pregnancy | No |
| | | | | Initial Patient Acuity | |
| | | | | Final Patient Acuity | |
| | | | | Patient Activity | |

| Medication/Allergies/History | |
|---|---|
| Medications | None Reported |
| Allergies | No known allergies |
| History | Other - partially paralyzed on right side |
| Last Oral Intake | |

| Vital Signs | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time | AVPU | Side | POS | BP | Pulse | RR | SPO2 | ETCO2 | CO | BG | Temp | Pain | GCS(E+V+M)/Qualifiers | RTS | PTS |
| 23:49 | Alert | L | Sit | 134/94 A | 80 R | 18 R | 98 Rm | | | | | 9 | 15=4+5+6 | 12 | |

| Initial Assessment | | | | |
|---|---|---|---|---|
| Category | Comments | Abnormalities | | |
| Mental Status | | Mental Status | | No Abnormalities |
| Skin | | Skin | | No Abnormalities |
| HEENT | | Head/Face | + | Pain |
| | | Eyes | | No Abnormalities |
| | | Neck/Airway | | No Abnormalities |
| | | Chest | + | Pain |
| Chest | | Heart Sounds | | No Abnormalities |
| | | Lung Sounds | | No Abnormalities |
| | | General | | No Abnormalities |
| Abdomen | | Left Upper | + | Pain |
| | | Right Upper | + | Pain |
| | | Left Lower | + | Pain |
| | | Right Lower | + | Pain |
| | | Cervical | | No Abnormalities |
| Back | | Thoracic | | No Abnormalities |
| | | Lumbar/Sacral | | No Abnormalities |
| Pelvis/GU/GI | | Pelvis/GU/GI | + | Pain (2) |
| Extremities | | Left Arm | + | Pain (2) |
| | | Right Arm | + | Pain (2) |
| | | Left Leg | + | Pain (3) |
| | | Right Leg | + | Pain (3) |
| | | Pulse | | Not Assessed |
| | | Capillary Refill | | Not Assessed |
| Neurological | | Neurological | | No Abnormalities |

Assessment Time:

03/28/2019 00:38:32
Template Version: PCR-WEB-1.3.1
Data Version: 00174-000000000217bc49

Case 3:20-cv-02826-L-BH   Document 183   Filed 08/26/21   Page 131 of 215   PageID 2076
02/11/2021   03:26 PM   TO:18173328851   FROM:2143820951   Page: 3
Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 59 of 66   PageID 1612

## Lancaster Fire Department
### Patient Care Record

Name: JIMERSON, KAREN          Incident #: 19-1650          Date: 03/27/2019          Patient 1 of 2

**Narrative**

aostf pt sitting on a chair. pt stated that the police raided her house and forced her to the ground while she was in the bathroom. the pt stated that she was on the floor for "what felt like 20 minutes". the pt stated that she was "hurting all over but more on my left side". pt was moved into the ambulance and v/s were taken. pt was monitored en-route with no changes. pt report was given to the ER staff and care was transferred.

**Specialty Patient - CDC 2011 Trauma Criteria**

| | | | |
|---|---|---|---|
| Vital Signs | None | Trauma Activation | No |
| Anatomy of Injury | None | Time | |
| Mechanism of Injury | None | Date | |
| Special Considerations | None | Trauma Level | |
| | | Reason Not Activated | |

| Incident Details | | Destination Details | | Incident Times | |
|---|---|---|---|---|---|
| Location Type | Home/Residence | Disposition | Transported No Lights/Siren | PSAP Call | 23:28:28 |
| Location | | Transport Due To | Patient's Choice | Dispatch Notified | |
| Address | 593 EIGHTH ST | Transported To | Methodist Charleton Medical Center | Call Received | 23:28:28 |
| Address 2 | | Requested By | Law Enforcement | Dispatched | 23:29:39 |
| Mile Marker | | Destination | Hospital | En Route | 23:30:24 |
| City | LANCASTER | Department | Emergency Room | Staged | |
| County | Dallas | Address | 3500 W. Wheatland Road | Resp on Scene | |
| State | TX | Address 2 | | On Scene | 23:36:25 |
| Zip | 75146 | City | Dallas | At Patient | 23:37:00 |
| Country | US | County | Dallas | Care Transferred | |
| Medic Unit | M353 | State | TX | Depart Scene | 23:50:58 |
| Medic Vehicle | M353 | Zip | 75237 | At Destination | 00:08:21 |
| Run Type | 911 Response | Country | US | Pt Transferred | 00:20:00 |
| Response Mode | Emergent | Zone | | Call Closed | 00:40:00 |
| Shift | A shift | Condition at Destination | Unchanged | In District | |
| Zone | City | Destination Record # | | At Landing Area | |
| Level of Service | Basic Life Support | Trauma Registry ID | | | |
| EMD Complaint | Assault | STEMI Registry ID | | | |
| EMD Card Number | | Stroke Registry ID | | | |
| Dispatch Priority | | | | | |

**Crew Members**

| Personnel | Role | Certification Level |
|---|---|---|
| BURTON, DANNY | Lead | NREMT-Paramedic (NREMT-P) - P8054608; EMT-Paramedic - 706559 |
| INGRAM, TYLER | Driver | EMT-Paramedic - 731306 |
| EMT Rider, Student | Other | |

**Insurance Details**

| | | | | | |
|---|---|---|---|---|---|
| Insured's Name | KAREN JIMERSON | Primary Payer | Medicaid | Dispatch Nature | |
| Relationship | Self | Medicare | | Response Urgency | |
| Insured SSN | | Medicaid | | Job Related Injury | |
| Insured DOB | | Primary Insurance | | Employer | |
| Address1 | 593 EIGHTH ST | Policy # | | Contact | |
| Address2 | | Primary Insurance Group Name | | Phone | |
| Address3 | | Group # | | Mileage to Closest Hospital | |
| City | Lancaster | Secondary Ins | | | |
| State | TX | Policy # | | | |
| Zip | 75146 | Secondary Insurance Group Name | | | |
| Country | US | Group # | | | |

| Mileage | | Delays | | Additional Agencies |
|---|---|---|---|---|
| Scene | 1.0 | Category | Delays | |
| Destination | 10.7 | Dispatch Delays | None/No Delay | |
| Loaded Miles | 9.7 | Response Delays | None/No Delay | |
| Start | | Scene Delays | None/No Delay | |
| End | | Transport Delays | None/No Delay | |
| Total Miles | | Turn Around Delays | None/No Delay | |

03/28/2019 00:38:32
Template Version: PCR-WEB-1.3.1
Data Version: 00174-0000000002176C49

02/11/2021 Case 3:20-cv-02826-L   Document 150-1   Filed 03/08/21   Page 60 of 66   PageID 1613

**Lancaster Fire Department**
Patient Care Record

Name: JIMERSON, KAREN

Incident #: 19-1650

Date: 03/27/2019

Patient 1 of 2

| Patient Transport Details | | | |
|---|---|---|---|
| How was Patient Moved to Ambulance | Stretcher | How was Patient Moved From Ambulance | Stretcher |
| Patient Position During Transport | | Condition of Patient at Destination | Unchanged |

03/28/2019 00:38:32
Template Version: PCR-WED-1.3.1
Data Version: 00174-0000000002176C49

## Lancaster Fire Department
Patient Care Record

**Incident #:** 19-1650          **Date:** 03/27/2019          Patient 2 of 2

**Name:** JIMERSON, JASAMEA

### Patient Information

| | | | | |
|---|---|---|---|---|
| Last | JIMERSON | Address | | |
| First | | Address 2 | | |
| Middle | | City | Lancaster | |
| Gender | Female | State | TX | |
| DOB | | Zip | 75146 | |
| Age | | Country | US | |
| Weight | | Tel | 2144975804 | |
| Pedi Color | | Physician | | |
| SSN | | Ethnicity | Not Hispanic or Latino | |
| Race | Black or African American | | | |
| Advance Directives | None | | | |
| Resident Status | Resident | | | |

### Clinical Impression

| | |
|---|---|
| Primary Impression | Injury |
| Secondary Impression | |
| Protocol Used | Multiple Trauma |
| Anatomic Position | |
| Onset Time | |
| Chief Complaint | "my knee hurts" |
| Duration | Units |
| Secondary Complaint | |
| Duration | Units |
| Patient's Level of Distress | |
| Signs & Symptoms | Pain - Knee pain |
| Injury | Struck by Object - Contact with blunt object - Home - 03/28/2019 |
| Mechanism of Injury | |
| Medical/Trauma | Trauma |
| Barriers of Care | None Noted |
| Alcohol/Drugs | None Reported |
| Pregnancy | No |
| Initial Patient Acuity | |
| Final Patient Acuity | |
| Patient Activity | |

### Medication/Allergies/History

| | |
|---|---|
| Medications | None Reported |
| Allergies | No known allergies |
| History | None Reported |
| Last Oral Intake | |

### Vital Signs

| Time | AVPU | Side | POS | BP | Pulse | RR | SPO2 | ETCO2 | CO | BG | Temp | Pain | GCS(E+V+M)/Qualifiers | RTS | PTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23:53 | Alert | R | Sit | 137/86 A | 86 R | 19 R | 9T Rm | | | | | 4 | 15=4+5+6 | 12 | |

### Initial Assessment

| Category | Comments | Abnormalities | |
|---|---|---|---|
| Mental Status | | Mental Status | No Abnormalities |
| Skin | | Skin | No Abnormalities |
| HEENT | | Head/Face | No Abnormalities |
| | | Eyes | No Abnormalities |
| | | Neck/Airway | No Abnormalities |
| Chest | | Chest | No Abnormalities |
| | | Heart Sounds | No Abnormalities |
| | | Lung Sounds | No Abnormalities |
| Abdomen | | General | No Abnormalities |
| | | Left Upper | No Abnormalities |
| | | Right Upper | No Abnormalities |
| | | Left Lower | No Abnormalities |
| | | Right Lower | No Abnormalities |
| Back | | Cervical | No Abnormalities |
| | | Thoracic | No Abnormalities |
| | | Lumbar/Sacral | No Abnormalities |
| Pelvis/GU/GI | | Pelvis/GU/GI | No Abnormalities |
| Extremities | | Left Arm | No Abnormalities |
| | | Right Arm | No Abnormalities |
| | | Left Leg | No Abnormalities |
| | | Right Leg | Pain |
| | | Pulse | Not Assessed |
| | | Capillary Refill | Not Assessed |
| | | Neurological | No Abnormalities |
| Neurological | | | |

**Assessment Time:**

## Lancaster Fire Department
Patient Care Record

Name: JIMERSON, JASAMEA          Incident #: 19-1650          Date: 03/27/2019          Patient 2 of 2

### Narrative
...notif pt standing next to her mother, pt stated that she was laying in her bed when a piece of glass from a window hit her in the knee. pt had no signs of trauma. the pt requested to go to the ER. the pt was moved into the ambulance and monitored en-route with no changes. pt report was given to the ER staff and care was transferred.

### Specialty Patient / CDC 2011 Trauma Criteria

| | | | |
|---|---|---|---|
| Vital Signs | None | Trauma Activation | |
| Anatomy of Injury | None | Time | |
| Mechanism of Injury | None | Date | |
| Special Considerations | None | Trauma level | |
| | | Reason Not Activated | |

### Incident Details / Destination Details / Incident Times

| Incident Details | | Destination Details | | Incident Times | |
|---|---|---|---|---|---|
| Location Type | Home/Residence | Disposition | Transported No Lights/Siren | PSAP Call | 23:28:26 |
| Location | | Transport Due To | Family Choice | Dispatch Notified | |
| Address | | Transported To | Methodist Charleton Medical Center | Call Received | 23:26:28 |
| Address 2 | | Requested By | Law Enforcement | Dispatched | 23:29:39 |
| Mile Marker | | Destination | Hospital | En Route | 23:30:24 |
| City | LANCASTER | Department | Emergency Room | Staged | |
| County | Dallas | Address | 3500 W. Wheatland Road | Resp on Scene | |
| State | TX | Address 2 | | On Scene | 23:36:25 |
| Zip | 75146 | City | Dallas | At Patient | 23:37:00 |
| Country | US | County | Dallas | Care Transferred | |
| Medic Unit | M353 | State | TX | Depart Scene | 23:50:58 |
| Medic Vehicle | M353 | Zip | 75237 | At Destination | 00:08:21 |
| Run Type | 911 Response | Country | US | Pt. Transferred | 00:15:00 |
| Response Mode | Emergent | Zone | | Call Closed | 00:29:50 |
| Shift | A shift | Condition at Destination | Unchanged | In District | |
| Zone | City | Destination Record # | | At Landing Area | |
| Level of Service | Basic Life Support | Trauma Registry ID | | | |
| EMD Complaint | Traumatic Injury | STEMI Registry ID | | | |
| EMD Card Number | | Stroke Registry ID | | | |
| Dispatch Priority | | | | | |

### Crew Members

| Personnel | Role | Certification Level |
|---|---|---|
| BURTON, DANNY | Lead | NREMT-Paramedic (NREMT-P) - P8054608; EMT-Paramedic - 706559 |
| INGRAM, TYLER | Driver | EMT-Paramedic - 731306 |
| EMT Rider, Student | Other | |

### Mileage / Delays / Additional Agencies

| Mileage | | | Delays | | |
|---|---|---|---|---|---|
| Scene | 1.0 | | Category | Delays | |
| Destination | 10.7 | | Dispatch Delays | None/No Delay | |
| Loaded Miles | 9.7 | geo-verified | Response Delays | None/No Delay | |
| Start | | | Scene Delays | None/No Delay | |
| End | | | Transport Delays | None/No Delay | |
| Total Miles | | | Turn Around Delays | None/No Delay | |

### Patient Transport Details

| | | | |
|---|---|---|---|
| How was Patient Moved to Ambulance | Assisted/Walk | How was Patient Moved From Ambulance | Assisted/Walk |
| Patient Position During Transport | | Condition of Patient at Destination | Unchanged |

Report Letter/Jimerson-Parks case
8 March 2021
page - 22 of 22
----------------------------

# EXHIBIT "H"

**EXHIBIT H** :  (VITA OF ROBERT K. "BOB" GILL ~ (totaling 3 pages)

# ROBERT K. "BOB" GILL

Attorney at Law
Retired State District Judge
2502 Gravel Drive
Fort Worth, TX 76118
Bob@GillBrissette.com
817-803-6918

## PROFESSIONAL ACTIVITIES

Assistant Criminal District Attorney-- Tarrant County 1981-92 and 2008-2014
Private Criminal Defense Practice Since January 2015
Presiding Judge, 213th Criminal District Court-- Jan. 1993-May 2007
Presiding Judge over Tarrant County Criminal Courts --1997
Local Administrative Judge-- Tarrant County 1997-98 and 2003-4
Board Certified in Criminal Law since 1988
Approved for Death Penalty Cases in 8th Admin. Judicial Region
Co-owner Third Chair Digital Forensics LLC and Third Chair Technologies LLC – Fort Worth,
Co-owner Third Chair Investigations LLC, Texas License Number C20849
Board Member, Texas Criminal Defense Lawyers Association (2020-2023)

## PROFESSIONAL MEMBERSHIPS

State Bar of Texas, Member, 1981 - Present
Tarrant County Bar Association, Member
Texas Bar Foundation, Life Fellow, 2013 – Present
Texas Criminal Defense Lawyers Association, Member
Tarrant County Criminal Defense Lawyers Association, Member
Texas District and County Attorneys Association, Former Member

## SPEAKING ENGAGEMENTS

Tarrant County Bar Association, *Pre-Trial Motions* (2018)
Southwestern Association of Forensic Scientists *Digital Forensics* (2017)
Tarrant County Medical Examiner's Office, *Current Trends in Forensic Science* (2015)
Tarrant County Criminal Defense Lawyers Association, *Capital Seminar* (2015-2017)
Tarrant County Medical Examiner's Office Grand Rounds, *Digital Forensics* (April 2015)
Tarrant County Criminal Defense Lawyers Association, *Digital Forensics* (March 2015)
Tarrant County Young Lawyers *When Lawyers Run For Office: Ethical Considerations of Political Campaigns* (2013)

The Center For American And International Law *Capital and Non-Capital Training For The Prosecution* (2013)

The Center For American And International Law *Emerging Trends in Capital Trial Prosecution* (2012)

Louisiana District Attorneys Association, *Electronic Discovery* (2012)

State Bar of Texas *Advanced Criminal Law Course* (2011)

Law Enforcement and Emergency Services Video Association *Video Evidence Symposium and Training Conference* (2011)

The Center For American And International Law *Actual Innocence: Establishing Innocence or Guilt* (2010)

Course Director—State Bar of Texas *Advanced Criminal Law Course, Death Penalty Workshop* (2010)

Texas Criminal Defense Lawyers Association, *Sexual Assault Conference* (2010)

Texas District and County Attorneys Association, *Annual Criminal and Civil Law Update* (2010)

State Bar of Texas, *Advanced Criminal Law Course* (2010)

Tarrant County Bar Association, *Ethical Practice of Criminal Law in Tarrant County* (2010)

Course Director—State Bar of Texas, *Advanced Criminal Law Course, Death Penalty Workshop* (2009)

Tarrant County Bar Association, *Trial by Movie* (2009)

Texas Center for the Judiciary, *Capital Murder Seminar* (2008)

Texas Center for the Judiciary, *College For New Judges* (2006)

National Judicial College, *Managing the Capital Case in Texas* (2006)

Texas Center for the Judiciary, *Criminal Justice Conference* (2006)

Texas Wesleyan University School of Law, *Death Penalty Law* (2005)

Texas Criminal Defense Lawyers Association, *Rusty Duncan Criminal Law Seminar* (2000)

Texas Criminal Defense Lawyers Association, *Attacking Forensic Evidence and Child Abuse Seminar* (2001)

Tarrant County Medical Examiner's Office, *Current Trends in Forensic Science* (2001)

Criminal Justice Advocacy Institute, *Jury Selection* (1995)

Leadership Colleyville, *The Tarrant County Justice System* (1995)

Texas Municipal Courts Training Center, *Felony Court Jurisdiction* (1993)

State Bar of Texas, *Sex Drugs and DNA: Use and Abuse of Scientific Evidence* (1991)

Juvenile Justice Seminar, *Gangs Update* (1991)

State Bar of Texas, *Advanced Criminal Law Course* (1990)

State of Oklahoma District Attorneys Council, *DNA Fingerprinting* (1990)

State Bar of Texas, *Practice Skills Course* (1989)

Texas District and County Attorneys Association, *Prosecutor Trial Skills Course* (1988-92)

## LAW-RELATED PUBLICATIONS

*Texas Criminal Lawyers Handbook* – James Publishing (Updated annually)

*Texas Criminal Forms* – James Publishing (Updated annually)

*Interview Rooms: Design for Safety and Utility*—The Police Chief, The Professional Voice of Law Enforcement, November 2013, International Association of Chiefs of Police

*DNA Testing Handbook For Prosecutors* – Texas District and County Attorneys Association – 1990

*Preparing A Case For Trial*—Texas Prosecutor's DWI Trial Manual (1989)

# EXHIBIT 10

## Chief Goolsby Deposition excerpts
## [the pages that are referenced in the depo index]

Pages 1-6; 8-12; 16-18; 25-28; 31-35; 40-45; 47-48; 50-51; 53; 55-59; 61-65; 67-68; 72-73; 76-80; 89-90; 92; 94-96; 98-99; 101-104

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   KAREN JIMERSON, ET AL.        )
                                   )
 4                                 )  CIVIL ACTION NO.
     VS.                           )  3:20-CV-02826-L
 5                                 )
     LT. MIKE LEWIS, ET AL.        )
 6

 7

 8           ----------------------------------

 9                    ORAL DEPOSITION OF
                     CHIEF WADE GOOLSBY
10                     AUGUST 9, 2021

11           ----------------------------------

12

13

14           ANSWERS AND DEPOSITION OF CHIEF WADE

15   GOOLSBY, produced as a witness at the instance of

16   the Plaintiff, taken in the above-styled and

17   -numbered cause on AUGUST 9, 2021, at 9:50 a.m.,

18   before CHARIS M. HENDRICK, a Certified Shorthand

19   Reporter in and for the State of Texas, located at

20   the Waxahachie Police Department, located at 630

21   Farley, in the City of Waxahachie, County of Ellis

22   and State of Texas, in accordance with the Federal

23   Rules of Civil Procedure.  It is further agreed

24   that Rule 30 (b)(5) is waived by agreement of the

25   parties.
```

```
 1                  A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         MR. ERNEST (SKIP) REYNOLDS III
           ATTORNEY AT LAW
 4         201 Main Street, Suite 600
           Fort Worth, Texas  76102
 5         (817) 332-8850
           ereynolds3@aol.com
 6

 7    FOR THE DEFENDANTS:

 8         MR. D. RANDALL MONTGOMERY
           D. RANDALL MONTGOMERY & ASSOCIATES, PLLC
 9         12400 Coit Road, Suite 560
           Dallas, Texas  75251
10         (214) 292-2600
           rmontgomery@drmlawyers.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## ORAL DEPOSITION OF CHIEF WADE GOOLSBY

Page 3

1                          INDEX

2     Appearances ..................................2

3     CHIEF WADE GOOLSBY

4          Examination by Mr. Reynolds..............5

5          Examination by Mr. Montgomery..........83

6          Examination by Mr. Reynolds.............87

7          Examination by Mr. Montgomery.........100

8          Examination by Mr. Reynolds...........101

9          Examination by Mr. Montgomery.........103

10

11    Signature and Changes......................105

12    Reporter's Certificate.....................107

13

14                        EXHIBITS

15    Exhibit 1 - ................................7
      Notice of Deposition
16
      Exhibit 2 - ................................7
17    Letter To Randall Montgomery From Skip Reynolds

18    Exhibit 3 - ................................7
      Subpoena To Wade Goolsby
19
      Exhibit 4 - ................................9
20    Waxahachie Documents-001 through Waxahachie
      Documents-093
21
      Exhibit 4-A - .............................44
22    Memorandum To Joe Wiser From Wade Goolsby

23    Exhibit 4-B - .............................51
      Memorandum To Wade Goolsby From Stephen Sanders
24
      Exhibit 4-C - .............................53
25    Waxahachie PD Administrative Investigation

1                                    EXHIBITS

2    Exhibit 4-D - ...............................99
     Photograph

3

     Exhibit 4-E - ...............................99
4    Photograph

5    Exhibit 4-F - ...............................99
     Photograph

6

     Exhibit 4-G - ...............................99
7    Photograph

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CHIEF WADE GOOLSBY,
 2   having been duly sworn, testified as follows:
 3                    MR. MONTGOMERY:  For the record, the
 4   witness -- you can send it to me, but the witness
 5   will read and sign.
 6                    THE REPORTER:  Thank you.
 7                    MR. REYNOLDS:  Okay.  So me is
 8   Attorney Montgomery, as opposed to the other me,
 9   which is Attorney Reynolds.  But it's
10   Mr. Montgomery who --
11                    MR. MONTGOMERY:  I think she would
12   know that from the fact that I was the one
13   speaking, right?
14                    THE REPORTER:  Correct.
15                    MR. MONTGOMERY:  Okay.
16                    MR. REYNOLDS:  Well, we might look the
17   same to her.  All lawyers may look the same to this
18   good lady.  Like some people, all birds look the
19   same.  All dogs look the same.
20                         EXAMINATION
21   BY MR. REYNOLDS:
22        Q.   State your name, please, for the court and
23   jury.
24        A.   Wade Goolsby.
25        Q.   And how are you employed, sir?
```

1        A.   I am employed as the chief of police,

2   Waxahachie.

3        Q.   So if I were to call you Chief Goolsby,

4   would that be appropriate?

5        A.   Yes.  That would be fine.

6        Q.   Okay.  And where are we today, please?

7        A.   We are at the Waxahachie Police Department

8   located at 630 Farley Street in Waxahachie.

9        Q.   How long have you been chief of this

10  department, sir?

11       A.   A little over six years.

12       Q.   And how long have you been active in law

13  enforcement?

14       A.   41 years.  A little over 41 years.

15       Q.   How long have you been a part of this

16  department?

17       A.   Just over six years.  I came in as chief.

18       Q.   And where were you previously?

19       A.   I worked for Seguin Police Department

20  previous to coming here.

21       Q.   Okay.  Do you understand that you are here

22  today pursuant to a Notice and a Subpoena?

23       A.   Yes, sir.

24       Q.   I am going to hand you what's been marked

25  as Exhibit 1 -- that's a copy of the Notice -- and

```
 1   I would assume it is.
 2        Q.   Okay.  If -- if you want to take a break
 3   at any time for any reason, just let us know.
 4        A.   Okay.
 5        Q.   So in your career in law enforcement, have
 6   you had occasion to give testimony on prior
 7   occasions?
 8        A.   Sorry.  Would you -- you're going to have
 9   to speak up a little bit.  My hearing is not great,
10   so if you would speak up very clearly for me.
11        Q.   I will be happy to do that.  And I'll --
12             MR. REYNOLDS:  Can we go off the
13   record for a second?
14             (Off-the-record discussion.)
15        Q.   (By Mr. Reynolds)  So, Chief, during your
16   law enforcement career, have you given testimony on
17   prior occasions?
18        A.   Yes, sir.
19        Q.   Was that in court, mostly?
20        A.   Yes, sir.
21        Q.   Would that be a few times or maybe quite a
22   few times?
23        A.   Actually, just a few times.
24        Q.   Okay.  And so you understand the
25   formalities of being under oath.  And the court
```

1   reporter takes the record down; and, therefore, I

2   need to speak loud enough and I'm sure she'll tell

3   all of us if we need to speak louder.

4       A.  Yes, sir.

5       Q.  Now, I want to show you what has been

6   marked as Exhibit 4.  And I have given a copy of

7   this to opposing counsel.  And you will note the

8   copy that you have is in a spiral notebook and it's

9   numbered Waxahachie Documents-001 through

10   Waxahachie Documents-093.

11       A.  Okay.

12       Q.  And I will tell you these were produced, I

13   believe, by Deputy Chief Wiser of your department

14   after we had sent a Public Information Act under

15   Texas law request under cover of a letter sent down

16   here on 2 December of 2020.  Have you ever seen

17   these documents before?

18       A.  Yes, sir.

19       Q.  As the chief, are you the person at the

20   apex of administrative control of this department?

21       A.  Yes, sir.

22       Q.  Are you the person who has ultimate

23   control over documents even though you may have an

24   assistant who does the clerical work?

25       A.  Yes, sir.  Well, I'll say under the advice

1    of an attorney sometimes, but, yes.

2        Q.   Okay.  So on a day-to-day basis, are you

3    the person that has access to all the documents

4    that, if you needed to, you could go to them or get

5    them brought to you or send them somewhere?

6        A.   Yes, sir.

7        Q.   And are these documents maintained, the

8    ones under your control, routinely as business

9    records of your department?

10       A.   Yes, sir.

11       Q.   And are they maintained by a person who is

12   actually paid to be the custodian to make sure they

13   are maintained properly and intact?

14       A.   We -- well, these records are maintained

15   here by the chief's office.  We have a records

16   division that maintains some records that you would

17   say are controlled by people that are paid just for

18   that purpose.

19       Q.   So when you say these records, you are

20   talking about the Exhibit 1 records?

21       A.   Some of these records.  I think --

22   actually, all these records, yes.

23       Q.   And so are these records, once they are

24   brought in, are they put into place by someone and

25   maintained by someone who has a job duty to

1  maintain them properly?

2      A.   Yes.

3      Q.   And are they based on information as it

4  comes into the department or into the knowledge of

5  people of the department?

6      A.   Would you -- would you restate that?

7      Q.   Well, these records, some of them,

8  obviously, like the photographs, may or may not be

9  taken by an officer.  Some of them, like these

10 bills that were paid for damage to the house that

11 the plaintiffs lived in --

12     A.   Right.

13     Q.   -- are probably bills that came in and got

14 paid.  But as these records come in, some of them

15 are memorandums; some from you to, for example,

16 Assistant Chief Wiser; and some of them are

17 statements in connection with an internal affairs

18 investigation.  But as these records come in, do

19 they come in at or near the time when they are

20 created and then are they archived as they are

21 received?

22     A.   If they are related to the particular

23 incident, yes.

24     Q.   Okay.  And so these records relate to an

25 incident where a SWAT team from your department

1    went to a nearby community and entered the home of

2    the Jimerson family; is that correct?

3         A.   That's correct.

4         Q.   And are these records maintained and

5    created generally on the basis of the knowledge of

6    the people making the records at or near the time

7    of events that they are recording about?

8         A.   I am going to have to ask you to rephrase.

9         Q.   Sure.

10        A.   Clarify that.

11        Q.   Well, that's kind of two questions.  So I

12   will start with this:  Are these records that come

13   in, are they records that are created at or near

14   the time of the events they pertain to?

15        A.   Within a reasonable time frame after the

16   event.

17        Q.   And are they based on the knowledge of the

18   people creating the records?

19        A.   Yes, sir.

20        Q.   And then are they maintained under your

21   control -- and you said these are maintained in the

22   chief's office -- intact as business records of

23   your department?

24        A.   Yes, sir.

25        Q.   Now, I want to ask you some general

```
 1        A.   I don't believe so.
 2        Q.   Well, I will tell you -- and I have a copy
 3   in case anyone wants to see it -- the current
 4   version of it is the Plaintiffs' First Amended
 5   Complaint pleading, Document 16 in Cause Number
 6   3:20-CV-02826-L pending in the United States
 7   Federal District Court in Dallas, Texas in the
 8   Northern District, Dallas Division.  And this
 9   pleading was filed on 15 December 2020.
10                I have a copy of the first pages of it
11   if anyone cares to see it.  Anyone want to see
12   this?
13                MR. MONTGOMERY:  No.
14                MR. REYNOLDS:  Counsel?
15                MR. MONTGOMERY:  No.  I'm just -- it
16   depends on what question is asked, I guess.
17                MR. REYNOLDS:  Okay.  Well, what I am
18   trying to do here is I am trying to get to the
19   point about who is a party in the case and see if
20   the chief knows these people.
21        Q.   (By Mr. Reynolds)  So, Chief, do you know
22   a Lieutenant Mike Lewis in your department?
23        A.   Yes, sir.
24        Q.   And an Officer Brent Dunn, do you know
25   him?
```

1     A.   Yes, sir.

2     Q.   Do you know an Officer Dustin Koch,

3  K-o-c-h?

4     A.   Yes, sir.

5     Q.   Do you know an Officer Andrew Gonzales?

6     A.   Yes, sir.

7     Q.   Do you know an Officer Derrick Young?

8     A.   Yes, sir.

9     Q.   Do you know Officer Brian Fuller?

10    A.   Yes, sir.

11    Q.   Do you know an officer by the name of

12 Stephen Sanders?

13    A.   Yes, sir.

14    Q.   And is Stephen Sanders a sergeant within

15 the department?

16    A.   He was.  And effective today, he's a

17 lieutenant.

18    Q.   And do you know an Officer James Lewis?

19    A.   Yes, sir.

20    Q.   And an Officer OT Glidewell?

21    A.   Yes, sir.

22    Q.   And an Officer James Taylor?

23    A.   Yes, sir.

24    Q.   And do you know an officer by the name of

25 Derek Behringer?

1          A.   Yes, sir.

2          Q.   It's B-e-r-r-i-n-g-e-r (sic).  I will tell

3     you that these individuals are named as defendants.

4     You are not a defendant.

5          A.   Okay.

6          Q.   The City of Waxahachie is not a defendant;

7     the police department is not a defendant.  But

8     these individuals are named as defendants.

9               I will ask you:  On or about 27 March

10    2019, were these individuals on the SWAT team of

11    the Waxahachie Police Department?

12         A.   Yes, sir.

13         Q.   And on that same occasion, as members of

14    the SWAT team, did they go to Waxahachie -- from

15    Waxahachie to Lancaster, Texas over in Dallas

16    County to serve a warrant?

17         A.   Yes, sir.

18         Q.   Now, since we have identified these people

19    and you know them, can we kind of abbreviate

20    instead of listing all their names every time and

21    either refer to them as the defendants or as the

22    SWAT team?

23         A.   Okay.

24         Q.   By the way, when and how did you first

25    learn you would be giving this deposition?

```
 1                    (Record read by Reporter.)
 2                    THE WITNESS:  Let me get you to read
 3      that one more time.
 4                    THE REPORTER:  Sure.  No problem.
 5                    THE WITNESS:  It's a long question.
 6           Q.   (By Mr. Reynolds)  I'll rephrase.  That
 7      may make it easier.  Let's look at Exhibit 4 --
 8           A.   Okay.
 9           Q.   -- which does not contain the audio we
10      talked about, but it contains physical documents,
11      including copies of photos and other things.  To
12      your knowledge, is there anything that's a physical
13      document or record pertaining to the internal
14      affairs investigation conducted in your department
15      and relating to the time when a SWAT team from your
16      department entered the Jimerson home on 27 March
17      2019 which is not included in Exhibit 4?
18           A.   This is everything that exists related to
19      that incident.
20           Q.   Is it correct that you authorized the use
21      of the SWAT team from your department on the
22      occasion in question?
23           A.   Yes, sir.
24           Q.   And at that time, were you aware that
25      there was a warrant to be served?
```

1      A.   Yes, sir.

2      Q.   Did you see the warrant at that time?

3      A.   No, sir.

4      Q.   Have you seen it since?

5      A.   Yes, sir.

6      Q.   So are you aware that that warrant was not

7  directed to the home of the Jimerson family, which

8  was located at 593 West 8th Street in Lancaster?

9      A.   Ask the question again.

10      Q.   I will get it read back.

11      A.   Okay.

12             (Record read by Reporter.)

13      A.   Yes, sir.

14      Q.   (By Mr. Reynolds)  In fact, the warrant

15  mentioned the address of 573 West 8th Street in

16  Lancaster; is that not correct?

17      A.   That's correct.

18      Q.   And are you aware that the warrant made no

19  mention or reference to any of the plaintiffs in

20  the Jimerson family who resided in the Jimerson

21  home?

22      A.   Yes, sir.

23      Q.   Have you ever seen the probable cause

24  affidavit and the -- and on it was Dallas Police

25  Officer Hight, H-i-g-h-t, that was used to obtain

1    this warrant?

2         A.   I don't believe I have.

3         Q.   Okay.  Are you aware that the warrant was

4    issued by a Texas state district judge in Dallas

5    County?

6         A.   That's my understanding, yes, sir.

7         Q.   When the SWAT team went out on the evening

8    in question, 27 March 2019, into Lancaster, Texas,

9    I would like to ask you a few questions about how

10   they were attired and equipped; may I do that?

11        A.   Sure.

12        Q.   So were they wearing body armor of some

13   sort?

14        A.   Yes, sir.  And let me preface my answers

15   as I am going to tell you -- I can only answer what

16   they would normally be wearing.  I did not see them

17   that night, so I can't say for a fact what they

18   were wearing, but I can tell you what they would

19   normally be wearing.

20        Q.   Okay.  Were they armed with weapons that

21   could be lethal?

22        A.   Yes, sir.

23        Q.   Did these weapons include pistols, tasers

24   and rifles?

25        A.   I am not sure if they carried tasers, but

1    they would normally be carrying pistols and rifles.

2         Q.   Okay.   Were they equipped with any

3    glass-breaking equipment?

4         A.   Yes, sir.

5         Q.   I have seen a reference to something about

6    break-n-rake; is that what they call that

7    equipment?

8         A.   Yes, sir.

9         Q.   And do you know which officer or officers

10   on the SWAT team used that equipment on the

11   Jimerson home?

12        A.   From reading the reports, I believe it was

13   Sergeant Sanders.

14        Q.   Okay.

15             MR. MONTGOMERY:   Do you want his

16   personal knowledge or do you want what he's read?

17             MR. REYNOLDS:   Well, I want to know

18   what he knows.   He directed that an internal

19   affairs investigation be done and we got these

20   documents.   Basically, much of this information is

21   in the documents.   I am just kind of going down the

22   list.

23             MR. MONTGOMERY:   I know, but just go

24   on personal knowledge at this point, Chief.

25             MR. REYNOLDS:   No.   Don't tell him

 1    didn't make a hostile pointing towards you.  And I

 2    have seen this through the years from people who

 3    want to whine and then go to court and whine and

 4    say they are victims, but you are a big guy and you

 5    are not a victim and you are not being treated

 6    rudely.  So may I proceed --

 7                MR. MONTGOMERY:  Object to sidebar.

 8    Object to sidebar.  If you have a question, please

 9    ask it.

10                MR. REYNOLDS:  Well, if you wouldn't

11    be so troublesome, I wouldn't have to talk to you

12    like this --

13                MR. MONTGOMERY:  Object to sidebar.

14                MR. REYNOLDS:  -- may I proceed,

15    please?

16                MR. MONTGOMERY:  Please ask the

17    question.

18                MR. REYNOLDS:  Thank you.

19                THE WITNESS:  I am going to suggest we

20    take a break.  I need a restroom break.  Is that

21    all right with you?

22                MR. REYNOLDS:  You are the boss.

23                (Recess taken.)

24       Q.   (By Mr. Reynolds)  So still talking about

25    your SWAT team, the defendants in this case, when

 1    they entered the home of the plaintiffs on 27 March

 2    2019, would that team normally have been equipped

 3    with flash-bang equipment?

 4        A.   Yes, sir.

 5        Q.   And would it normally have been equipped

 6    with zip-tie equipment?

 7        A.   Yes, sir.

 8        Q.   And what would the flash-bangs be used for

 9    when there's going to be what you call a dynamic

10    entry into a house with a no-knock warrant?

11        A.   It's used as a distraction for the

12    individuals inside, to allow the team to get in and

13    take control of the situation before the person

14    realized what was happening.

15        Q.   Kind of like a shock-and-awe operation,

16    sort of?

17        A.   I guess you could call it that.

18        Q.   Yeah.  And what would the zip ties be used

19    for?

20        A.   That's temporarily detaining somebody.

21        Q.   And, of course, you wouldn't want to be

22    shocking or attacking or detaining someone who is

23    not the subject of a warrant unless you otherwise

24    had probable cause to believe that there was a

25    problem with them; is that correct?

```
 1                MR. MONTGOMERY:  Object to form.
 2                MR. REYNOLDS:  And what is the
 3   objection, please?
 4                MR. MONTGOMERY:  You are asking for a
 5   legal conclusion.
 6                MR. REYNOLDS:  No, I'm asking a police
 7   officer about things they all know about.
 8                MR. MONTGOMERY:  You asked me what my
 9   objection was and I stated it.
10                MR. REYNOLDS:  Well, I'll restate the
11   question, then.
12        Q.   (By Mr. Reynolds)  Would you expect the
13   SWAT team would use zip ties or flash-bangs against
14   people that were not the subject of their warrant?
15        A.   No.
16        Q.   Would you expect that a SWAT team would
17   use flash-bangs or zip ties against a physical
18   location or residence which was not the subject of
19   their warrant?
20        A.   No.
21        Q.   Do you know how long the SWAT team was at
22   the Jimerson residence on 27 March 2019?
23        A.   Not exactly, but there is probably two
24   phases to that question.
25        Q.   All right.  Well, let me start with this:
```

1    Do you have personal knowledge about this?

2        A.   No.

3        Q.   Okay.  So to the extent that you do have

4    knowledge about it, how did you acquire that

5    knowledge?

6        A.   Through an investigation into the actions

7    that evening.

8                  (Exhibit 4 marked.)

9        Q.   (By Mr. Reynolds)  And so that

10   investigation generated these documents that we see

11   as Exhibit 4, correct?

12       A.   That's correct.

13       Q.   But in Exhibit 4 -- and I may have missed

14   it -- and you have got a copy, so if I did, show me

15   where it is.  But I didn't see anything that showed

16   a timeline or showed when the SWAT team got to or

17   left the Jimerson residence.  Is there anything in

18   the Exhibit 4 documentation?

19       A.   I think there is one reference as to when

20   they left, but there's not a reference that I could

21   find when they arrived.

22       Q.   Okay.  And can you find the reference to

23   when they left?

24       A.   On Page 066, there is a reference that

25   SWAT officers were cleared from scene security at

1   approximately 12:45 a.m.

2       Q    Would that be 12:45 a.m. on 28 March?

3       A.   That would be correct.

4       Q.   So that's 28 March 2019, correct?

5       A.   Correct.

6       Q.   Have you seen the ambulance or EMS records

7   pertaining to the time when the ambulance came to

8   the Jimerson residence on the evening of 27 March

9   2019?

10      A.   No, sir.

11      Q.   I am going to make this comment on the

12  record and I want you to correct me if I am wrong.

13  My understanding is that the ambulance was from

14  Lancaster and not from Waxahachie; is that your

15  understanding?

16      A.   I don't know.

17      Q.   Okay.  Well, if you don't know, you don't

18  know.

19      A.   Right.

20      Q.   And similarly, you would not know whether

21  the ambulance records showed a time when they got

22  the call and were dispatched or got on scene or

23  left, but you have not seen the records; is that

24  right?

25      A.   That's correct.

1    After-Action Report?

2        A.   No, sir.  Not for a fact.

3        Q.   Okay.  Would it normally have been

4    prepared by the person in command of the SWAT team?

5        A.   Yes, sir.

6        Q.   And on Page 61 where it starts out,

7    synopsis of the incident, does it say that the SWAT

8    commander was Lieutenant Mike Lewis, Badge Number

9    109?

10        A.   Yes, sir.

11        Q.   So even though these documents don't tell

12    us for sure who prepared this report, is Lieutenant

13    Lewis the person who, in the normal course of

14    affairs, would have prepared it?

15        A.   Yes, sir.

16        Q.   And the After-Action Report up here at

17    Page 61 at the very top says the incident location

18    is 573 8th Street in Lancaster; do you see that?

19        A.   Yes, sir.

20        Q.   Now, that's the address mentioned in the

21    warrant, but not the address of the Jimerson

22    family; is that correct?

23        A.   That is correct.

24        Q.   And on Page 63, in the last line, the

25    report says that this was a no-knock warrant; is

1    that correct?

2         A.   That's correct.

3         Q.   What is a no-knock warrant, sir?

4         A.   It means that you can make entry without

5    waiting for someone to come to the door, basically.

6    You can -- you can force entry and make entry

7    without knocking and waiting for somebody to come

8    to the door.

9         Q.   But it still requires that you have to go

10   to the address mentioned in the warrant; is that

11   correct?

12        A.   Yes, sir.

13        Q.   And so when the SWAT team of the

14   Waxahachie Police Department makes entry using a

15   no-knock warrant, do they have some kind of device

16   that's part of their equipment regularly that they

17   use to open the door?

18        A.   Yes, sir.

19        Q.   And what is that device called?

20        A.   I don't remember.  Depend -- there's

21   multiple devices that could be used, in all

22   honesty.

23        Q.   What are some of them?

24        A.   One of them is called a ram and one of

25   them would be a pry tool.

1        Q.   Okay.  So would a pry tool be kind of like

2    an old-fashioned crowbar --

3        A.   Pretty much.

4        Q.   -- but bigger?

5        A.   Pretty close.

6        Q.   And would a ram tool be kind of like

7    something that's big that you use to ram against

8    the door?

9        A.   Correct.

10       Q.   And which one, generally, permits entry

11   the quickest?

12       A.   Depends on how the door opens.  If the

13   door opens inwardly, the ram.  If the door opens

14   outwardly, the pry tool.

15       Q.   From looking at this After-Action Report,

16   can you tell which kind of tool was used when entry

17   was made to the Jimerson family residence?

18       A.   I don't remember seeing that, but let me

19   look at it again.  It doesn't really specify how

20   the front door was opened.

21       Q.   Are you aware that while the internal

22   affairs investigation into this incident -- which

23   you ordered -- was being conducted, statements were

24   requested and then submitted by Lieutenant Lewis

25   and Sergeant Sanders?

```
 1        A.   Ask the question again.

 2        Q.   Let me get it read back, please.

 3                  (Record read by Reporter.)

 4        A.   Yes, sir.

 5        Q.   (By Mr. Reynolds)  And is it correct that

 6   in these statements which are part of Exhibit 4,

 7   both of them admitted that they were at fault?

 8                  MR. MONTGOMERY:  Object to form.

 9        A.   I don't remember seeing that exactly in

10   the report.

11        Q.   (By Mr. Reynolds)  Well, we will come back

12   to that in a minute.

13        A.   Okay.  Okay.

14        Q.   Let's start with Page 1 of Exhibit 4; and

15   tell us what that is, please.

16        A.   Page 1?

17        Q.   Page 1, first page there.

18        A.   Okay.  That is a memo to Assistant Chief

19   Joe Wiser from me --

20        Q.   And what's the date of --

21        A.   -- ordering -- I am sorry?

22        Q.   What is the date of it, please?

23        A.   April 2nd, 2019.

24        Q.   So a few days after 27 March 2019?

25        A.   Yes, sir.
```

1      Q.   And what's -- what's this memo about,

2  please?

3      A.   This is about an investigation into the

4  execution of the search warrant we've been talking

5  about.

6      Q.   Okay.

7           MR. REYNOLDS:   And I think I am going

8  to get this marked as Exhibit 4-A in his copy.

9           THE REPORTER:   The first page?

10          MR. REYNOLDS:   Or we can -- we can

11 mark this one.   I will make sure you have it before

12 you leave, 4-A.

13          (Exhibit 4-A marked.)

14     Q.   (By Mr. Reynolds)  So I will show you

15 Exhibit 4-A; that's the first page --

16     A.   Okay.

17     Q.   -- of Exhibit 4.   Why did you order an

18 internal affairs investigation into the actions of

19 the Waxahachie department SWAT team on 27 March

20 2019?

21     A.   Because we were serving a warrant for 573

22 8th Street in Lancaster and mistakenly went to the

23 house at 593 8th Street.

24     Q.   Okay.   And why was that significant enough

25 to make you decide there should be an internal

1   affairs investigation?

2      A.   Because property damage occurred, people

3   were subjected to it that -- and those kind of

4   mistakes shouldn't happen.

5      Q.   Okay.  And are you aware that before the

6   SWAT team went over to Lancaster on the occasion in

7   question and went to serve the warrant, they were

8   briefed and shown photos?

9      A.   Yes, sir.

10      Q.   And here on Exhibit 4-A, read the last --

11   very last sentence in your memo, please.

12      A.   Specifically, Lieutenant Mike Lewis was

13   the SWAT commander on the scene and he has stated

14   he mistakenly directed the team to 593 8th Street.

15      Q.   Was there any reason for the SWAT team to

16   enter the residence of the plaintiffs on the

17   occasion in question?

18      A.   There were lots of reasons why it

19   happened, if that's -- I am not sure what you are

20   asking.  From a legal perspective or from an

21   operational perspective?

22      Q.   I am not asking a legal question.  I am

23   just asking:  Operationally, in the field, when you

24   have a SWAT team and they have been briefed and

25   they have been shown photos and they have a warrant

 1   difference between a good reason and a bad reason,
 2   but there were factors involved that would be --
 3   you could say reasons or not, but they shouldn't
 4   have gone to the wrong house.
 5        Q.   And that's what concerned you and made you
 6   decide there needed to be an internal affairs
 7   investigation?
 8        A.   Yes.
 9        Q.   Is it something -- I will restate it this
10   way:  Should the SWAT team do something like this
11   again somewhere in the future by going to a house
12   that's not the subject of a warrant?
13        A.   Should they?
14        Q.   Should they?
15        A.   No.
16        Q.   And they shouldn't have gone into the
17   plaintiffs' house on the occasion in question;
18   isn't that correct?
19        A.   That's correct.
20        Q.   And, ultimately, Lieutenant Lewis ended up
21   getting suspended without pay for a while because
22   of this; is that right?
23        A.   That's correct.
24        Q.   Now, you have told us that you don't have
25   any record of how long the SWAT team members were

1    in the residence of the Jimersons on the occasion

2    in question, so let me ask you this question:   Are

3    you aware that Sergeant Sanders, before entering

4    the residence, broke out at least three of the

5    windows of it with the break-n-rake device?

6         A.   Yes, sir.

7         Q.   Do you think he could have done that and

8    then entered the residence and then left the

9    residence within 10 seconds?

10                  MR. MONTGOMERY:   Object --

11        Q.   (By Mr. Reynolds)   I am talking about from

12   the time he started breaking the windows through

13   the time he went in to the time that he came back

14   out, do you believe that he could have done that

15   within 10 seconds?

16                  MR. MONTGOMERY:   Object to form.

17        A.   I don't know.

18        Q.   (By Mr. Reynolds)   Well, I also notice

19   there is no mention in any of these documents now

20   labeled as Exhibit 4 of him or any of the other

21   officers going in and coming back out within 10

22   seconds.   Am I correct that it's not mentioned in

23   these records?

24        A.   There is a mention that they went into the

25   house and, I think, were in for 15 to 20 seconds,

1       Q.   So apparently he's talking about --

2  Lieutenant Lewis is talking in this statement he

3  gave about his own activities.  And, now, he's

4  mentioning 10 minutes as part of that sentence; is

5  that correct?

6       A.   Yes.  They went back to the residence.

7       Q.   Is it your understanding that Lieutenant

8  Lewis was the commander of the SWAT team on the

9  occasion in question who directed them to enter the

10  Jimerson residence?

11       A.   That's correct.

12       Q.   And did Sergeant Sanders make a statement

13  saying that he was second in command and he thought

14  he was also at fault?

15       A.   Yes, sir.

16       Q.   Can you tell us what page we could find

17  that at, please?

18       A.   Page 18 and 19.

19       Q.   So on Page 19, Sergeant Sanders says,

20  among other things, quote, I share responsibility

21  with Lieutenant Lewis, closed quote.

22       A.   Correct.

23       Q.   And on Page 18 of Exhibit 4, this is the

24  first page of Sergeant Sanders' memorandum to you

25  dated 28 March 2019.  Could you -- it's a short

1   paragraph, but could you read for us only the

2   second paragraph here in that memorandum statement?

3        A.   By error and self-admittance of fault, the

4   WPD SWAT team, including myself as team leader,

5   mistakenly executed the search warrant at the wrong

6   address, 593 8th Street, prior to redirecting to

7   the correct target location.

8        Q.   And then what does he say in the first

9   sentence of the next paragraph about Lieutenant

10  Lewis, please?

11       A.   The first sentence of the next paragraph?

12       Q.   Yes.   It starts with the words, by now.

13       A.   By now, I have been made aware that

14  Lieutenant Mike Lewis, SWAT team commander, has

15  shouldered the entire blame for the operation's

16  initial and understandably unacceptable mistake.

17       Q.   And then in the last sentence of that

18  paragraph, what does Sergeant Sanders say about

19  himself, please?

20       A.   Although Lieutenant Lewis had overall

21  command and control of the operation from the

22  onset, I, as team leader, also share responsibility

23  and blame.

24            MR. REYNOLDS:   Let's mark that --

25  that's Pages 18 and 19 as Exhibit 4-B, 4-Baker,

 1                      THE REPORTER:   And I will keep track

 2      of it right here as well.

 3                      MR. REYNOLDS:   Sure.   That's fine.

 4          Q.   (By Mr. Reynolds)   Now, in connection with

 5      doing the internal affairs investigation about this

 6      incident involving the SWAT team invasion of the

 7      home of the Jimerson family, the plaintiffs, on 27

 8      March 2019, various pieces of evidence were looked

 9      at and then Assistant Chief Wiser did a report for

10      you; is that correct?

11          A.   That's correct.

12          Q.   Let's see if we can find that report,

13      please.

14          A.   I think it starts at Page 36.

15                      MR. REYNOLDS:   And probably should

16      mark this as Exhibit 4-C, please, ma'am.

17                      (Exhibit 4-C marked.)

18          Q.   (By Mr. Reynolds)   So at Page 36, which is

19      the first page of this 4-C exhibit, this looks like

20      you're the complainant because you ordered the

21      investigation.   And your address, where we are

22      today, is up here --

23          A.   That's correct.

24          Q.   -- police department?   And the allegations

25      appear to have included violation of department

1   statement, to be honest with you.  It's referring

2   to the fact of doing a personal on-view sight of

3   the location.

4       Q.   But it says, quote, reasonable and normal

5   protocol was completely overlooked; doesn't it?

6       A.   That's what he wrote, yes.

7       Q.   Yeah.  And then he details some things

8   here, including that the houses have different

9   numbers?

10      A.   Correct.

11      Q.   And that the houses 573, 583 and 593

12  apparently --

13              MR. MONTGOMERY:  587.

14              MR. REYNOLDS:  Yeah.  I am sorry.

15  573, I think I said.

16              MR. MONTGOMERY:  You said 583.  It's

17  587 on this sheet of paper.

18              MR. REYNOLDS:  Okay.  Well, I have a

19  confession to make:  My over-40 eyes have been over

20  40 for 32 years.  And I thank you for correcting

21  me.

22      Q.   (By Mr. Reynolds)  Okay.  Here we are at

23  Page 43 of Exhibit 4 in exhibit -- I think it's 4-C

24  now.  And it says, in part, the houses on the

25  street are numbered -- and then it shows the

 1    numbers -- 573, 587, 593 with no lots between them.

 2                   Do you see that?

 3        A.    That's correct.

 4        Q.    And it says, the target home was similar,

 5    but had several defining characteristics.

 6                   Do you see that?

 7        A.    Yes, sir.

 8        Q.    It says, the defining characteristics

 9    included one house having a wheelchair ramp

10    complete with handrails; one house having a

11    chain-linked fence in the front yard; both houses

12    being clearly marked with address numbers affixed

13    to both homes' front facade and both being marked

14    with house numbers on the outer curbing.

15                   Do you see that?

16        A.    Yes, sir.

17        Q.    Now, also, back starting at Page 46 here

18    in Exhibit 4, which is part of exhibit -- I believe

19    this is 4-C now, there are a number of findings of

20    fact; do you see that?

21        A.    Yes, sir.

22        Q.    And it says here on the next page among

23    these findings of fact --

24                   MR. MONTGOMERY:   Are you on 46 or 47?

25                   MR. REYNOLDS:   Well, the next page is

```
 1    47, yes.
 2              MR. MONTGOMERY:  Okay.
 3         Q.   (By Mr. Reynolds) -- that the residence
 4    located at 593 8th Street, Lancaster, Texas, was
 5    wrongfully breached and entered in a dynamic manner
 6    by the Waxahachie SWAT team on March 27, 2019.
 7              Do you see that?
 8         A.   Where are you -- fourth one down?
 9         Q.   Yes, sir.
10         A.   Yes, sir.
11         Q.   And right beyond that, starting at Page 50
12    of Exhibit 4 is the Affidavit that we talked about
13    earlier.
14         A.   Okay.
15         Q.   Which is executed at Page 56 by Dallas PD
16    Officer Christopher -- pardon, that's the
17    authorization.  So let me see where this is
18    actually starting.  It looks like it's signed by
19    Christopher Hight and sworn to by him in the
20    presence of the judge on Page 56.  And then the
21    search warrant documentation appears at Pages 57
22    and 58, ending at Page 60.  Am I correct that none
23    of this documentation makes any mention of any of
24    the plaintiffs or of their residence at 593 West
25    8th Street?
```

```
 1        A.   That's correct.
 2        Q.   So in addition to the findings by Chief
 3   Wiser that the home which was the target home under
 4   the warrant and the plaintiff home were not next to
 5   one another and had separate markings and street
 6   numbers, and that reasonable and normal protocol
 7   was overlooked, isn't it correct that Chief Wiser
 8   found that the actions of Lieutenant Lewis and the
 9   SWAT team when they invaded the home of the
10   plaintiffs on the occasion in question displayed
11   poor judgment?
12        A.   Where does it say that?
13        Q.   We will have to hunt through.  Well, let
14   me just ask this:  Would you agree that entering
15   the wrong house on the occasion in question by the
16   SWAT team involved poor judgment?
17        A.   I would agree that it was a mistake.
18        Q.   Okay.  Would you agree that the home of
19   the plaintiffs was entered illegally?
20             MR. MONTGOMERY:  Object to form.
21        A.   I am sorry?  I didn't hear the question.
22        Q.   (By Mr. Reynolds)  Would you agree that
23   the home of the plaintiffs on the occasion in
24   question was entered illegally by the SWAT team?
25             MR. MONTGOMERY:  Object to form.
```

```
 1        A.   I think that would be a question for a
 2   court to decide.
 3        Q.   (By Mr. Reynolds)   Well, let me point your
 4   attention to Page 45; that's within Exhibit 4, and
 5   I think it's also within Exhibit 4-C.  This is part
 6   of the report of Chief Wiser.  And look at the last
 7   paragraph here.
 8        A.   Page 45?
 9        Q.   Page 45.
10        A.   Okay.
11        Q.   It starts, although the mistakes; do you
12   see that?
13        A.   Yes.
14        Q.   And this report from Chief Wiser says, in
15   part, quote, the mistakes made were significant.  A
16   home was entered illegally by members of our police
17   department, closed quote.
18             It says that, doesn't it?
19        A.   Yes, it says that.
20        Q.   Is there anywhere in this report or in
21   your findings where you disagreed with that
22   statement?
23             MR. MONTGOMERY:  Object to form.
24        Q.   (By Mr. Reynolds)   In this document --
25        A.   Again, I think that --
```

```
 1    Texas.  So even though the Jimersons, bless their
 2    hearts, are poor people and they were renting,
 3    their home was their home, correct?
 4                  MR. MONTGOMERY:  Object to the form of
 5    the question.
 6                  MR. REYNOLDS:  Well --
 7         A.   Their home is their home.
 8                  MR. REYNOLDS:  -- I wish a jury could
 9    see you do this.  And I am going to tell you, I am
10    old and I will be meeting my maker soon and you
11    will too.  Think about this:  People have rights.
12    God made us all.  Rich and poor, we all have the
13    same rights.  Police work is hard, but it's
14    important for the police to obey the law.  We count
15    on them to enforce the law.
16                  MR. MONTGOMERY:  Object to the
17    sidebar.  Go ahead if you have got a question.
18                  MR. REYNOLDS:  Okay.
19         Q.   (By Mr. Reynolds)  So is there anywhere in
20    writing in Document Exhibit 4 here where you, in
21    writing, took exception to the statement at Page 45
22    here from assistant Chief Wiser that, quote, a home
23    was entered illegally by members of our police
24    department, closed quote?
25                  Did you except to that in writing
```

1    anywhere?

2        A.   No, sir.

3        Q.   Is there anywhere in writing in this

4    Exhibit 4 where you took exception to the statement

5    made by Chief Wiser at Page 46 of Exhibit 4 that's

6    in Exhibit 4-C also, quote, the mistakes made were

7    significant, closed quote?

8        A.   No, sir.

9        Q.   Would you expect a competent police

10   officer under your command to make these kinds of

11   mistakes?

12                MR. MONTGOMERY:   Object to form.

13       A.   No, I wouldn't expect it.

14       Q.   (By Mr. Reynolds)   Now, I know we're

15   fixing to get an objection to a question about

16   probable cause.   And you are here as a fact

17   witness.   But in your day-to-day work as a police

18   officer, you know what probable cause is, don't

19   you?

20       A.   Yes, sir.

21       Q.   And so do all the members of your

22   department; is that correct?

23       A.   I hope so.

24       Q.   All the officer members?

25       A.   Yes, sir.   Yes, sir.

1       Q.   And you know about the requirement of

2    having a warrant to do searches and seizures,

3    generally; you know that?

4       A.   Yes, sir.

5       Q.   And the officers under your command know

6    that?

7       A.   Yes, sir.

8       Q.   And they knew that and you knew that back

9    on 27 March of 2019; is that right?

10      A.   Yes, sir.

11      Q.   And on that date, you and your officers

12   also knew about the Fourth Amendment to the Federal

13   Constitution that speaks to searches and seizures;

14   you were aware of that?

15      A.   Yes, sir.

16              MR. MONTGOMERY:   Object to form.

17      Q.   (By Mr. Reynolds)   Okay.   And when you

18   authorized this operation, you didn't give

19   authority to the SWAT team to go beyond the bounds

20   of what they were permitted to do under the warrant

21   that had been issued on the occasion in question;

22   am I right?

23      A.   You are right.

24      Q.   And isn't it correct that one of the

25   reasons that you were very concerned about what had

1    happened when the SWAT team went into the wrong

2    house was because they exceeded what you expected

3    them to do when you told them to go out there and

4    serve a warrant and they didn't do it right?

5        A.   State that again.

6        Q.   Yes.  Let me get it read back.

7        A.   Okay.

8        Q.   The problem here, Chief, is I am trying to

9    get into your mind and you are smarter than me.

10       A.   I don't know about that.

11            MR. MONTGOMERY:  Object to the

12   sidebar.

13       A.   It's a pretty empty space up there, so --

14            (Record read by Reporter.)

15       A.   Okay.  I think the word probably that's

16   hanging me up is "exceeds."  But I think I would

17   expect them to do the job correctly, if that

18   answers your --

19       Q.   (By Mr. Reynolds)  To do which -- to do

20   which correctly?

21       A.   To do the job correctly.

22       Q.   Okay.  And the correct way to do the job

23   that you sent them out to do was to go to the

24   location mentioned in the warrant; is that right?

25       A.   That's correct.

1      Q.   So when they went to the wrong location

2  and then you got an investigation and you looked at

3  everything that Assistant Chief Wiser had found in

4  his reports and statements, at that point, did you

5  believe they had acted correctly or incorrectly by

6  entering the wrong home?

7      A.   No.   They acted incorrectly.

8      Q.   Okay.   And because Lieutenant Lewis was in

9  command, he was the one that actually got suspended

10  for a while?

11      A.   Yes, sir.   Do you know how much longer

12  we're going to go?

13      Q.   We might go a few more minutes.   If you

14  want to take a break and check calls or something,

15  that's fine.

16      A.   Either that or I was going to suggest we

17  break for lunch.

18      Q.   Well, it's 11:30 and I think --

19            MR. MONTGOMERY:   Let's go off the

20  record.

21            (Recess taken.)

22      Q.   (By Mr. Reynolds)   I would like for you to

23  look within Exhibit 4 at Pages 11 and 12, please.

24      A.   Okay.

25      Q.   And we've seen that -- at the top of Page

1    first and were told to get on the ground and both

2    complied.  An officer took the adult female by the

3    arm to assist her to the ground, but force was not

4    used against either female.  Before the male could

5    be told to get on the ground, officers began to

6    realize they were inside the wrong house.

7        Q.   Now, does this sound like something that

8    could have all been done within 20 seconds and then

9    be back out the door?

10       A.   I think it could probably be done in 20

11   seconds.

12       Q.   Okay.  But you don't know for sure, do

13   you?

14       A.   No.

15       Q.   And you weren't there to see it, correct?

16       A.   That's correct.

17       Q.   So you realize that other people who were

18   there might have differing recollections?

19       A.   Sure.

20       Q.   I note there is nothing in any of this

21   documentation in Exhibit 4 that appears to indicate

22   that any member of the Jimerson family was, in

23   fact, rude to the officers or was observed doing

24   anything that appeared to be dangerous to the

25   officers or to themselves; am I right?

1     A.   That's correct.

2     Q.   Okay.  I notice there is nothing in

3   Document 4 that indicates that any member of the

4   Jimerson family was observed doing anything that

5   looked like bad behavior, if you could use that

6   term kind of globally as opposed to a legalistic

7   term?

8     A.   There is --

9              MR. MONTGOMERY:  Object to form, but

10   go ahead.

11     A.   There is nothing in the report that

12   indicates that.

13     Q.   (By Mr. Reynolds)  I would like for you to

14   look at Exhibit 4, Pages 27 through 29, which

15   appears to be the Waxahachie Police Department SWAT

16   Operational Plan.

17     A.   Okay.

18     Q.   Did you see this plan when you approved

19   the operation?

20     A.   No.

21     Q.   Was this plan drawn up before or after the

22   operation, if you know?

23     A.   I don't know.

24     Q.   The reason I am kind of curious is because

25   we know that the Jimerson home was entered on the

```
 1        Q.   Sir, I would like for you to look at Page

 2   42 in Exhibit 4, which, I think, is also part of

 3   Exhibit 4-C, the --

 4        A.   Page 42?

 5        Q.   Page 42.  4-C starts at Page 36.  So Page

 6   42, under investigator statement.

 7        A.   Okay.

 8        Q.   And I would like for you to read the first

 9   sentence there, which is about two and a half

10   lines.

11        A.   Under investigator statement?

12        Q.   Yes.

13        A.   It has been alleged that Lieutenant Mike

14   Lewis used poor judgment and decision-making skills

15   when commanding the Waxahachie Police Department

16   SWAT team.

17        Q.   So that was what was being looked at.  And

18   in connection with that, on the next page, this

19   report says, among other things, reasonable and

20   normal protocol was overlooked, correct?

21               It says that, doesn't it?

22        A.   That's what the report says, yes.

23        Q.   And Lieutenant Lewis himself did not deny

24   that he had made this mistake, did he?

25        A.   No.
```

```
 1        Q.   And let me ask you this question about
 2   timing, just a commonsense question:   If it turns
 3   out that after the officers came into the Jimerson
 4   home, Ms. Jimerson's recollection is she was
 5   compelled to lay facedown on the floor not in her
 6   bedroom, but in the bathroom where she was just
 7   finishing a bath, with no clothing on from the
 8   waist down for at least 10 minutes, would that
 9   recollection on her part be consistent or
10   inconsistent with a recollection that all of the
11   officers were out of the house within 15 to 20
12   seconds?
13             MR. MONTGOMERY:   Object to form.
14        A.   Sounds like it would be inconsistent.
15        Q.   (By Mr. Reynolds)   In March of 2019, was
16   there any policy or procedure in place within the
17   Waxahachie Police Department that permitted
18   officers serving a warrant for one specific
19   location to enter another location just because
20   they had a warrant in hand?
21        A.   No, sir.
22        Q.   In March of 2019, was there any specific
23   policy or procedure of the Waxahachie Police
24   Department that said, well, if you are an officer
25   and you have a warrant to search a person or arrest
```

```
 1    the residence of the plaintiffs, did not mention
 2    plaintiffs; yet the officers attempting to serve
 3    that warrant went into the plaintiffs' house
 4    without a warrant to do so?
 5              MR. MONTGOMERY:  Object to form.
 6       A.  Would you restate that question?
 7       Q.  (By Mr. Reynolds)  I will get it read
 8    back.
 9              (Record read by Reporter.)
10              MR. MONTGOMERY:  Same objection.
11       A.  I think, when he made that statement, it
12    was in reference to the fact that they mistakenly
13    went to the wrong house.
14       Q.  (By Mr. Reynolds)  And that concerned him?
15       A.  And that what?
16       Q.  That concerned Chief Wiser, that they went
17    to the wrong house?
18       A.  Yes.
19       Q.  And it concerned you?
20       A.  Yes.
21       Q.  And because you were concerned, that's why
22    you had an order issued over your signature to do
23    an internal affairs investigation?
24       A.  Yes.
25       Q.  Because you don't do an internal affairs
```

 1    investigation lightly; you do that for things that
 2    you think are serious concerns, correct?
 3         A.   Correct.
 4         Q.   And at the end of those investigations,
 5    you don't issue sanctions like unpaid leave
 6    lightly; you only do that if you are convinced that
 7    something has happened and you need to make some
 8    sanctions; is that right?
 9                   MR. MONTGOMERY:   Objection.   Form.
10         A.   Generally, correct, yes.
11         Q.   (By Mr. Reynolds)   I don't see anything in
12    Exhibit 4 about any portion of the home of the
13    Jimersons actually being searched or, quote,
14    tossed, closed quote; do you see anything in
15    Exhibit 4 about that?
16         A.   No, sir.
17         Q.   Was there anything in the warrant which
18    mentioned only 573 West 8th Street which, on its
19    face, would justify searching a different residence
20    or a part of a different residence?
21         A.   The warrant was for 573.
22         Q.   Yes, sir.
23         A.   And it was a search warrant.
24         Q.   For that location?
25         A.   Yes.

1    Q.   But was there anything about that warrant

2    that would, on its face, say, well, you read this

3    warrant, you can go two houses down and search that

4    house too?

5    A.   No.

6    Q.   Do you think that might be what Assistant

7    Chief Wiser was referring to in part when he

8    mentioned the term "illegal conduct"?

9              MR. MONTGOMERY:   Object to form,

10   speculation.

11   A.   Well, again, I think he wasn't using the

12   term "illegal" from a legal perspective.  I think

13   that's -- again, that's a decision a court has to

14   make.  I think he -- it was a statement he made in

15   -- in his report to me, which referred to the fact

16   that we mistakenly went to the wrong house.

17   Q.   (By Mr. Reynolds)  And as a result of

18   that, your department and the City of Waxahachie

19   paid for repairs to be made to that house, didn't

20   you?

21   A.   Yes, sir.

22   Q.   And are you aware that on the evening of

23   the entry into the Jimerson house, Lieutenant Lewis

24   told Ms. Jimerson they shouldn't have come into the

25   house and that they did the wrong thing?

1          MR. MONTGOMERY:  Object to form.

2      A.   I am not aware of what he told her.

3      Q.   (By Mr. Reynolds)  Okay.  But you have no

4  reason to confirm or deny it because you don't

5  know; is that right?

6      A.   That's correct.

7      Q.   And are you aware that, subsequently,

8  Chief Lewis -- I guess, he's Lieutenant Lewis -- I

9  don't know how you --

10      A.   Lieutenant.

11      Q.   Some small departments; you are a big

12  department.  Everyone with some rank as -- a chief

13  or deputy chief.  Are you aware that subsequent to

14  the occasion when the SWAT team entered the

15  Jimerson residence, Lieutenant Lewis communicated

16  with Ms. Jimerson and wanted to know if she wanted

17  to take a little money to settle a claim?

18          MR. MONTGOMERY:  Object to form.

19      A.   I don't know.  I know that he had multiple

20  conversations with her, but I don't know what the

21  content on those conversations were.

22      Q.   (By Mr. Reynolds)  Based on what you do

23  know, do you think that Lieutenant Lewis feels

24  remorse about the difficulty that was caused to the

25  Jimerson family when the SWAT team came into their

1    home?

2          A.    I think so.

3          Q.    Do you have remorse and regret about it?

4          A.    Sure.

5          Q.    And would I be correct to conclude that

6    you have sufficient remorse and neglect -- or

7    regret about it that you don't want it to happen

8    again to anyone in the future?

9          A.    Sure.

10          Q.    Have you taken steps, as a result of this

11    internal affairs investigation, to implement

12    additional policies to try to prevent this sort of

13    thing?

14          A.    Yes, we have.

15          Q.    And could you tell me what you have done

16    in that connection?

17          A.    Basically, we would require that a member

18    of our team goes and gets eyes on the location so

19    that not only he sees the target, but the

20    surrounding homes, rather than relying on other

21    people's intelligence.

22          Q.    Now, would I be correct, based on your

23    general testimony today and what's in Exhibit 4,

24    that you and other members of your department do

25    not find any fault with any federal agents or

 1    fresh in mind?

 2         A.   Yes.

 3         Q.   And he lists various officers who are

 4    members of the SWAT team and defendants: Brent

 5    Dunn, Dustin Koch, Andrew Gonzales, Derrick Young,

 6    Brian Fuller, Stephen Sanders, James Lewis, OT

 7    Glidewell, James Taylor and, of course, Lieutenant

 8    Lewis; they are all mentioned, correct?

 9         A.   Correct.

10         Q.   And you were asked about start and stop

11    time.  And interestingly enough, that's for

12    negotiators on Page 28.  And it doesn't say from

13    the time started, but it says the time ended at

14    1:30 in the morning; do you see that in the middle

15    of Page 28?

16         A.   Yes.

17         Q.   So it doesn't tell us who the negotiators

18    actually were, but that is a line that seems to

19    refer to negotiators?

20         A.   I don't think there was any negotiators

21    there based on the NAs on the bottom ones.  I think

22    he started -- it looks like he put a time up

23    there incorrectly.

24         Q.   Now -- and then you were asked about DEA

25    folks and did they say anything about the location.

1    Isn't it correct that these documents in Exhibit 4

2    show that the DEA provided photographs, which were

3    then shown to the SWAT team officers?

4         A.   Yes.

5         Q.   And there were two briefings for the SWAT

6    team officers; and the second one was provided at

7    least in part by the federal agents?

8         A.   I don't know about two briefings.   My

9    understanding was there was one briefing.

10        Q.   Well, if the documents here show that

11   there was a briefing as the SWAT team was

12   assembling and another briefing closer to the

13   location; and that the second briefing was

14   conducted at least in part by the federal agents,

15   you wouldn't contest whatever is in the documents

16   of Exhibit 4, would you?

17        A.   No.

18        Q.   Okay.  And we went through the findings of

19   the Assistant Chief Joe Wiser earlier about how the

20   houses differed and were marked with their numbers?

21        A.   Right.

22        Q.   And one house had a ramp with handrails

23   for a wheelchair and the target house had a

24   chain-link fence; you recall that?

25        A.   Yes.

1     Q.   (By Mr. Reynolds)  Well, let's ask it this
2     way.
3                MR. REYNOLDS:  I will -- I appreciate
4     these evidence lessons I am getting and I will keep
5     at it until I try to get it right.
6     Q.   (By Mr. Reynolds)  Let's look at Page 73
7     of Exhibit 4, please, Chief.
8     A.   72?
9     Q.   No.  73.
10    A.   73.  Okay.
11    Q.   Yes.  And what do you see a picture of
12    there?
13    A.   See a picture of a house.
14    Q.   And does it have something in front of the
15    house that you can see?
16    A.   A wheelchair ramp and a truck.
17    Q.   Okay.  Now, does the wheelchair ramp have
18    guardrails?
19    A.   Yes, sir.
20    Q.   Okay.  Now, if we go back to Page 72,
21    which is the house at 573 West 8th Street,
22    according to its markings, does it have a
23    wheelchair ramp?
24    A.   No, sir.
25    Q.   Let's take a look here at Page 75.  And it

1    Street after it was dynamically entered?

2        A.    It might be.

3                    MR. MONTGOMERY:   Object to form.

4        Q.    (By Mr. Reynolds)  And, now, let's go to

5    Page 77.  And on Page 77, that's another picture;

6    what does it appear to depict?

7        A.    Broken window.

8        Q.    And has someone written something up with

9    a marker kind of at the top here?

10       A.    593 8th Street.

11       Q.    Okay.  So if we assume that this is a

12   picture of the plaintiff residence, this depicts a

13   window that has been broken, correct?

14       A.    Correct.

15       Q.    Then let's look at Page 79; and that's

16   another picture.  And up at the top, someone has

17   written some address on 8th Street and it's kind of

18   cropped.  So it looks like it's probably, what --

19   what would you think it is; 593 or 573 or can you

20   tell me?

21       A.    It's probably 593 8th Street.

22       Q.    And this appears to show some windows at

23   that location that look like maybe the windows or

24   the blinds, or both, are a little disarrayed or

25   damaged; is that correct?

1      A.   Correct.

2      Q.   Is that the kind of damage that might be

3   consistent with using a break-n-rake on windows?

4      A.   Yes, sir.

5      Q.   And I will ask you also with regard to the

6   picture on Page 77 of the broken window, is that

7   damage that could be consistent with the use of a

8   break-n-rake device on the window?

9      A.   Yes, sir.

10      Q.   And with regard to the picture of what

11   appears to be a doorway at Page 75 of Exhibit 4,

12   does that appear to be consistent with the damage

13   that might follow a forced entry if the door was

14   rammed open?

15      A.   Well, it's a little hard to tell what this

16   picture is, but, yes, I would say --

17   representative.

18      Q.   And then we get to Page 81; and that

19   appears to be a truck that says, glassdoctor.com.

20      A.   Yes.

21      Q.   Do you know who that is?

22      A.   My understanding, that's the company they

23   called out to secure the house and then replace the

24   windows.

25      Q.   Secure which house; the plaintiffs' house?

1       A.   Yes.

2       Q.   And who called them out; do you know?

3       A.   I don't know exactly.  I believe -- well,

4    I don't know exactly.  If I recall correctly, the

5    DEA called them out.

6       Q.   Did the DEA ever complain to you or your

7    department about this operation having kind of gone

8    a little bit sideways when entry was made into the

9    wrong location?

10      A.   No.

11      Q.   Did you or your department ever complain

12   to the DEA about that?

13      A.   No, not really.  I mean, we just -- we had

14   a quick conversation about it, but it wouldn't be a

15   complaint necessarily.

16      Q.   I would like for you to look at Page 82 of

17   Exhibit 4.

18      A.   83?

19      Q.   82.

20      A.   82.  Okay.

21      Q.   Yes.  So do you recognize that as

22   something you have seen before?

23      A.   I have seen it in reviewing the case.  I

24   don't remember if I saw it prior to that.

25      Q.   Do you know what it is?

 1   answer to this already from the date of things.  Is

 2   this complaint on 4/9, it looks like 9 April, what

 3   caused you to send out a memorandum and start the

 4   internal affairs investigation; or did you, in

 5   fact, already start the internal affairs

 6   investigation with the memo of 2 April?

 7        A.   I think we had already -- I think I had

 8   started it before getting this.

 9        Q.   So regardless of what impact the note from

10   Mr. Early Jimerson might or might not have had on

11   you, you had sufficient concern on your own to

12   decide that it was important to have an internal

13   affairs investigation without seeing anything from

14   anyone outside the department; is that correct?

15        A.   That's correct.

16        Q.   And let's go ahead, since we've had

17   discussion about them, and at Page 73 --

18             MR. REYNOLDS:  Would that be 4-D now?

19             THE REPORTER:  Yes, sir.

20        Q.   (By Mr. Reynolds)  So, Chief, you talked

21   about Page 73, and we are going to mark it as

22   Exhibit 4-D, which is the house that has the ramp

23   in front of it.

24        A.   Okay.

25        Q.   And you talked about Page 74 -- take that

```
 1    back.  You talked about Page 75, which is what

 2    looks like a door casing; let's mark that as 4-E, I

 3    believe it would be.

 4              So Page 75, Chief, 4-E; that's what

 5    you testified about that looks like it might be a

 6    door frame, correct?  75, next page.

 7              MR. MONTGOMERY:  Chief, one more.  One

 8    more page, he's saying.  Turn the page.  He is

 9    saying is that 75?

10        A.   Okay.

11        Q.   (By Mr. Reynolds)  Yeah.  So we're marking

12    that as 4-E.

13              MR. MONTGOMERY:  Yes.

14        Q.   (By Mr. Reynolds)  And you have testified

15    about that earlier?

16        A.   Yes.

17        Q.   And then let's go to Page 77.  You had

18    testified about that window.

19        A.   Yes.

20        Q.   And we'll mark that as 4-F, right?  And

21    then Page 79, that will be 4-G as in George.  And,

22    Chief, Page 79, you testified about as to the

23    windows, correct?

24        A.   That's correct.

25              (Exhibits 4-D through G marked.)
```

1     Q.   Okay.

2              MR. MONTGOMERY:   I think that's all I

3     have.   Thank you.

4                        EXAMINATION

5     BY MR. REYNOLDS:

6     Q.   I have a question or two in follow-up.

7     A.   All right.

8     Q.   Chief, we don't know if the truck or the

9     trailer might or might not have been moved, but

10    isn't it correct that as the operation was getting

11    closer to unfolding, the DEA was trying to provide

12    real-time intelligence through communications?   I

13    think that's reflected some of these documents.

14    A.   I think that's correct.

15             MR. MONTGOMERY:   Objection.   Form.

16    Q.   (By Mr. Reynolds)   Since there is an

17    objection, I will ask it again.   Is it not correct

18    that some of these documents in Exhibit 4 showed

19    that after the briefings were over and as time to

20    actually commence the operation by going into a

21    house drew near, the DEA was -- through electronic

22    communications, radio communications or whatever --

23    trying to provide real-time intelligence?

24             MR. MONTGOMERY:   Object to form.

25    A.   I believe that's correct.

1      Q.   (By Mr. Reynolds)   Did the DEA provide

2   real-time intelligence as the operation was about

3   to unfold?

4                MR. MONTGOMERY:   Object to form.

5      A.   That, I am not sure.

6      Q.   (By Mr. Reynolds)   Okay.   Do the documents

7   that you have provided indicate that the DEA

8   provided real-time intelligence?

9                MR. MONTGOMERY:   Object to form.

10     A.   They did, but I am not sure of the timing

11   of it.

12     Q.   (By Mr. Reynolds)   Okay.   So whatever

13   these documents say is all you would know?

14     A.   That's correct.

15     Q.   But Lieutenant Lewis probably would know

16   more since he was on scene as the commander?

17     A.   Yes, sir.

18     Q.   Okay.   Do you think you made the wrong

19   decision, individually and as a department, when

20   Lieutenant Lewis was sanctioned for a few days of

21   unpaid leave?

22                MR. MONTGOMERY:   Object to the form.

23     A.   No, sir.

24                MR. REYNOLDS:   Pass the witness.

25                         *-*-*

```
 1                        EXAMINATION
 2   BY MR. MONTGOMERY:
 3       Q.   Chief, just two things.  He keeps using
 4   the word "sanctioned"; is that a term that you
 5   would use with regard to Lieutenant Lewis?
 6       A.   No.   I mean, we don't use that term.
 7       Q.   Would it just be reprimanded?  What term
 8   would you use?
 9       A.   Suspended or disciplined.
10       Q.   Okay.  Okay.  And then in terms of the
11   DEA, what intelligence they provide or didn't
12   provide and when they did and when they didn't, you
13   don't have any personal knowledge of it; it would
14   just be whatever you read in Exhibit 4; would that
15   be correct?
16       A.   That's correct.
17       Q.   All right.
18              MR. MONTGOMERY:   Thank you, sir.  Pass
19   the witness.
20                        EXAMINATION
21   BY MR. REYNOLDS:
22       Q.   Chief, would you agree with the
23   proposition that police officers have a very hard
24   job and it's often very dangerous, but even so,
25   they have a constant obligation to do everything
```

1    they can to protect innocent citizens?

2         A.   Sure.

3         Q.   And in doing that, it's important for them

4    to obey rules and regulations of their departments?

5         A.   Sure.

6         Q.   And it's important for them to obey rules

7    and regulations that take the form of laws or

8    constitutional provisions, correct?

9         A.   Yes.

10                  MR. REYNOLDS:  Pass the witness.

11                  MR. MONTGOMERY:  We're done.  I would

12   like a copy as well, please.

13                  MR. REYNOLDS:  Chief, I want to thank

14   you for taking the time to be here today.

15                  THE WITNESS:  You bet.

16                  (End of Proceedings, 12:34 p.m.)

17

18

19

20

21

22

23

24

25

# EXHIBIT 11

Chief Goolsby signature page and Errata Sheet page
from Chief Goolsby Deposition

## ORAL DEPOSITION OF CHIEF WADE GOOLSBY

Page 106



1   I, CHIEF WADE GOOLSBY, have read the
foregoing deposition and hereby affix my signature
2   that same is true and correct, except as noted
above.

3

4

5
CHIEF WADE GOOLSBY

6

7   THE STATE OF _Texas_
COUNTY OF _Ellis_
8

9

10  Before me, _18 August 2021_ , on this day
personally appeared CHIEF WADE GOOLSBY, known to me
11  (or proved to me under oath or through
_____) to be the person whose name is
12  subscribed to the foregoing instrument and
acknowledged to me that they executed the same for
13  the purposes and consideration therein expressed.

14

15

16  Given under my hand and seal of office this _18th_
day of _August_ , 2021.

17

18

19  NOTARY PUBLIC IN AND FOR THE
STATE OF _Texas_
20

21

22  MY COMMISSION EXPIRES: _3/23/2022_

23

24

25

## ORAL DEPOSITION OF CHIEF WADE GOOLSBY

Page 105

1                    CHANGES AND SIGNATURE

2    WITNESS NAME:  CHIEF WADE GOOLSBY

3    DATE OF DEPOSITION:  AUGUST 9, 2021

4    PAGE          LINE      CHANGEREASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

# EXHIBIT 12

Photo of Jimerson residence showing a wheelchair ramp
with handrails in front of it
[EXHIBIT 4-D to the deposition of Chief Goolsby]



EXHIBIT

4-D

PENGAD 800-631-6989

WAXAHACHIE DOCUMENTS - 073

# EXHIBIT 13

Photo of front door to Jimerson residence after it was rammed
and busted open by SWAT Team
[EXHIBIT 4-E to the deposition of Chief Goolsby]



WAXAHACHIE DOCUMENTS - 075

# EXHIBIT 14

Photo of a window of the Jimerson residence
after it was broken by the SWAT Team
[EXHIBIT 4-F to the deposition of Chief Goolsby]



EXHIBIT
4-F

WAXAHACHIE DOCUMENTS - 077

# EXHIBIT 15

Photo of other windows of Jimerson residence
broken by the SWAT Team, and showing damage to the blinds
and curtains inside the home due to the breaking of windows
[EXHIBIT 4-G to the deposition of Chief Goolsby]



EXHIBIT

4-6

WAXAHACHIE DOCUMENTS - 079