**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| KAREN JIMERSON, et al., | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No. 3:20-CV-2826-L-BH** |
| | § | |
| LT. MIKE LEWIS, et al., | § | |
| **Defendants.** | § | Referred to U.S. Magistrate Judge[1] |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

*Defendants' Motion for Summary Judgment*, filed June 23, 2021 (doc. 167), should be **GRANTED in part**, and this action against them should be dismissed with prejudice.

## I.    BACKGROUND

This civil rights action arises from the execution of a "no knock" search warrant at the wrong address by the Waxahachie Police Department (WPD). Karen Jimerson (Mother) and James Parks (Father), individually and as next friend of their young sons, Jyden Jimerson and Xavien Parks (Sons), and Mother as next friend of her minor daughter, Jasamea Jimerson (Daughter), (collectively Plaintiffs), sue the members of the WPD's SWAT team who executed the warrant, including its commander, Lieutenant Mike Lewis (Commander), team leader Stephen Sanders (Leader), canine officer Derek Behringer (K9 Officer), and officers Brian Fuller, Andrew Gonzales, Derrick Young, Brent Dunn, Dustin Koch, O.T. Glidewell, James Lewis, and James Taylor (collectively Defendants), in their individual capacities. (*See* doc. 16 at 41.)[2] Plaintiffs seek compensatory and punitive damages, declaratory relief, attorney's fees, and costs. (*Id*. at 45-48.)

---

[1] By *Standing Order of Reference* dated April 20, 2021 (doc. 159), this case was referred for full case management.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

A.  **Factual Background**

On March 27, 2019, at approximately 7:15 p.m., an agent with the Drug Enforcement Agency's (DEA) Dallas Office contacted Commander and requested the WPD SWAT team's assistance with the execution of a search warrant at a suspected methamphetamine "stash house" located at 573 8th Street, Lancaster, Texas (Target House). (doc. 169-1 at 1, 15.) The agent stated that the DEA had established surveillance at the location, and he provided Commander pictures of the front of Target House. (*Id.*) Commander's after-incident report states that DEA agents did not see any fortification or surveillance cameras at the property, or any evidence indicating the presence of children. (*Id.* at 15.) They believed that large quantities of drugs were being kept at Target House, that there were four to six adult males on the property, and that the property had a "deeply extending backyard." (*Id.* at 17.) Commander obtained information about the property's primary residence, detached garage, and yard from the Dallas County Central Appraisal District's website. (*Id.* at 16.) Based on the information from the DEA, Commander determined that SWAT deployment was appropriate and obtained approval from the Chief of the WPD to activate the SWAT team. (*Id.*)

Commander met with members of the SWAT team at WPD headquarters and briefed them on the intelligence from the DEA. (*Id.* at 17.) They developed a plan for a six-member team consisting of Fuller, Gonzales, Young, Dunn, Koch, and Leader (Entry Team) to deploy a flashbang diversionary device in the front yard and then enter the primary residence. (*Id.*) As an additional distractionary measure, and to provide cover for the other Entry Team members, Leader was tasked with breaking the front windows until entry was made. (*Id.*) A three-person team consisting of Glidewell, Lewis, and Taylor (Perimeter Team) would secure the detached garage and backyard and detain any people found outside the target location with "zip-tie style cuffs"

before deploying a flashbang diversionary device in the backyard. (*Id.*) K9 Officer and officers with the Lancaster Police Department (LPD) were to stage in the front driveway until the flashbangs were deployed, and then proceed to the backyard to establish a rear perimeter. (*Id.*) Commander was to remain outside in a "command and control status." (*Id.*)

Defendants gathered and prepared their equipment and proceeded to LPD headquarters for a final briefing with the DEA. (*Id.*) Commander received a copy of the search warrant; he confirmed that the warrant included no-knock authorization, and that the address of Target House was "573 8th Street." (*Id.*) "DEA agents provided real-time intelligence that surveillance officers at the scene reported a truck pulling a white box trailer had pulled up and stopped in front of the target location." (*Id.* at 1.) It was decided that an officer with LPD (LPD Officer) would lead the SWAT team to the location and "stop his vehicle about a house before the target location so SWAT members could make an approach on foot." (*Id.* at 2, 18.)

After the final briefing, LPD Officer drove to the target location, followed by the SWAT team, Commander, K9 Officer, and DEA agents in separate vehicles. (*Id.*) Upon arrival, the SWAT team exited the vehicle, and LPD Officer pointed the team to the house with the truck and trailer in front of it, which was actually "583 8th Street". (*See id.*) As the team approached it, Commander noticed that it did not look like the house in the DEA's photos. (*Id.*) He believed that Plaintiffs' house, which was to the left of it, looked like the house in the photos, and that the house number on it was "573", although the reflection from the porch light made it difficult to read. (*Id.*) Plaintiffs' house address was "593 8th Street". (*Id.*) Commander notified the SWAT team that they were approaching the wrong house and directed them to Plaintiffs' house instead. (*Id.*)

Entry Team ran to the front of Plaintiffs' house, a flashbang was deployed in the front yard, and Leader began breaking the front windows using a "break-and-rake" technique. (*Id.* at 18, 46-

47.) After Gonzales, Fuller, and Young breached the front door and entered the house, they "began a protective sweep, checking for occupants." (*Id.* at 36, 38, 40.) They encountered two females and ordered them to get on the ground, and both complied. (*Id.*) They then encountered an adult male, but before they could instruct him to get on the ground, they heard several team members yelling "Wrong house!", and they left Plaintiffs' house. (*Id.*) They estimate they were in Plaintiffs' house "no more than 30 seconds." (*Id.* at 37, 39, 41.) According to Koch, he entered Plaintiffs' house after the initial entry but only made it to the hallway when he heard "Wrong house!"; he then left the house. (*Id.* at 42-43.) According to Leader, he followed Entry Team to the front of the house but did not enter with the other officers. (*Id.* at 46-47.) After he broke out the front windows, he heard someone yell that it was the wrong house, and he proceeded with Entry Team to Target House. (*Id.*)

According to Plaintiffs, at the time of entry, Mother was taking a bath, Daughter was in bed in her room, and Father was putting Sons to bed in another bedroom. (doc. 183 at 22, 26-27.) Police officers met Mother in the hallway near the bathroom and "made [her] lay down on the floor" "for at least 15 minutes." (*Id.* at 33, 35.) She was undressed from the waist down, but the officers did not allow her to put on clothes. (*Id.*) The officers went into Daughter's room, grabbed her from her bed, and threw her down on the glass-covered floor, injuring her knee. (*Id.* at 22.) They zip-tied her hands behind her back and made her stay on the ground for "more than 20 minutes." (*Id.*) They searched her room without her permission and made a mess tossing things around her room. (*Id.*) The officers entered the other bedroom with Father and Sons, made them leave the bedroom, and then searched the bedroom. (*Id.* at 27.) Pieces of glass from the broken windows got into Sons' eyes. (*Id.*) Officers roamed around the house, moved some things around, and searched the rooms without their permission. (*Id.* at 22, 27-28, 33-35.)

According to a neighbor who lived across the street from Plaintiffs, she looked out her window after hearing a loud "boom." (*Id.* at 18.) She saw the front door of Plaintiffs' house "busted open" and officers walking around the yard with "A-K's." (*Id.*) Twenty minutes after the boom, she approached an officer outside of Plaintiffs' house and obtained permission to enter and check on the children. (*Id.*) There was "broken glass all over the house," and Mother was sitting on a sofa "with glass on her shoulders and arms", "bleeding from cuts that were on her body." (*Id.* at 18-19.) When she left five minutes later, "police officers" were still in the house. (*Id.* at 19.)

After the warrant was executed on Target House, Commander returned to Plaintiffs' house, "where several DEA agents were checking on [their] welfare and making arrangements for an after-hours glass company to make repairs to the damaged windows and door." (doc. 169-1 at 2.) He asked Plaintiffs if they required medical attention, which they declined. (*Id.* at 3, 19.) Ten minutes later, Mother told him that her side was hurting, and he called for an ambulance at 11:28 p.m. (*Id.*) According to an ambulance report, the ambulance arrived at 11:36 p.m., and departed for the hospital with Mother and Daughter at 11:50 p.m. (doc. 183 at 52.) Commander avers that while he was in their home, Plaintiffs never asked him to leave. (doc. 169-1 at 3.) According to the after-incident report, members of the SWAT team "were cleared from scene security" at 12:45 a.m., and Commander "cleared the scene" at 1:30 a.m. (*Id.* at 19-20.)

A WPD internal investigation of the incident found that "reasonable and normal protocol was completely overlooked." (doc. 183 at 16, 166-68, 173-74, 190.)

## B.  **Procedural History**

On September 11, 2020, Plaintiffs sued Commander and twenty John Doe defendants in their individual capacities under 42 U.S.C. § 1983, alleging violations of their Fourth Amendment

rights,[3] as well as state law tort claims for assault, negligence per se, gross negligence, criminal trespass, criminal assault, aggravated assault, and official oppression.[4] (*See* doc. 1 at 2, 35.) After obtaining leave, they filed their first amended complaint on December 15, 2020, reasserting their federal and state law claims, and naming Defendants in place of the John Doe defendants.[5] (*See* docs. 14; 15; 16 at 2, 41-42.) On April 21, 2021, Plaintiffs' state law tort claims against Defendants in their individual capacities were dismissed with prejudice under § 101.106(f) of the Texas Tort Claims Act (TTCA). (*See* doc. 160.)

On June 23, 2021, Defendants moved for summary judgment on the basis of qualified immunity. (*See* doc. 167.) Plaintiffs responded on August 26, 2021, and Defendants replied on September 9, 2021. (*See* docs. 181-183, 187.)

## II.    DEFENDANTS' OBJECTIONS

Defendants object to Plaintiffs' response, brief, and exhibits (*See* doc. 187 at 6-12.)

### A. <u>Local Rules</u>

Defendants object to Plaintiffs' response, brief, and exhibits as non-compliant with the Local Rules. (*See* doc. 187 at 5-6.)

Courts have discretion to decline to strike filings, even when they violate the Local Rules. *See, e.g., Green v. JPMorgan Chase Bank, N.A.*, No. 3:11-CV-1498-N, 2013 WL 11609925, at *2 (N.D. Tex. Aug. 16, 2013) ("The Court in its discretion declines to strike the appendix in this

---

[3] Despite references to the Fourteenth Amendment, the first amended complaint does not appear to assert a separate under it, but to only reference the fact that the Fourth Amendment's protections against wrongful search and seizure were made applicable to the actions of state actors through the Fourteenth Amendment. (doc. 16 at 16 n.8.)

[4] Although the First Amendment is also mentioned, there are no allegations of First Amendment violations. (*See* doc. 16 at 41.)

[5] Plaintiffs also sued LPD Officer, but he was voluntarily dismissed with prejudice by joint agreed stipulation on March 11, 2021. (doc. 153.)

instance, but it advises [the defendant] and its counsel to abide by the Local Rules in future filings."); *Graham v. Dallas Indep. Sch. Dist.*, No. 3:04-CV-2461-B, 2006 WL 2468715, at *4 (N.D. Tex. Aug. 24, 2006) ("Under ordinary circumstances, the court might overlook these untimely filings and consider plaintiff's summary judgment response and evidence in the interests of justice."). Defendants' objections are **OVERRULED**. Plaintiffs' exhibits will be considered, but only where they have provided specific citations to indicate the portions of the documents relied upon. *See City of Clinton v. Pilgrim's Pride Corp.*, 654 F. Supp. 2d 536, 541 (N.D. Tex. Sept. 14, 2009) (declining to strike a party's appendix for violations of the Local Rules, but limiting consideration of its appendix).

## B.  Evidence

Defendants also object and move to strike some of Plaintiffs' summary judgment evidence on grounds that it is misleading, constitutes inadmissible hearsay, and is not proper summary judgment evidence. (*See* doc. 187 at 6-9.) Even if considered, this evidence does not affect the disposition of the pending motion for summary judgment, so Defendants' objections to this evidence are **OVERRULED as moot**. *See Continental Casualty Co. v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 984690, at *1 n. 6 (N.D. Tex. Apr. 14, 2006) (overruling as moot objections to evidence that was not considered by the court in deciding motion for summary judgment).

## C.  Expert's Declaration

Defendants also object and move to strike Plaintiffs' expert testimony as inadmissible under Rule 702. (*See* doc. 187 at 9-12.)

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597-98 (1993), the Supreme Court acknowledged that Federal Rule of Evidence 702 serves as the proper standard for determining the admissibility of expert testimony.  In fact, it was amended to incorporate the

principles first articulated by the Supreme Court in *Daubert*, as well as those enunciated in subsequent cases applying *Daubert*. *See* FED. R. EVID. 702 Advisory Committee Notes.  Rule 702 now provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based upon sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  Under this rule, the main issue is whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (citations omitted).  A court has discretion to keep an expert witness from testifying if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

The key factors in evaluating expert testimony are relevance and reliability. *Daubert*, 509 U.S. at 589.  The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *Id.* at 592 n.10; *see* FED. R. EVID. 104(a).  As stated by this court, relevance requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue[,]" and it depends on "whether [the expert's] reasoning or methodology properly can be applied to the facts in issue."  *State Automobile Mutual Insurance Company v. Freehold Management, Inc.*, No. 3:16-CV-2255-L, 2019 WL 1436659, at *4 (N.D. Tex. Mar. 31, 2019) (internal quotations omitted) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) and *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir.

2007)). Reliability turns on "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* (internal quotations omitted) (quoting *Knight*, 482 F.3d at 352).

"*Daubert* standards apply not merely at trial, but also on summary judgment." *Gen. Star Indem. Co. v. Sherry Brooke Revocable Trust*, 2001 WL 34063890, at *9 (W.D. Tex. Mar. 16, 2001); *see also Kumho Tire Co.*, 526 U.S. at 146 (affirming district court decision granting motion for summary judgment in light of its decision to exclude expert testimony pursuant to *Daubert*). To be considered on summary judgment, "an expert affidavit must include materials on which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion." *Michaels v. Avitech, Inc.*, 202 F.3d 746, 754 (5th Cir., 2000), *cert. denied*, 531 U.S. 926 (Oct. 10, 2000) (quoting *Boyd v. State Farm Ins. Companies*, 158 F.3d 326, 331 (5th Cir. 1998). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).

Here, Plaintiffs' expert states that he has "some familiarity with what S.W.A.T. TEAMS do" without explaining the basis of his familiarity or expertise. (*See* doc. 183 at 64.) His opinion that all Defendants "improperly entered" Plaintiffs' home is based on statements in their motions to dismiss, which Plaintiffs characterize as admissions. (*See id.* at 65-66; doc. 182 at 8; doc. 183 at 41, 43, 46, 48.) He also makes general statements regarding how long all Defendants remained in Plaintiffs' home, but he does not discuss Defendants individually; he does not explain how he reached his opinion that all Defendants remained in Plaintiffs' home for a specific amount of time. (*See id.* at 66.) Ultimately, he agrees with the outcome of the Chief's internal investigation and concludes that Defendants were incompetent and unreasonable and violated Plaintiffs' rights. (*See id.* at 70-71, 83.)

9

Plaintiff's expert does not explain how he reached his conclusions, only that he did reach them. He does not identify the methodology he used, nor provide any explanation of the reasoning process utilized in reaching his conclusions. He appears to be relying primarily, if not exclusively, on experience to form his conclusions, but fails to articulate how his experience led to his conclusions, why his experience is a sufficient basis for the conclusions reached, and how his experience is reliably applied to the facts of this case. *See Kumho*, 526 U.S. at 152 (stressing that the *Daubert* factors may be relevant to the reliability of experience-based testimony and that the same level of intellectual rigor that characterizes the practice of an expert in the relevant field is employed whether basing testimony upon professional studies or personal experience). He does not explain the facts upon which he relies to reach his conclusion that all Defendants entered Plaintiffs' home and remained there for some time.

Expert opinions that fail to set forth a discernable methodology are conclusory and lack the requisite evidentiary reliability mandated by Rule 702. To be competent summary judgment evidence, an expert's report must contain some "indication of the reasoning process underlying the opinion." *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 331 (5th Cir. 1998). Neither *Daubert* nor the Federal Rules of Evidence "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. at 136, 146 (1997). And a "trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument." *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir.1986). Here, Plaintiffs' expert testimony is no more than the inadmissible "it is so". *See Viterbo*, 826 F.2d at 424.

Defendants' motion to exclude and strike Plaintiffs' expert testimony is **GRANTED**.

### III.   SUMMARY JUDGMENT STANDARD IN QUALIFIED IMMUNITY CASES

Summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Typically, a movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the context of § 1983 litigation, however, governmental employees asserting the defense of qualified immunity in a motion for summary judgment need only assert the defense in good faith. *See Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008); *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). They have no burden to put forth evidence. *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633-34 (5th Cir. 2000).

The burden then shifts to the non-movant to show that the defense does not apply. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam). The non-movant must identify specific evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *see also RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). [6] Although

---

[6]Rule 56 imposes no obligation for a court "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas*

courts view the evidence in a light most favorable to the non-movant, *Anderson*, 477 U.S. at 255, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). The non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.

Even though Defendants have no burden to provide evidence, they have submitted sworn declarations, the search warrant, and the after-incident report. (*See* doc. 169-1.) They have carried their summary judgment burden by asserting the qualified immunity defense. *See Gates*, 537 F.3d at 419. The burden now shifts to Plaintiffs to identify evidence in the record creating a genuine issue of material fact regarding whether Defendants violated their constitutional rights, and whether the violation was objectively unreasonable under clearly established law at the time of the violation. *See Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407-08 (5th Cir. 2007).

## IV.    QUALIFIED IMMUNITY

Defendants move for summary judgment on grounds that they are protected from suit by qualified immunity. (*See* doc. 168 at 12.)

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). It "afford[s] redress for violations of

---

*v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998)).  Parties must "identify specific evidence in the record" supporting challenged claims and "articulate the precise manner in which that evidence supports [those] claim[s]." *Ragas*, 136 F.3d at 458 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

federal statutes, as well as of constitutional norms." *Id.* To state a claim under § 1983, a plaintiff must allege facts that show (1) he has been deprived of a right secured by the Constitution and the laws of the United States and (2) the deprivation occurred under color of state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).

A governmental employee who is sued under § 1983 may assert the affirmative defense of qualified immunity. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved as early as possible in the litigation. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In deciding whether a defendant is entitled to qualified immunity, courts conduct a two-prong inquiry. Under the first prong, courts consider whether the facts alleged, taken in the light most favorable to the plaintiff, show a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). Under the second prong, courts determine whether the violated constitutional right was clearly established within the specific context of the case. *Id.* at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. It is within the discretion of the court to

decide which of the two prongs to address first in light of the circumstances particular to each case. *Pearson*, 555 U.S. at 236; *Lytle v. Bexar Cty.*, 560 F.3d 404, 409 (5th Cir. 2009). If the court answers both the constitutional violation and clearly established questions in the affirmative, the officer is not entitled to qualified immunity. *Lytle*, 560 F.3d at 410.

## A.    <u>Constitutional Violation</u>[7]

Defendants contend that there is no credible evidence of a Fourth Amendment constitutional violation and that they cannot overcome their entitlement to qualified immunity. (*See* doc. 168 at 12.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. IV. Generally, "[w]arrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez–Moreno*, 479 F.3d 350, 354 (5th Cir. 2007); *see Payton v. New York*, 445 U.S. 573, 590 (1980) ("Absent exigent circumstances, [a person's] threshold may not reasonably be crossed without a warrant."). Even though warrantless searches are "presumptively unreasonable," "officers do not necessarily violate the Fourth Amendment when they mistakenly execute a search warrant on the wrong address." *Simmons v. City of Paris*, 378 F.3d 476, 479 (5th Cir. 2004) (citing *Maryland v. Garrison*, 480 U.S. 79, 88 (1987)). As recognized by the Supreme Court, officers are entitled to "some latitude for honest mistakes" made "in the dangerous and difficult process of

---

[7] Defendants first move for summary judgment on Plaintiffs' Fourteenth Amendment claim, arguing it fails as a matter of law. (*See* doc. 168 at 11.) As noted, Plaintiffs do not appear to assert a separate Fourteenth Amendment claim, and they did not respond to Defendants' argument. Because they have not asserted a Fourteenth Amendment claim, Defendants' motion for summary judgment on this claim should be **DENIED as moot**.

making arrests and executing search warrants." *Garrison*, 480 U.S. at 87. When officers attempting to execute a valid search warrant enter the wrong residence, they do not violate the Fourth Amendment if their conduct is "consistent with a reasonable effort to ascertain and identify the place intended to be searched." *Id.* at 88; *see also Gerhart v. McLendon*, 714 F. App'x 327, 333 (5th Cir. 2017) (quoting *id.*) ("[N]o Fourth Amendment violation occurs when officers attempting to perform a valid search mistakenly search the wrong property-as long as they make 'a reasonable effort to ascertain and identify the place intended to be searched.'"). Even if the initial entry results from an objectively reasonable mistake, the Fourth Amendment requires officers to "immediately terminate a search upon realizing it is the incorrect location." *Thomas v. Williams*, 719 F. App'x 346, 352 (5th Cir. 2018) (citing *Garrison*, 480 U.S. at 87); *see Simmons*, 378 F.3d 476, 479-80 ("[W]hen law enforcement officers are executing a search warrant and discover that they have entered the wrong residence, they should immediately terminate their search.").

### 1. *Officers Who Did Not Enter*

Although Defendants met their burden simply by asserting the qualified immunity defense, they have also submitted the sworn declarations of Dunn, Glidewell, J. Lewis,Taylor, and K9 Officer, each stating that they did not enter Plaintiffs' house. (*See* doc. 169-1 at 44-45, 48-55.) Dunn avers that he was "stacked up" on the front porch of the house next to Target House at the time when other members of Entry Team entered Plaintiffs' house. (*Id.* at 44.) He heard someone yell "Wrong house!" and then proceeded to Target House. (*Id.*) Glidewell, J. Lewis, Taylor, and K9 Officer aver that they were tasked with securing the perimeter and remained outside of Plaintiffs' house at the time of the initial entry. (*Id.* at 48, 50, 52, 54.) They also heard someone yell that it was the wrong house, and they proceeded to Target House and secured that location.

(*Id.*) Because they have met their summary judgment burden, the burden now shifts to Plaintiffs to identify evidence in the record raising a genuine issue of material fact that Dunn, Glidewell, J. Lewis, Taylor, and K9 Officer unlawfully entered their house.

Plaintiffs provide the sworn declarations of Mother, Father, and Daughter stating that "police officers" broke down the door and entered their house. (*See* doc. 183 at 22, 27, 33.) They also provide their neighbor's sworn declaration stating that she saw "police officers" in their home. (*Id.* at 18-19.) These declarations do not contradict the declarations of Dunn, Glidewell, J. Lewis, Taylor, and K9 Officer that they did not enter Plaintiffs' house. While there is evidence in the record of certain members of the SWAT team entering the house without permission, Plaintiffs have not identified evidence in the record creating a genuine issue of fact on whether these specific defendants physically entered their home. *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").

Plaintiffs point to excerpts from the motions to dismiss filed by Dunn, Glidewell, J. Lewis, Taylor, and K9 Officer, contending that they "all have filed pleadings admitting they entered the house of the Plaintiffs." (doc. 182 at 8; doc. 183 at 41, 43, 46, 48.) The relevant portions of the motions to dismiss the state tort claims against the officers state:

> At the time of the incident, [the officer] was a member of the Waxahachie Police Department as well as the Waxahachie Police Department's SWAT Team. [The officer], and the other Defendants, were serving a search warrant on the behalf of the DEA but mistakenly entered Plaintiffs' home instead of the house next door. All of Plaintiffs' allegations against the Defendants (Plaintiffs do not differentiate between Defendants' actions) involve their actions that night in attempting to execute the DEA search warrant.

(*See* doc. 183 at 41, 43, 46, 48.) These statements were made in the context of the officers' arguments that they were acting within the scope of their employment for purposes of dismissal of

16

the state tort claims against them under Texas Civil Practice and Remedies Code § 101.106(f). (*See id.*) The motions specifically note that Plaintiffs' complaint did not differentiate between Defendants' individual actions, and the reference in each motion appears to be to the entry into Plaintiffs' house by the SWAT team while executing the search warrant rather than the actions of each specific Defendant. Notably, each statement has a citation to specific paragraphs in Plaintiffs' first amended complaint. These general statements in their motions to dismiss are not sufficient to create a genuine issue of material fact upon which a jury may find in their favor regarding whether Dunn, Glidewell, Taylor, J. Lewis, and K9 Officer unlawfully entered Plaintiffs' home during the SWAT team's execution of the search warrant for Target House. Because no genuine issue of material fact exists as to whether Plaintiffs' Fourth Amendment rights were violated by Dunn, Glidewell, Taylor, J. Lewis, and K9 Officer, they are entitled to qualified immunity as a matter of law. *See Simmons*, 378 F.3d at 481 (finding officers were entitled to qualified immunity because there was no evidence that they entered the residence with the other officers).

### 2. *Officers Who Entered*

It is undisputed that SWAT team members entered Plaintiffs' home without their consent and without a search warrant for their home. The sworn declarations of Gonzales, Young, and Fuller state that they entered Plaintiffs' house after breaching the front door, performed a "protective sweep," and instructed two females to get down on the ground. (doc. 169-1 at 36-41.) According to Koch's sworn declaration, he ran into Plaintiffs' house after Entry Team's initial entry and made it to the hallway. (*Id.* at 42-43.) Plaintiffs have met their burden to identify evidence of a violation of their Fourth Amendment rights by Gonzales, Young, Fuller, and Koch. *See Rogers v. Hooper*, 271 F. App'x 431, 433 (5th Cir. 2008) (finding plaintiffs "unquestionably

17

demonstrated the violation of a constitutional right" by the officers who mistakenly entered their home where there was no warrant or any other constitutionally sufficient justification for the entry).

### 3. Commander and Leader

Defendants provide the sworn declarations of Commander and Leader and the after-incident report. (*See* doc. 169-1 at 1-3, 15-24, 46-47.) Commander initially briefed the SWAT team on information about the target location and its occupants, directed the team to Plaintiffs' house, and remained "outside in a command and control status." (*Id.* at 2-3, 15-18.) He "turned over control to" Leader after the target location was secured. (*Id.* at 18-19.) Leader led the SWAT team and broke out the front windows of Plaintiffs' house but denies ever entering it. (*Id.* at 46.)

Plaintiffs argue that "as commander" and "second in command", Commander and Leader "bear special responsibility for what happened at the home of the plaintiffs on 27 March 2019, and both have so admitted." (doc. 181 at 21.) They point to excerpts from Chief's deposition testimony that he ordered an internal investigation into the incident, that Leader submitted a statement that he "as team leader" shared responsibility and blame with Commander for the team's mistakes, and that Commander was suspended without pay as a result of the incident. (doc. 183 at 167-73.)

The officers in charge of planning and leading the execution of a search warrant "are responsible for ensuring that they have lawful authority for their actions." *Hunt v. Tomplait*, 301 F. App'x 355, 360 (5th Cir. 2008) (citing *Ramirez v. Butte–Silver Bow Cnty.*, 298 F.3d 1022, 1027 (9th Cir. 2002)). In *Hunt*, the Fifth Circuit held that the deputy who actively led the search team to the wrong residence could not rely on the fact that he never physically entered the house to avoid liability for any unlawful search. *Id.* at 361. Even though the deputy was responsible for identifying

18

the residence described in the search warrant and leading the search team to the property, he never consulted the warrant. *Id.* at 360. After directing the search team to the wrong house, the deputy secured the road while the team entered the house. *Id.* The Fifth Circuit noted that the deputy was responsible for leading the search team to the correct location and not "a mere bystander in the execution of the search warrant." *Id.* Because the deputy's misidentification of the residence to be searched and guidance of the search team to the incorrect residence was a direct cause of the Fourth Amendment violation, the deputy could not "contend that he did not effectuate the violation because he did not physically enter the incorrect residence." *Id.* at 361. The court affirmed the district court's order denying summary judgment on deputy's qualified immunity defense. *Id.*

Plaintiffs have met their burden to identify summary judgment evidence sufficient to create a genuine issue of material fact regarding whether Commander and Leader violated their Fourth Amendment rights. Even though they deny entering the house during Entry Team's initial entry, genuine issues of material fact exist regarding their responsibilities in planning and leading the execution of the search warrant, and whether their conduct caused the unlawful entry. *See Hunt*, 301 F. App'x at 360. Viewing the evidence in the light most favorable to Plaintiffs as the nonmovants, a reasonable jury could find that Commander and Leader were "personally involved" in the error that caused the SWAT team's unlawful entry and search of Plaintiffs' home instead of the Target House. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (citation omitted) ("As a prerequisite [to § 1983 liability], a plaintiff 'must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged.'").

19

**B.**    **Objectively Unreasonable**

To show the inapplicability of the qualified immunity defense, a plaintiff must present evidence to show that the violation of his constitutional rights was objectively unreasonable given the clearly established law at the time of the alleged constitutional violation. *See Zarnow*, 500 F.3d at 407-08; *Club Retro*, 568 F.3d at 194. "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur Cty., Tex.*, 245 F.3d447, 457 (5th Cir. 2001).

In order for a constitutional right to be "clearly established" under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Saucier*, 533 U.S. at 202. "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). The Supreme Court has repeatedly warned courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)) (the general proposition "that an unreasonable seizure violates the Fourth Amendment is of little help"). When the constitutional violation is obvious, a materially similar case is unnecessary in order to find the law clearly established. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see Gerhart v. McLendon*, 714 F. App'x 327, 335-36 (5th Cir. 2017) ("We need not immunize an officer from suit for an obvious violation simply because no case has held that the officer's precise conduct was unlawful.").

### 1. *Initial Entry*

At the time of the initial entry in March 2019, it was clearly established that officers who participate in searches "must make reasonable, non-feeble efforts to correctly identify the target of a search—even if those efforts prove unsuccessful." *Gerhart v. McLendon*, 714 F. App'x 327, 334 (5th Cir. 2017) (citing *Rogers v. Hooper*, 271 F. App'x 431, 435 (5th Cir. 2008)). The Fifth Circuit has recognized that "[w]hat's reasonable for a particular officer depends on his role in the search." *Gerhart v. Barnes*, 724 F. App'x 316, 325 (5th Cir. 2018) (citing *id.* at 335). "[L]aw enforcement officers are generally granted qualified immunity if the evidence is undisputed that they merely made an honest mistake when entering the incorrect home." *Hunt*, 301 F. App'x at 361 (citing *Simmons*, 378 F.3d at 479-80).

Defendants provide Commander's sworn explanation of how he received information and photos from the DEA about Target House. (doc. 169-1 at 1.) At the final briefing, DEA agents provided "real-time intelligence" that a truck and trailer would be parked outside Target House. (*Id.*) LPD Officer then led the SWAT Team to the location and pointed the team to the house with the truck and trailer. (*Id.* at 2.) After Commander realized it was the wrong house, he directed the team to Plaintiffs' house, believing it looked like the house in the DEA's photos. (*Id.*) He also believed that the house number was "573," but the reflection from the porch light made it difficult to read. (*Id.*) His after-incident report that details how he reviewed the search warrant, conducted additional research on the house and its occupants, briefed the team on the intelligence from the DEA, and developed a plan with the team to execute the search warrant. (*Id.* at 15-24.) Defendants also provide the sworn declarations from members of the SWAT team stating that they believed Commander was directing them to Target House when he pointed to Plaintiffs' house. (*See id.* at

21

36-55.) Defendants have brought forward evidence to show that they engaged in reasonable efforts to identify the correct residence. *See Garrison*, 480 U.S. at 88; *see also Greene v. Knight*, 564 F. Supp. 2d 604, 611-12 (N.D. Tex. 2008) (finding officers' actions were "objectively reasonable" when they relied on information supplied by another officer and served warrants at the wrong address).

The burden now shifts to Plaintiffs to identify evidence in the record creating a genuine issue of material fact regarding whether Defendants made reasonable efforts to identify the correct residence. Plaintiffs generally argue that their 215-page appendix creates fact issues about whether Defendants acted "incompetently" and "as no reasonable officer should have acted" "in connection with their illegal entry into the home." (doc. 182 at 8.) As noted, the responding party on summary judgment must "identify *specific evidence* in the record" supporting challenged claims and "articulate the *precise manner* in which that evidence supports [those] claim[s]." *Ragas*, 136 F.3d at 458 (emphasis added) (citing *Forsyth*, 19 F.3d at 1537). Plaintiffs have neither identified specific evidence in the record nor articulated the precise manner in which it supports their claims that Defendants' conduct was objectively unreasonable. *See Williams v. Valenti*, 432 F. App'x 298, 303 (5th Cir. 2011) (per curiam) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.") (citation omitted). They fail to identify evidence in the record from which a jury could infer that Defendants did not make "reasonable efforts" to identify the target house. *See also Rogers*, 271 F. App'x. at 435 (holding that officers were entitled to immunity where they directed the search team to the wrong house based, in part, on the location of a car they had observed during their initial surveillance of the house); *see also Johnson v. Deep*

22

*E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 304-05 (5th Cir. 2004) (affirming grant of qualified immunity to officer sued under unreasonable-search-and-seizure theory where officer entered plaintiff's house mistakenly based on information provided by other agents). The officers who initially entered Plaintiffs' home (Gonzales, Young, Fuller, Koch), Leader, and Commander are all therefore entitled to qualified immunity on the wrongful entry claim.

### 2. *Termination of Search*

The clearly established law at the time of the alleged unlawful entry was that officers are "required to discontinue the search immediately if they realize they have entered the wrong residence." *Thomas*, 719 F. App'x at 352 (citing *Simmons*, 378 F.3d at 479-80). "Qualified immunity does not provide a safe harbor for police to remain in a residence after they are aware that they have entered the wrong residence by mistake." *Simmons*, 378 F.3d at 481. "[T]he violation of the constitutional right hinges upon the officers conducting a *search* even after realizing they are in the wrong location." *See Thomas*, 719 F. App'x at 353 (emphasis original).

According to the sworn declarations of Gonzales, Young, and Fuller, they began a protective sweep to check for occupants after they entered Plaintiffs' house and encountered Mother and Daughter. (*See* doc. 169-1 at 38-41) They instructed them to lie on the ground, and they complied. (*Id.*) When they encountered Father, they heard members of the SWAT team yelling "Wrong house!", "immediately exited" the house, and proceeded to Target House. (*Id.*) They estimate they were in Plaintiffs' house for "no more than 30 seconds." (*Id.* at 36, 38, 40.) Koch's sworn declaration states that he entered Plaintiffs' house after Entry Team's initial entry and was in the hallway when he heard "Wrong house!" (*Id.* at 42-43.) He "immediately ran out" and proceeded to Target House with Entry Team. (*Id.* at 42.) He estimates he was in Plaintiffs'

house for "no more than 5-10 seconds." (*Id.*)

According to Commander's sworn declaration, he went to Plaintiffs' house after the warrant was executed on Target House and asked Plaintiffs if they needed medical attention or an ambulance. (*Id.* at 2-3.) Several DEA agents were at their house "checking on [their] welfare and making arrangements for an after-hours glass company to make repairs to the damaged windows and door." (*Id.* at 2.) He contends that when he entered the house after the initial entry, "at no time did the Plaintiffs ask [him] to leave." (*Id.* at 3.) The after-incident report reflects that members of the SWAT team departed the scene at 12:45 a.m., and Commander "cleared the scene" at 1:30 a.m. (*See* doc. 169-1 at 19-20.) Defendants have brought forward evidence to show that Gonzales, Young, Fuller, Koch, Leader, and Commander acted reasonably once they discovered that they were in the wrong house. *See Garrison*, 480 U.S. at 88.

The burden is now on Plaintiffs to identify evidence raising a genuine issue of material fact as to whether these officers unreasonably remained in their house. Plaintiffs provide the sworn declarations of Mother, Father, and Daughter stating that "police officers" broke windows, broke down the front door, and entered their home with their weapons drawn. (*See* doc. 183 at 22, 27, 33.) They state that police officers roamed the house, searched rooms, and tossed and moved things without permission for "a long time." (*Id.*) Daughter contends that she was restrained with zip-ties on the floor for "more than twenty minutes," and that when the ambulance took her and Mother to the hospital "at least thirty or more minutes" after initial entry, police officers were still in the house. (*Id.* at 22-23.) Mother contends that she was made to lie on the floor for "at least fifteen minutes," and that police officers were in the house for "more than twenty-five or thirty minutes." (*Id.* at 34-35.) Father contends that police officers were in the house for "more than two hours."

24

(*Id.* at 28.) Plaintiffs also provide their neighbor's sworn declaration, which reflects that "police officers" were still in their house twenty-five minutes after initial entry. (*Id.* at 18-19.)

Plaintiffs do not dispute Defendants' evidence that Gonzales, Young, Fuller, and Koch "immediately exited" their house after learning it was the wrong location and proceeded to Target House, or that Leader never entered their house. As discussed, DEA agents and LPD officers were also involved in the execution of the search warrant. Plaintiffs also do not dispute that DEA agents were in Plaintiffs' house after the initial entry and remained until repairs were completed. While Plaintiffs provide sworn statements of "police officers" being in their home from between thirty minutes to more than two hours, they offer no evidence that Gonzales, Young, Fuller, and Koch were the police officers who remained in their home during that time frame. Generalized testimony addressing the defendants as a group is not competent summary judgment evidence of each defendant's personal involvement in the deprivation of a plaintiff's constitutional right. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992) (explaining that a § 1983 plaintiff "must specify the personal involvement of each defendant" after being given the opportunity for discovery); *see, e.g., Thomas v. Humfield*, 32 F.3d 566, 1994 WL 442484, at *5 (5th Cir. 1994) ("A civil rights claimant to prevent an adverse summary judgment must specifically identify each defendant's personal involvement in the alleged wrongdoing."). The personal involvement or causal connection of each individual must be demonstrated because allegations of group liability are insufficient to sustain a § 1983 action against each individual defendant. *See Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999) (holding that each defendant's actions in a § 1983 case must be considered individually); *see also Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (finding defendant entitled to qualified immunity where plaintiff failed to establish personal

involvement). Plaintiffs have not brought forward sufficient evidence to support a resolution in their favor on whether the actions of Gonzales, Young, Fuller, Koch, Leader, and Commander after the initial entry were unreasonable or violated a clearly established right.

Plaintiffs also do not identify evidence creating a genuine issue of material fact as to when Gonzales, Young, Fuller, Koch, Leader, and Commander learned or should have learned that they were in the wrong house, or as to whether they searched their house *after* they learned or should have learned of their mistake. *See Thomas*, 719 F. App'x at 353 (finding district court properly granted officer qualified immunity in the absence of evidence that he performed a search after realizing he was at the wrong location). While there is evidence that Commander entered Plaintiffs' house with full awareness that it was not the target location, there is no evidence that he performed an unconstitutional search at that time. He submitted evidence to show that he remained in the house to check on Plaintiffs' medical needs, which is not objectively unreasonable conduct. *See id.* (finding it was not "objectively unreasonable" for officer to remain in plaintiffs' home "to explain the circumstances under which the officers inadvertently entered their home"). They also point to no evidence that they asked Commander or any of the other defendants to leave their home. Plaintiffs have failed to provide sufficient evidence to create a genuine issue of material fact that Defendants "failed in their duty of immediate termination of a search upon learning of the mistake." *Rogers*, 271 F. App'x at 436.[8]

---

[8]Plaintiffs' response contends that the "Fourth Amendment also protects against unreasonable use of force." (doc. 182 at 6.) While their first amended complaint contains allegations that they were "attacked," "roughed up," "abused," and "assaulted," it does not assert a claim for excessive force. (*See* doc. 16 at 3, 10, 19.)

In conclusion, Plaintiffs have not met their summary judgment burden to identify a genuine issue of material fact as to whether their Fourth Amendment rights were violated by Defendants. Because no genuine issue exists as to any material fact regarding any claim of unlawful search or seizure, Defendants are entitled to qualified immunity.

## V.    RECOMMENDATION

Defendants' motion for summary judgment on grounds of qualified immunity on Plaintiffs' Fourth Amendment claims should be **GRANTED in part**. All claims for Fourth Amendment violations against Dunn, Glidewell, J. Lewis, Taylor, and K9 Officer should be **DISMISSED with prejudice** on grounds of qualified immunity under the constitutional violation prong, and Plaintiff's claims for unlawful entry and for unlawful search against Gonzales, Young, Fuller, Koch, Leader, and Commander should be **DISMISSED with prejudice** on grounds of qualified immunity under the objective reasonableness prong. Because no Fourteenth Amendment claims were asserted against them, Defendants' motion for summary judgment on the Fourteenth Amendment claims should be **DENIED as moot**. This action should be dismissed with prejudice as to Defendants.[9]

**SO RECOMMENDED** on this 28th day of February, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9] Plaintiffs' first amended complaint specifically states that it still names unidentified "John Doe" defendants, (*see* doc. 16 at 2 n. 1, at 11-15 n. 5, 6), so those claims appear to remain pending.

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE