IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **KAREN JIMERSON,** *et al.,* | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No**. 3:20-CV-2826-L-BH** |
| | § | |
| **LT. MIKE LEWIS,** *et al.,* | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Named Defendants' Motion for Summary Judgment (Doc. 167), filed on June 23, 2021 ("Motion"). The case was referred to Magistrate Judge Irma Carrillo Ramirez, who entered the Findings, Conclusions, and Recommendation of the United States Magistrate Judge (Doc. 188) ("Report") on February 28, 2022, recommending that the court grant in part and deny in part the Motion. Specifically, the Report recommends that:

> All claims for Fourth Amendment violations against Dunn, Glidewell, J. Lewis, Taylor, and K9 Officer should be **DISMISSED** with prejudice on grounds of qualified immunity under the constitutional violation prong, and [Plaintiffs'] claims for unlawful entry and for unlawful search against Gonzales, Young, Fuller, Koch, Leader, and Commander should be **DISMISSED** with prejudice on grounds of qualified immunity under the objective reasonableness prong. Because no Fourteenth Amendment claims were asserted against them, Defendants' motion for summary judgment on the Fourteenth Amendment claims should be **DENIED** as moot. This action should be dismissed with prejudice as to Defendants.

Report 27.

On March 14, 2022, Plaintiffs filed objections to the Report (Doc. 192), contending that: (1) they did not agree to transfer this case to the magistrate, nor did the court authorize such transfer; (2) the magistrate judge erred by failing to follow summary judgment procedure under Rule 56 of the Federal Rules of Civil Procedure; (3) the magistrate judge erred by improperly

conducting a "mini-trial" and acting as a "fact finder"; (4) the magistrate judge erred by failing to view the summary judgment evidence in the light most favorable to Plaintiffs; and (5) the magistrate judge improperly struck Plaintiffs' expert, Mr. Gill. *Id.* Named Defendants filed their response on March 24, 2022 (Doc. 193), agreeing with the findings, conclusions, and the recommendation in the Report. The court addresses each objection in turn, and for the reasons stated herein overrules Plaintiffs' objections.

## I.    Procedural Background

On September 11, 2020, Karen Jimerson, James Parks, Jyden Jimerson, Xavien Parks, and Jasamea Jimerson ("Plaintiffs") sued Lt. Mike Lewis of the Waxahachie Police Department ("WPD") SWAT team and 20 John Does alleging Fourth Amendment violations stemming from an execution of a search warrant at Plaintiffs' residence on March 27, 2019. Plaintiffs' First Amended Complaint likewise asserts claims against unidentified John Does 1 through 20 ("John Does"). It also names the following members of the WPD in their individual capacities as Defendants: Lt. Mike Lewis, Brent Dunn, Dustin Koch, Andrew Gonzales, Derrick Young, Brian Fuller, Stephen Sanders, James Lewis, O.T. Glidewell, James Taylor, Derek Berringer ("Named Defendants"). In addition, Zach Beauchamp was named as a Defendant, but he was previously dismissed with prejudice from the action pursuant to a joint stipulation (Doc. 151). On April 21, 2021, the court dismissed with prejudice Plaintiffs' state tort claims against the Named Defendants (Doc. 160).

## II.      Discussion

### A.  Objections to the Report

#### 1.   Alleged Transfer of Case to Magistrate Judge

Plaintiffs contend that this case was transferred to the magistrate judge, and they object to this alleged transfer. Doc. 192 at 1. This case was not transferred to the magistrate judge. Plaintiffs' objection shows their lack of appreciation for the rules that allow a district judge to refer cases to a magistrate judge. Pursuant to 28 U.S.C. § 636(b)(1)(B), a district judge may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any [dispositive motion.]" Rule 72 of the Federal Rules of Civil Procedure also provides that a magistrate judge "must enter a recommended disposition, including, if appropriate, proposed findings of fact" for dispositive motions. Fed. R. Civ. P. 72. Additionally, the court issued a Standing Order of Reference (Doc. 159) on April 20, 2021, which stated:

> This case is hereby referred to United States Magistrate Judge Irma Carrillo Ramirez for pretrial management. All nondispositive motions, pending or prospective, are referred to the magistrate judge for determination. All dispositive motions, pending or prospective, are referred to the magistrate judge for findings of fact and recommendations. All other pretrial matters, including scheduling and alternative dispute resolution, are referred to the magistrate judge for appropriate action consistent with applicable law. Magistrate Judge Ramirez is to notify the court when the case is ready for a trial setting.

Doc. 159.

Consistent with 28 U.S.C. § 636, Rule 72, and the court's order, the magistrate judge issued the Report that made *recommendations* to the court concerning the disposition of the Motion. Because the magistrate judge acted consistent with the controlling statute and the court's orders, the court **overrules** Plaintiffs' first objection. Moreover, the magistrate judge did not dispose of the Motion; she merely made recommendations to the court through the Report. Accordingly, the

court also **overrules** Plaintiffs' third objection that the magistrate judge conducted a "mini-trial" and was acting as a "fact finder." The magistrate judge may not make the final decision regarding the Motion. That is expressly reserved for this court.

### 2.   Summary Judgment Standard and Application

Plaintiffs next contend that the magistrate judge erred by (1) failing to follow summary judgment procedure under Rule 56 of the Federal Rules of Civil Procedure; and (2) failing to view the summary judgment evidence in the light most favorable to Plaintiffs. Doc. 192 at 3-8. The court disagrees, except to the extent that it rejects the magistrate judge's findings as to the second prong of the qualified immunity test with respect to Defendant Lt. Mike Lewis.

### a.   Legal Standard for Summary Judgment

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence

of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

      b.  <u>Analysis</u>

The magistrate judge outlined the correct legal standard for summary judgment procedure under Rule 56 of the Federal Rules of Civil Procedure and proceeded to analyze the facts consistent with Rule 56 and controlling precedent.[1] In particular, the court agrees with the Report with respect to finding that the police officers who provided unchallenged declarations that they did not enter Plaintiffs' home are entitled to qualified immunity. *See Simmons v. City of Paris*, 378 F.3d 476, 481 (5th Cir. 2004) (finding officers were entitled to qualified immunity because there was no evidence that they entered the residence with the other officers). The court also agrees that when viewing the evidence in the light most favorable to Plaintiffs, the officers who did enter Plaintiffs' home immediately stopped searching the home upon learning it was the wrong residence. Moreover, Plaintiffs' summary judgment evidence does not identify which officers they assert remained in the residence after realizing their mistake. As such, those officers who entered Plaintiffs' residence are entitled to qualified immunity. *See id.* at 481. The court, therefore,

---

[1] The court, similar to the Report, finds that Plaintiffs have not asserted a violation of the Fourteenth Amendment against the Named Defendants. Because Plaintiffs have only asserted allegations of unlawful searches and seizures, such claims fall under the Fourth Amendment, not the Fourteenth. *See Graham v.* Connor, 490 U.S. 386, 396 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a "substantive due process' approach.") (emphasis in original). Additionally, the court finds that Plaintiffs have not asserted an excessive force claim. The elements of an excessive force claim are: "(1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive; and (3) the excessiveness of which was clearly unreasonable." *Ratliff v. Aransas County, Tex.*, 948 F.3d 281, 287 (5th Cir. 2020); *see Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (reciting that the second element of an excessive force claim requires that the force be "clearly excessive"); *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018) (same); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (same); *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) (same). Even if the court liberally construes Plaintiffs' allegations as having alleged an excessive force claim, they fail to raise a genuine dispute of material fact as to elements two and three. This is so because there is no evidence in the record that the use of force used on Plaintiffs was clearly excessive and that the excessiveness was clearly unreasonable. *See id.*

**Memorandum Opinion and Order – Page 6**

**overrules** these objections. To the extent the court disagrees with the Report, the reasoning for the disagreement is analyzed below.

### 3. Striking of Plaintiffs' Expert Witness Under Rule 702

Plaintiffs next assert the magistrate judge erred by improperly striking Plaintiffs' expert, Mr. Gill. *See* Doc. 192 at 8-10. The court disagrees. For the reasons stated below, the court overrules this objection.

On March 8, 2021, Plaintiffs filed their expert disclosures under Federal Rule of Civil Procedure 26(a)(2) (Doc. 150). Plaintiffs listed Robert "Bob" Gill, currently a practicing attorney in Fort Worth, Tarrant County, Texas, as a retained expert, and his report purports to address the unreasonableness of the Named Defendants' actions on March 27, 2019. *Id.* In their response to the Motion, Plaintiffs attach a declaration by Mr. Gill. Doc. 183, Exhibit 9. Named Defendants object and move to strike Mr. Gill and his declaration as inadmissible under Rule 702 of the Federal Rules of Evidence. Doc. 187 at 5. The Report recommends striking Mr. Gill and his declaration after finding his opinions were unreliable under Rule 702. Doc. 188 at 10.

### a. Legal Standard for Expert Testimony

The admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" that is non-scientific in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In *Kumho Tire,* the Supreme Court resolved a split among the circuits and held that *Daubert*'s "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony.

As part of its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702, and *Daubert* and its progeny. The amendments to Federal Rule of Evidence 702, effective December 1, 2000, essentially codify *Daubert* and *Kumho Tire.* The Advisory Committee's Notes to Rule 702 state that the determination of whether an expert's opinions are reliable is based upon sufficient facts or data that calls for a "quantitative rather than qualitative analysis." In addressing this issue, the "question is whether the expert considered enough information to make the proffered opinion reliable. . . . The expert must base [his or her] opinion on at least the amount of data that a reliable methodology demands." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987). Further, in reviewing a *Daubert* challenge, the court makes no credibility determinations; it only decides whether the threshold reliability standards have been satisfied. *See* Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments).

"The court may admit proffered expert testimony only if the proponent . . . demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S & B Indus., Inc.*, No. 3:15-CV-641-D, 2017 WL 345641, at *2 (N.D. Tex.

Jan. 24, 2017) (citing *Kumho Tire Co.*, 526 U.S. at 147) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turn[] upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid. 702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

      "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted).  "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief," *Johnson*, 685 F.3d at 459 (internal quotation marks omitted); however, "there is no requirement that an expert derive his opinion from firsthand knowledge or observation." *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). "The proponent need not prove to the judge that the expert's testimony is correct, but [it] must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). On the other hand, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"[C]ourts consider the following non-exclusive list of factors when conducting the reliability inquiry: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). These factors, however, are not definitive or exhaustive. The reliability inquiry is flexible, and the district court conducting the *Daubert* analysis has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Daubert*, 509 U.S. at 593-95; *Kumho Tire Co.*, 526 U.S. at 142.

The Advisory Committee's Notes to Rule 702 contemplate that expert testimony may be based on experience, training, or both:

> Nothing in this amendment is intended to suggest that experience alone—
> or experience in conjunction with other knowledge, skill, training or education—

may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.  *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendments).

The Advisory Committee's Notes to Rule 702 further explain: "If the witness is relying solely or primarily on experience, then [he or she] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* This is because the "trial court's gatekeeping function requires more than simply taking the expert's word for it" that the claimed basis supports the opinion. *Id.* (citation and internal quotation marks omitted); *Pipitone*, 288 F.3d at 245-47 (finding expert testimony reliable when the expert explained how his experience in the field led him to opine that an absence of contamination of some samples did not undermine his conclusion that the plaintiff's infection came from the same drug). Overall, the trial court must strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. As stated earlier, the relevance and reliability of expert testimony turn upon its nature and the purpose for which its proponent offers the testimony.  *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course,

whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

> b. <u>Analysis</u>

The court does not find that Mr. Gill is qualified to offer opinions under Rule 702 on police and tactical procedures. Mr. Gill acknowledges that he has *some familiarity* with how SWAT teams operate. Some familiarity alone, however, is enough to disqualify him as an expert under Rule 702 because definitionally, having some familiarity does not meet the test under Rule 702. To qualify under Rule 702, a person has to have scientific or some otherwise specialized knowledge of the subject matter of which he or she intends to testify. *See* Fed. R. Evid. 702. Nowhere in his CV or his report does Mr. Gill state he has specialized training, skill, or knowledge in police practices, particularly in areas of SWAT operations. Moreover, the court agrees with the magistrate judge that his opinions are conclusory, and that Mr. Gill fails to support his contentions. *See Pipitone*, 288 F.3d at 245-47 (5th Cir. 2002) (finding expert testimony reliable when the expert explained how his experience in the field led him to his opinions). Accordingly, the court determines that Plaintiffs have not met their burden of showing that Mr. Gill's expert testimony is reliable under Rule 702. In light of the standard enunciated by the court for the admission of expert testimony and in light of the court's findings, Mr. Gill is not qualified to testify as to tactical procedures with respect to execution of search warrants. Further, his opinions are neither relevant nor reliable. For these reasons, the court **strikes** his purported testimony and will not consider it in ruling on the issues presented.

### B. Qualified Immunity

#### 1. Legal Standard for Qualified Immunity

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   A defendant official must affirmatively plead the defense of qualified immunity.   *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  Named Defendants asserted this defense in their motion for summary judgment.

In deciding a dispositive motion that raises the defense of qualified immunity, the Supreme Court initially set forth a mandatory two-part inquiry for determining whether a government official was entitled to qualified immunity.   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under *Saucier*, a court must determine first whether the facts alleged or shown are sufficient to make out a violation of a constitutional or federal statutory right.  If the record sets forth or establishes no violation, no further inquiry is necessary.  On the other hand, if the plaintiff sufficiently pleads or establishes that a violation could be made out, the court must determine whether the right at issue was clearly established at the time of the government official's alleged misconduct.  *Id.*  The Court relaxed this mandatory sequence in *Pearson v. Callahan*, 555 U.S. 223 (2009), and stated, "[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory," and judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.  The second prong of the test "is better understood as two separate inquiries: whether the allegedly violated constitutional right[] [was]

clearly established at the time of the incident; and if so, whether the conduct of the defendant[] [official] was objectively unreasonable in light of that then clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017*)* (quoting *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005) (internal quotation marks and citations omitted)).

Ordinarily, one who pleads an affirmative defense must establish his entitlement to such defense. In the context of qualified immunity, however, this burden varies from the norm. In this circuit, the rule is as follows:

> Where . . . [a] defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the burden to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law. We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.

*Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997) (internal quotations and citations omitted); *see also Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. at 640; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998); and *Pierce v. Smith*, 117 F.3d at 871.

In *Anderson*, 483 U.S. at 641, the Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him.

If public officials or officers of "reasonable competence could disagree [on whether the conduct is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)). Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster*, 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640. For an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Pierce v. Smith*, 117 F.3d at 882 (emphasis in original and citation omitted); and *Stefanoff v. Hays County*, 154 F.3d at 525. Stated differently, while the law does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted).

In analyzing qualified immunity claims, the Supreme Court has "repeatedly told courts … to not define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). Pursuant to *Mullenix*, courts must consider "whether the violative nature of *particular* conduct is clearly established" and must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (citations and internal quotations marks omitted).

2. <u>Analysis</u>

The court agrees with the magistrate judge's analysis in the Report regarding qualified immunity and its application to the Named Defendants, except for the analysis of the second prong of the test of qualified immunity with respect to whether Defendant Lt. Mike Lewis ("Commander") acted objectively reasonable in his efforts to identify the correct house. The record in this case contains ample evidence for a reasonable jury to conclude that Commander acted objectively unreasonable prior to the execution of the search warrant. The court first focuses on the facts relevant to Commander's efforts to identify the correct home. In support of his efforts, Commander provides the following:

> I was put in contact with Ruben Felan via Tommy Hale. Ruben is an agent with the Drug Enforcement Agency and he gave me some basic information on what they had [regarding the request for assistant in executing a search warrant at a house located at 573 8th St., Lancaster, Texas] . . . .
>
> I requested additional information from their team, including pictures of the target location, whether or not the location was fortified, whether or not it appeared to have surveillance equipment, whether or not children were present, and whether or not there were any exterior indicators on the property that children may be present.
>
> . . . .
>
> DEA agents provided me with pictures of the front of the residence, and advised me they currently had surveillance established at the location. They believed there were 4-6 adult males currently occupying the target location. They advised they had never seen any children coming or going from the residence during their entire investigation into the target location. They saw no fortification, no surveillance cameras, and no evidence on the exterior of the property that indicated children would be present.
>
> . . . .
>
> I was able to gather information on the target location through the Dallas Central Appraisal District website, including the square footage and year built.
>
> . . . .
>
> Agents also provided real-time intelligence that surveillance officers at the scene reported a truck pulling a white box trailer just pulled up in front of the target location and stopped.

> Agents provided me with a copy of their search warrant and I confirmed the details of the warrant including the address of the target location and that it included the outbuilding. The warrant included a no-knock authorization by the signing judge.
>
> . . . .
>
> Upon arrival to the area, SWAT . . . made an approach toward the residence with the truck and box trailer in front of it.

Defs.' App. 0015-17. Commander states that he was provided photographs of the target location by the DEA; however, he did not include any of those particular photographs as part of the record. *See id.* The summary judgment evidence, however, includes copies of black and white photographs of the target home and Plaintiffs' residence that were taken after the execution of the search warrant. See Defs.' App. 0026-27. This is of major significance because the photograph of Plaintiffs' residence included an attachment to Plaintiffs' residence that was markedly different from the target residence, which the court discusses below, that should have been readily apparent to any reasonably competent officer.

The record further reflects that the truck pulling a white box trailer was parked in front of 583 8th Street. Defs.' App. 0002. Based upon information provided by the DEA, the SWAT Team began approaching the home. *Id.* On approach, Commander noticed that the residence did not appear to be the one in the photographs provided by the DEA, and he then directed his team to the house located to the left of them—Plaintiffs' residence located at 593 8th Street. *Id.* at 0018. Shortly after SWAT Team members entered Plaintiffs' residence, "SWAT Team officers began yelling out, 'Wrong house!'" *Id.* at 0002. The SWAT Team thereafter left Plaintiffs' residence and proceeded to the correct target location—573 8th Street. *Id.* Instructive to the court's analysis are the Fifth Circuit's reasoning in *Rogers v. Hooper*, 271 F. App'x 431 (5th Cir. 2008) (unpublished table decision), and the Eleventh Circuit's analysis in *Hartsfield v. Lemacks,* 50 F.3d 950 (11th Cir. 1995), which was relied on by the Fifth Circuit in *Rogers*.

In *Rogers*, the Fifth Circuit affirmed the lower court's entry of summary judgment based on qualified immunity after finding the actions of two officers, who guided the team serving a warrant on a wrong location, to be "consistent with a reasonable effort to ascertain and identify the place intended to be searched." *Rogers*, 271 F. App'x at 435 (quoting *Maryland v. Garrison*, 480 U.S. 79, 87 (1987) (internal quotations omitted). The officers performed various actions prior to executing the warrant during the night: obtained the search warrant; drove by the target house; and identified a vehicle parked in front of the target residence to serve as a cue to the officers. *Id*. Despite these precautions, the wrong residence was entered into before the officer could inform the team they were at the wrong location. *Id.* at 432. This court agrees that the officers in *Rogers* were entitled to qualified immunity because their pre-execution efforts were reasonable. The court cannot say the same for Commander, as his efforts and lack of alertness do not rise to the level of the two officers in *Rogers*.

The Eleventh Circuit in *Hartsfield* had a different issue. 50 F.3d 950. There, the leading officer, who obtained the search warrant, led his team to execute the warrant on the wrong residence during daylight. *Id*. at 952. The Eleventh Circuit reversed the lower court's granting of summary judgment with respect to the lead officer being entitled to qualified immunity because "he did not check to make sure that he was leading the other officers to the correct address, let alone perform any precautionary measures." The Eleventh Circuit goes on to state:

> As it is uncontroverted that the numbers on the houses are clearly marked, and that the raid took place during daylight hours, simply checking the warrant would have avoided the mistaken entry. Moreover, evidence before the court showed that the houses were located on different parts of the street, separated by at least one other residence, and that their appearances were distinguishable.

> Because [the commanding officer] did nothing to make sure that he was leading the other officers to the correct residence, we conclude that the district court erred in holding that he was protected by qualified immunity.

*Id.* at 955.

Here, Commander took more precautionary measures than the defendant in *Hartsfield,* but he did not take the same level of competent measures outlined in *Rogers.* The undisputed evidence before the court reveals the SWAT Team was approaching 583 8th Street—the wrong address—when Commander directed them to 593 8th Street—*also the wrong address.* Prior to directing officers to the wrong home, Commander (1) reviewed the search warrant; (2) conducted additional searches on the target residence through the Dallas Central Appraisal District website; (3) ran a computerized criminal history search of the occupant of the target residence; (4) debriefed with DEA agents twice; (5) was provided with "real-time intelligence that surveillance officers at the scene reported a truck pulling a white box trailer just pulled up in front of the target location and stopped;" and (6) observed the home and took note of the front windows, driveway, and the numbers on the front of the home in an attempt to confirm the residence as being the target location. Defs.' App. at 0015-24. The court finds that while Commander took some precautionary measures to lead the SWAT team to the correct house, such measures were not sufficient to be "consistent with [] reasonable effort[s] to ascertain and identify the place intended to be searched." *Rogers*, 271 F. App'x at 435.

First, the undisputed evidence before the court reveals the search warrant noted that "the numbers '573' [were] painted on the curb directly in front of the [target] residence and [also] affixed to a wooden post that supports the front porch." Defs.' App. 0011. Simply checking the warrant and looking down at the curb would have avoided Commander's mistaken order to enter the wrong house. Second, the search warrant further noted that the target residence "is the

thirteenth residence west from Elm Street." *Id.* at 0010. Commander, prior to the execution of the warrant, also had the option to count the houses as he and his team proceeded down 8th Street. The record does not reveal that Commander took any of these precautionary measures.

Third, while there are a few similarities between the target house and Plaintiffs' residence, the undisputed evidence shows a glaring difference between Plaintiffs' residence and the target location. Most notable is the uncontroverted evidence that Plaintiffs' residence had two wheelchair ramps in front of it, complete with handrails, and the target location did not. *See* Doc. at 175; *and compare* Defs.' App. 0027 *with* Defs.' App. 0026.  This handicap structure had ramps projecting from the front door of the house towards the sidewalk in the front and to the side towards the driveway. Defs.' App. 00027. Commander does not address, or even mention in passing, that Plaintiffs' residence had a protruding handicap ramp when he observed the home before directing his team to execute the search warrant on it. To breach the front door of Plaintiffs' house, the entry team necessarily had to navigate those ramps, and Commander, who remained outside of the house, offers no explanation why he did not see those ramps that his officers had to use to reach the front door of Plaintiffs' residence. The presence of the ramps should have been a "dead giveaway" that Plaintiffs' house was not the target location. Even assuming this difference was less noticeable at night, "because the search was to occur at night, the chance for a mistake was greater and the need for precautions proportionately were increased." *Rogers*, 271 F. App'x at 435. Additionally, the target residence and Plaintiffs' residence were separated by one other residence, which the SWAT team first approached before being directed away by Commander. *Id.* at 0002.

Despite Commander's efforts, the record does not reveal he performed the most basic precaution prior to executing the search warrant: driving by the target location or having a person under his command do so. Nothing is in the record that a drive-by was impossible or would

**Memorandum Opinion and Order – Page 20**

jeopardize officer safety. The court, for all of these reasons, determines there is a genuine dispute of material fact regarding whether Commander made the necessary reasonable effort to identify the correct residence and whether his actions were "[in]consistent with a reasonable effort to ascertain and identify the place intended to be searched." *Garrison*, 480 U.S. at 88. A jury could return a verdict in Commander's favor; however, this is a classic dispute regarding a material fact that should proceed to the jury for final determination. A jury, *not this court*, should determine whether Commander was plainly incompetent.

So that there is no misapprehension of the court's ruling, this is not a situation in which the court is applying 20/20 hindsight to a situation that went awry or second-guessing what Commander did or failed to do prior to the execution of the warrant. The court's focus is on what steps a reasonable police officer in his position should have done prior to the execution of the search on Plaintiffs' residence. The court has included a number of things that Commander easily could have reasonably done or noticed. He was the person in charge of the tactical operation, and "the buck stopped" with him. The failure to observe and follow some basic and fundamental steps regarding police procedure was a recipe for disaster. The pre-planning did not involve a tense, fast-moving, or a set of quickly-unfolding facts or circumstances. As stated before, this case presents a situation for the jury to decide whether Commander was plainly incompetent in the execution of the search warrant that resulted in an unconstitutional search of Plaintiffs' residence.

### C. Discovery Requests

Plaintiffs also contend that they were denied opportunities to conduct discovery except for the deposition of WPD Chief Goolsby, and the denial hampered their ability to respond to the Motion and further prevents them from identifying more John Does. *See* Doc. 192 at 2; Doc. 190. After the Motion was filed, Plaintiffs filed a motion for discovery (Doc. 170) seeking permission

to serve specific interrogatories and requests for production, which sought the production of certain documents and recordings, upon the Named Defendants in their individual capacities to assist their response to the Motion. Named Defendants argue in their response that Plaintiffs have "obtained documents in this case by sending multiple Open Records Requests to the City of Waxahachie." Doc. 174 at 2. They further argue that the discovery sought is not narrowly tailored to the issue of qualified immunity. *Id.* The magistrate judge held a hearing on July 27, 2021, to discuss the pending motion and ultimately denied Plaintiffs' requested discovery relief but allowed the deposition of Chief Goolsby. *See* Doc. 177.

After reviewing the record, the court determines that Plaintiffs were allowed to depose Chief Goolsby and that they failed to identify what additional documents or information they could not have obtained or requested from Chief Goolsby or other public sources. Additionally, the court finds that the specific discovery sought to be served upon Named Defendants by Plaintiffs were not narrowly tailored to the issue of qualified immunity. Moreover, Plaintiffs did not appeal or file any objections within 14 days of the the magistrate's ruling regarding their efforts to seek additional discovery to this court. *See* Fed. R. Civ. P. 72. Plaintiffs have therefore waived these objections. Accordingly, to the extent Plaintiffs raised an objection regarding their previous attempts to obtain additional discovery, the court **overrules** such objection.

### III. Conclusion

Having considered the pleadings, Report, Objection, file, and record in this case, and having conducted a de novo review of that portion of the Report to which objection was made, the court, for the reasons explained, determines that the magistrate judge's findings and conclusions in Sec. II and IV.A., are correct, and **accepts** them as those of the court. Accordingly, the court **overrules** Named Defendants' objection to Plaintiffs' response, brief, and exhibits as non-

compliant with the Local Rules; **overrules as moot** Defendants' objection to Plaintiffs' use of pleadings to serve as summary judgment evidence; **grants** Named Defendants' motion to exclude and strike Plaintiffs' expert testimony; and **grants** Named Defendants' Motion for Summary Judgment (Doc. 167) as to Plaintiffs' claims against Brent Dunn, O.T. Glidewell, James Lewis, James Taylor, and Derek Behringer, and **dismisses with prejudice** the Fourth Amendment violations against them. The court also **denies as moot** Named Defendants' Motion for Summary Judgment (Doc. 167) on any Fourteenth Amendment violation because Fourteenth Amendment claims cannot be made when a person is seized or detained.

The court further determines that the magistrate judge's findings and conclusions in Sec. IV.B. are correct as they relate to Andrew Gonzales, Derrick Young, Brian Fuller, Dustin Koch, and Stephen Sanders; and **accepts** them as those of the court. Accordingly, the court **grants** Named Defendants' Motion for Summary Judgment (Doc. 167) as to Plaintiffs' claims against Andrew Gonzales, Derrick Young, Brian Fuller, Dustin Koch, and Stephen Sanders and **dismisses with prejudice** the Fourth Amendment violations against them.

The court **rejects** the magistrate judge's findings and conclusions in Sec. IV.B. relating to Defendant Lt. Mike Lewis. Accordingly, the court **denies** Named Defendants' Motion for Summary Judgment (Doc. 167) as to Plaintiffs' claims against Defendant Lt. Mike Lewis.

Further, the court considered the magistrate judge's order on February 28, 2022, requiring Plaintiffs to provide proof that they have served the John Does by March 14, 2022, or show cause in writing why service cannot be made on them (Doc. 189); Plaintiffs' Objection stating additional discovery is needed to identify the John Does (Doc. 190); and Named Defendants' Response to Plaintiffs' Objection (Doc. 191). After careful review, the court finds that Plaintiffs failed to show good cause why the John Does cannot be identified and why service cannot then be made on them.

Accordingly, pursuant to Federal Rule of Civil Procedure 4(m), the court **dismisses without prejudice** Plaintiffs' claims against the remaining John Doe Defendants, which the court shows to be John Does 1-9.[2] The only claim that remains for trial or other resolution is Plaintiffs' claim for a Fourth Amendment violation against Defendant Lt. Mike Lewis.

**It is so ordered** this 31st day of March, 2022.

Sam A. Lindsay
United States District Judge

---

[2] The court previously dismissed with prejudice Plaintiffs' claims against John Does 10-20 in its order dated April 21, 2021 (Doc. 160).

**Memorandum Opinion and Order – Page 24**